E-FILED
Wednesday, 31 March, 2021  09:59:49 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| ELIZABETH TIMMERMAN LUGG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 18-cv-1412-JES-JEH |
| | ) | |
| LENFORD SUTTON, individually, and in | ) | |
| His capacity as Chair, Department of | ) | |
| Educational Administration and Foundations | ) | |
| at Illinois State University; BOARD OF | ) | |
| TRUSTEES OF ILLINOIS STATE | ) | |
| UNIVERSITY, an Agency of the State of | ) | |
| Illinois; Robert Churney, Robert Dobski, | ) | |
| Rocco Donahue, Julie Annette Jones, Mary | ) | |
| Ann Louderback, John Rauschenberger, | ) | |
| Sharon Rossmark, and Sarah Aguilar, | ) | |
| Student Trustee, in Their Capacity as the | ) | |
| Board of Trustees of Illinois State University | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

**Page**

**I.  INTRODUCTION**
......................................................................................................................................
3

**II.  RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS**
......................................................................................................................................
8

       **A.  Undisputed Material Facts**
......................................................................................................................................
10

       **B.  Material Facts Claimed To Be Disputed**.
......................................................................................................................................
11

C. **Disputed Immaterial Facts**.
...................................................................................................................................
64

D. **Undisputed Immaterial Facts**
...................................................................................................................................
65

E. **Additional Material Facts**.
...................................................................................................................................
66

III. **ARGUMENT**
...................................................................................................................................
79

A. **Summary Judgment Standards**
...................................................................................................................................
79

B. **This Court Previously Rejected Defendants' Argument That Lugg's Ethics Act Retaliation Claim Against Sutton in His Official Capacity Should Be Dismissed**
...................................................................................................................................
80

C. **Lugg's Retaliation Claims in Counts I, II, and IV Against Sutton and ISU**
...................................................................................................................................
80

D. **Plaintiff's Title VII Gender Discrimination Claim**
...................................................................................................................................
100

**CONCLUSION**
...................................................................................................................................
102

**CERTIFICATE OF SERVICE**
...................................................................................................................................
103

Pursuant to F.R.C.P. 56 and Local Rule 7.1, Plaintiff, Elizabeth Timmerman Lugg, by and through her attorneys, Katz Nowinski P.C., states as follows for her Response to Defendants' Motion for Summary Judgment:

<u>**INTRODUCTION**</u>

Defendants appear to have lost sight of which party is the plaintiff in this case and what the issues in plaintiff's case are, and in the process completely subvert the summary judgment standard of review by asking this court to view virtually every single fact favorably to them. Their motion is a shameless presentation of Dr. Lenford Sutton's side of this story, with no recognition of Dr. Elizabeth (Betsy) Lugg's voluminous evidence in this record precluding summary judgment.

The aggrieved party plaintiff in this case is Dr. Lugg, not Dr. Sutton. The issues are retaliation based on Dr. Lugg providing evidence in a Title IX Complaint brought by a student against Dr. Sutton, retaliation following numerous complaints filed with ISU's Office of Equal Opportunity, Ethics and Access ("O.E.O.E.A."), retaliation following numerous Charges of Discrimination filed with the Illinois Department of Human Rights, and gender discrimination.

The short version of plaintiff's side of the story is that Lenford Sutton, a man who would later directly threaten plaintiff (and the other female professor in EAF who dared to bring a claim against Dr. Sutton) with the words "If you mess with me, you're going to get it back -- you're going to feel it," had a documented and admitted pattern of immediately and repeatedly retaliating against plaintiff virtually every time he perceived that she had been a whistleblower or exercised her rights to bring a claim against him or be a witness in a claim against him.

In summary, as alleged in paragraphs 8-9 of the Complaint: "[On] April 8, 2015, a Ph.D. student, B.G. [███████████] filed a Title IX complaint against Sutton ....  Thereafter on April 17, 2015 Lugg provided corroborating evidence in support of the Title IX complaint of gender discrimination in support of Ph.D. candidate's Title IX discrimination complaint." Plaintiff then alleges that Dr. Sutton began a campaign of retaliation against her on the basis of her whistleblowing in violation of the Whistle Blower Protection" provisions of the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/5 *et. seq*., as well as retaliation based on being a witness in [███████] complaint and retaliation based on bringing numerous Charges of Discrimination with the Illinois Department of Human Rights.

Specifically, within days of providing corroborating evidence, Dr. Sutton asked for the syllabus for one of Dr. Lugg's courses, and within approximately one week had taken away that class.  See Elizabeth Lugg Deposition, 257:16 – 258:3:

> ... [███████] had filed the complaint on the 8th of April 2015; that one week later on the 15th of April 2015 during a faculty meeting, Dr. Sutton referenced that complaint to the faculty at length; that on April 17th, 2015, I provided my testimony and then I believe it was three days -- a week later, Dr. Sutton started in with requests such as -- at that date requesting my syllabus on 521.

See also *id*., 413:5-10:

> A. ... if you look at the timeline of April 8th, the complaint is filed, April 15th Lenford talks about it in some great detail, April 17th, I give testimony and April 21st, all of a sudden now my syllabi is being scrutinized and a class is being taken away from me.

While temporal proximity alone rarely is sufficient to prove a causal connection, (and plaintiff certainly has more than just timing to support her claims), the timing in this case is so damning as to rise to this level.  It is undisputed that whether he knew with absolute certainty that plaintiff was a witness to [███████] complaint, Dr. Sutton admitted in his deposition that he "believed" that she was in April, 2015. See Lenford Sutton Dep 123:14 – 123:20:

Q. Is it your testimony that you believed Dr. Lugg was serving as a witness back in April, but you did not know that she was serving as a witness until well after the filing?

A. That's my -- yes.

Q. That is correct?

A. Yes.

And without question, Dr. Sutton knew for a fact that this formal complaint had been

brought against him by June 11, 2015 because he admits receiving the e-mail sent at 11:00 a.m.

on June 11, 2015 from M. Shane McCreery, ISU's Ethics Officer and Title IX Coordinator at

that time, to Dr. Sutton stating in part:

This letter is to inform you that the Office of Equal Opportunity, Ethics, and Access (OEOEA) has received a complaint filed by ████████ ████████ alleging that you violated the University's Anti-Harassment and Non-discrimination Policy by discriminating against her on the basis of her color and sex. (See Ex. 3, Sutton Exhibit 25)

Within **2 hours** of receiving formal notice, Dr. Sutton sent an e-mail to plaintiff at 12:58

informing her that there would be "no expenditures for the policy and law online journal for next

year." (See Ex. 4, Sutton Dep. Ex. 8.) As Dr. Sutton admitted:

Q. So whereas previously you had budgeted -- reduced the budget from four to two journals, now on June 11th you are reducing it completely?

A. Yes.

Q. Okay. And would you agree this is just under two hours after you were e-mailed that ████████ had filed the OEOEA complaint?

A. I guess, yes. (Sutton Dep., 88:15 – 90:22.)

Remember, this is not the typical employment case because we are dealing with tenured professors, and Dr. Sutton, however much he obviously wanted to, could not unilaterally terminate plaintiff.  But what he could do, and what he did, was take away one source of income after another, and continue doing it for the next 6 years!  And the fact that he took away her journals, a source of $6000 annual income, within 2 hours of receiving formal notice of a complaint to which he admits he believed Dr. Lugg to be a witness, is precisely the temporal proximity which can show causality.

But as will be supported herein, plaintiff has much more than just timing to support her case.  Again, Dr. Sutton directly threatened plaintiff: "If you mess with me, you're going to get it back -- you're going to feel it."  He brought his own claim against plaintiff on March 31, 2016, in which he referred to Ms. ████████ as plaintiff's (as well as Dr. Diane Dean's) "student-surrogate" and "minion," and whom he completely falsely accused of being "employed by Lugg" to file complaints against him.  And for all of his excuses and after-the-fact justifications manufactured in his Affidavit, the truth is that, time after time, the only professors who did "feel it" were Dr. Lugg and Dr. Dean, the only two to bring claims against him and the two he believed (falsely) to be behind the student complaint against him.  As Diane Dean summarized in her deposition at 147:16 – 148:21:

> A. Retaliation. When people get widely different amounts of resources; when e-mails to the department chair go unanswered; when my requests for -- I need to have them sign off on something and he refuses to sign my documents; when -- just the general hostility within the department; when I stopped getting all summer teaching employment and my courses started to be given to adjunct faculty; what -- steady string of negative performance appraisals; being penalized or chastised for making some kind of mistake that another faculty -- not -- but no comment on that, gets -- gets -- there's no problem; allowing faculty to treat me disrespectfully and hostilely in meetings, without fulfilling his role as department chair. Having things like fake -- fake grievance hearing -- having -- what do you call -- like a mock grievance committee -- grievance hearing within the department. He sometimes has invented his own ways -- his own use of policy within the department, using committees for what they're not intended to be used or not using ones

for what they're intended to be used; making it very difficult for some students -- some of my dissertation advisees to progress normally through the program. Do you want me to go on? I mean, that -- those kind of things.

See also *id.*, 148:22 – 149:12:

Q. Have you had -- has Betsy -- has Professor Lugg told you that she shares any of these concerns with you, that she feels that they -- she experienced the same thing?

A. I'm aware of the things that happened with a few dissertation committees because I'm on those committees, so I'm aware of that. I'm aware that the law journal was taken away from her. I'm aware of that.

Q. Okay. So she spoke with you about that?

A. I'm aware that she also stopped receiving summer employment and that courses she would normally teach were assigned to adjunct faculty instead.

150:9 – 151:5:

Q. Okay. Did she ever speak to you about her courses being reassigned to faculty with insufficient knowledge of the subject matter?

A. Yes.

Q. And what did she say?

A. Well, I'm aware that her -- just as some of my -- my summer teaching was reassigned to adjunct faculty with lesser qualifications than me in the subject area, hers was as well.

Q. Are you aware that this is a trend nationwide, that courses are being reassigned to adjunct faculty throughout universities across the country?

A. I am aware of that, but I am aware that within the EAF department, it's really only Betsy Lugg and I that that applies to, other than faculty who normally never want summer teaching.

Q. Okay.

A. I'm aware that other faculty gets full loads in the summer.

What defendants attempt to do in their motion is parse out each individual claim of

damage (for example, each individual class – EAF 512, 436, etc. -- taken away for each

semester, her summer classes taken away, her independent studies taken away, her journals taken

away) and then justify or rationalize those decisions based on some alleged business reason (or

merely Dr. Sutton's discretion), but employment law does not work this way.  This Court must

view the totality of these circumstances, and do so favorably to plaintiff' version, not

defendants', and that view must preclude summary judgment.

## II. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

At the outset, plaintiff must object to Defendants' Statement of Undisputed Facts to the

extent that, with very few exceptions, it relies almost entirely on the 68 paragraph Affidavit of

Defendant Lenford Sutton (Def. Ex. 3). While dealing with Northern District, not Central

District, Local Rules, *Bhd. of Maint. of Way Emps. Div./IBT v. Norfolk S. Ry. Co.*, No. 10 C

7425, 2012 WL 4461690, at *1 (N.D. Ill. Sept. 25, 2012), aff'd, 745 F.3d 808 (7th Cir. 2014) is

instructive:

> The undisputed material facts submitted by the union are all supported solely by
> the Affidavit of Steven V. Powers, an Assistant to the President of the union.[1] Although
> Powers' affidavit states that he supervises all matters that appear before RLA arbitration
> boards, he fails to present any facts that show that he has personal knowledge of each of
> the hearings he is testifying regarding as required by Federal Rule of Civil Procedure
> 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made
> on personal knowledge, set out facts that would be admissible in evidence, and show that
> the affiant or declarant is competent to testify on the matters stated."). *See Judson
> Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec,* 529 F.3d 371, 382 (7th Cir.2008)
> ("The evidence supporting a factual assertion must represent admissible evidence.").
> Such testimony by Powers would be based on inadmissible hearsay in violation of
> Federal Rules of Evidence 801 and 802 or would violate Federal Rule of Evidence
> 1002. *See Id.* Furthermore, the factual assertions made by the union in paragraphs 3, 8
> and 17 are not relevant to any of the claims or defenses of the parties in this case. The
> statements of fact contained in paragraphs 20, 21, 22, 23 and 24 constitute statements of
> opinion and arguments, not statements of fact, contrary to Local Rule
> 56(a)(3). *See Judson Atkinson Candies, Inc.,* 529 F.3d at 382 n. 2 ("It is inappropriate to

make legal arguments in a Rule 56.1 statement of facts. We have held that a district court has broad discretion to require strict compliance with Local Rule 56.1.") (internal citations omitted); *Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir.2006) (a party's statement of material facts submitted pursuant to Local Rule 56.1 is improper where it fails to cite to the record and is "filled with irrelevant information, legal arguments, and conjecture."). The purpose of Local Rule 56.1 statements of facts is to identify the relevant admissible evidence supporting the material facts that each party contends require either the granting or the denial of summary judgment. *See Markham v. White,* 172 F.3d 486, 490 (7th Cir.1999) (the local rules governing summary judgment "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence.").

Dr. Sutton's Affidavit is replete with references based on hearsay and pure conclusions. See, for example, the following from paragraphs 16-20:

- Based on the statements during my interview … I understood that prior to my hire, there were issues within EAF related to leadership, lack of structure, and interpersonal issues amongst its faculty.

- Based on statements made by faculty members after I was hired, I understood that there was significant interpersonal conflict between Lugg and many of her colleagues.

- I further understood that faculty members believed that Lugg would bully and attack faculty members …

- I also understood that faculty members believed that Lugg allowed students to take independent studies with her …

A purported Statement Undisputed Material Facts should be based on a fair marshalling of the record evidence, not merely one defendant's version from a manufactured Affidavit of his conclusory view of the "facts" which favor him.  Without waiving this objection, plaintiff responds as follows:

9

### A.  <u>Undisputed Material Facts</u>.

Plaintiff admits the following facts from defendants' "Undisputed Material Facts."

1.-5.

7.-9.

11.-13

15.

18.-19.

34.

42.-51.

56.-62.

65.-67.

69.-71.

73.-75.

80.-83.

85.

87.

90.

93.-94.

98.-100.

106.-107.

109.-111.

122.

124.-131.

134.-135.

137.-142.

145.-150.

152.-154.

161.-164.

168.-169.

174.-178.

180.-182.

187.

194.

201.-202.

204.

### B.  Material Facts Claimed To Be Disputed.

6. One of the key duties for EAF faculty is to sit on comprehensive examination and dissertation committees for doctoral students who have completed their coursework. (Exhibit 3, Sutton Aff. at ¶ 13)

**RESPONSE**: Denies.  Sitting on doctoral committees and chairing doctoral dissertations is one of numerous activities that are considered teaching under the policies of Illinois State University – no more or less "key" than any of the other duties.  Such duties can be found in university Appoint, Salary, Promotion, and Tenure ("ASPT") documents.  (Exhibit 1, Lugg Aff. at ¶ 3.)

10.  Lugg is a member of the P-12 staff for the master's and doctorate students and often teaches law-related classes. (Exhibit 4, Lugg Dep. Tr. at pp. 65:13-65:22)

**RESPONSE**:  Denies. Plaintiff does not "often" teach law related classes.  She is the <u>only</u> professor who was hired to teach law classes.  Plaintiff was also hired to teach personnel administration and collective bargaining.  Plaintiff also often taught policy analysis and legal research as well as undergraduate foundations courses and capstone courses in the masters program. (Exhibit 1, Lugg Aff. at ¶ 4.)

14.  Each EAF faculty member is entitled to teach two courses each fall and two courses each spring semester, which constitutes a full load. (Ex. 1, Sutton Dep. Tr. at 143:13-143:17)

**RESPONSE**:  Denies.  EAF faculty members are not "entitled" to teach two courses each fall and two courses each spring semester; they are "required" to teach 3 courses per semester but one is waived because of their work on dissertations.  If faculty members are not chairing enough dissertations then they are to teach three courses.  They are "entitled" to teach in the summer if the courses they teach are offered.  (Exhibit 1, Lugg Aff. at ¶ 5.)

> See also Exhibit 2, Excerpts from Deposition of Elizabeth Lugg, 197:13-25:
>
> A. This will be my answer for every time you ask if I felt entitled: I believe as a faculty member who was hired to teach certain classes or classes in certain areas, when classes in those areas become available that I should be assigned to teach them, including summer and including overload. That has been the past practice for two decades and if you want to call that an entitlement, then yes, I am entitled, as is the statistician entitled to each stat classes that need to be covered and the higher ed. finance professor who was hired to do that is entitled to the higher ed. finance classes if they become available and so on and so forth.

16. EAF faculty members are not entitled to teach during the summer semester. (Exhibit 3, Sutton Aff. at ¶ 9)

**RESPONSE**:  Denies.  See response to 14.  Prior to Dr. Sutton, faculty were asked (1) if they wanted to teach in the summer and (2) how many courses they wanted to teach.  There were some faculty that did not want to teach in the summer (i.e. Linda Lyman) and others that wanted to teach three courses.  Faculty were assigned courses according to their response on the survey.

(Exhibit 1, Lugg Aff. at ¶ 6.)  See also Ex. 2, Lugg Depp., 80:6-13:

>       A. I believe that everyone according to that human resources document is entitled, not just me, but everyone is entitled to be provided summer teaching when available.

>       Q. Okay. And that document, which we're going to find, is the sole basis of your opinion, correct?

>       A. And past practice and rationality. Those are the three bases for my opinion.


17. Summer courses are offered and assigned by the EAF Chair based on student needs. (Exhibit 3, Sutton Aff. at ¶ 10)

**RESPONSE**:  Denies. See responses to ¶¶'s 14 and 16.  There is no way to know why the chair

assigns summer teaching.  Evidence suggests it is for reasons other than student need.  When

plaintiff told Dr. Sutton that EAF 578 was not needed in the summer because it had just been

taught in the spring, but 512 was needed, one would think he would schedule 512 if this

statement in ¶ 17 were true.  He did not and 578 did not fill so was not offered.  Neither was 512.

(Exhibit 1, Lugg Aff. at ¶ 7.)


20. Based on statements made to him during his interview for the Chair position in Spring of 2014, and based on what he learned immediately upon starting as Chair, Sutton understood that prior to his hire, there were issues within EAF related to leadership, lack of structure and interpersonal issues among its faculty. (Exhibit 3, Sutton Aff. at ¶ 16)

**RESPONSE**:  Denies.  See general objection based on hearsay above.  Further responding,

plaintiff was in only one meeting – a lunch meeting – while Dr. Sutton was on campus

interviewing.  No such topics were discussed at the lunch meeting.  In fact, Dr. Sutton spent most

of lunch playing with his phone.  When faculty finally became exasperated and asked if he had

any questions, his only question was whether there were good gyms in the area because he had to

keep "these" (meaning his biceps which he flexed) in good shape.  Several of us were shocked

with his behavior; concluded he must have been told he was going to be hired and so was just

going through the motions. (Exhibit 1, Lugg Aff. at ¶ 8.)


21. Based on statements made to him during his interview for the Chair position in Spring of 2014, Sutton also understood that there was conflict in EAF and that students were sometimes aware of or even participants in conflict between faculty members. (Exhibit 3, Sutton Aff. at ¶ 14)

**RESPONSE**:  Denies.  See general objection based on hearsay above.


22. Once he began as Chair in July 2014, Sutton met with EAF faculty members to get a sense of how the department had functioned in the past and to plan for the future of EAF. (Exhibit 3, Sutton Aff. at ¶ 15)

**RESPONSE**:  Denies.  Plaintiff did not meet with him.  (Exhibit 1, Lugg Aff. at ¶ 9.)


23. Sutton also reviewed EAF's budget and financial documents so that he could get an understanding of how money was being spent, whether he could make any cuts to unnecessary expenses, and how to budget and grant funding requests going forward. (Exhibit 3, Sutton Aff. at ¶ 15; Exhibit 6)

**RESPONSE**:  Denies.  To the extent that defendants are implying that Dr. Sutton made any

particular future decision regarding plaintiff based on budgetary reasons rather than retaliatory or

discriminatory reasons, the record belies this implication.  Perhaps most damningly and

obviously, at 11:00 a.m. on June 11, 2015 M. Shane McCreery, ISU's Ethics Officer and Title IX

Coordinator at that time, sent an e-mail to Dr. Sutton providing formal notice of the complaint

filed against him by a student, stating in part that:

> This letter is to inform you that the Office of Equal Opportunity, Ethics, and Access (OEOEA) has received a complaint filed by ▮▮▮▮▮ ▮▮▮▮▮▮ alleging that you violated the University's Anti-Harassment and Non-discrimination Policy by discriminating against her on the basis of her color and sex.  (See Ex. 3, Sutton Exhibit 25)

Within 2 hours of receiving formal notice, Dr. Sutton sent an e-mail to plaintiff at 12:58 p.m.

informing her that there would be "no expenditures for the policy and law online journal for next

year." (See Ex. 4, Sutton Dep. Ex. 8.)  See also Exhibit 5, Excerpts from Deposition of Lenford

Sutton, 88:15 – 90:22:

> Q.  I will direct your attention, then, to Sutton Exhibit 25. This was the notice you received June 11 at eleven o'clock in the morning from Mr. McCreery at OEOEA indicating that ███████████ had filed a formal complaint against you, correct?
>
> A. No, this says Tony Walesby.
>
> Q. No, if you look in the middle of the first page from McCreery, Michael sent, Thursday, June 11, 2015.
>
> A. I see it, yes, uh-huh.
>
> Q. All right. So you were aware at eleven o'clock in the morning on June 11th that the complaint had been filed by ███████ correct?
>
> A. I received this e-mail at that time, yes.
>
> Q. Okay. And then I will direct your attention to Sutton Exhibit 8. Do you recognize Exhibit 8?
>
> A. Let me pull it up. Yes, I do.
>
> Q. And tell me what Exhibit 8 is?
>
> A. It's me telling your client that there will be no expenditures for the Policy and Law Online Journal for next year.
>
> Q. So on June 11th, 2015, at 12:58 p.m., you are sending Betsy an e-mail basically canceling the Policy and Law Online Journal for the 2016 fiscal year, correct?
>
> MS. KHETARPAL: Objection; misstates what is said in the document.
>
> MR. DOAK: Well, let me just break it down then.
>
> BY MR. DOAK: Q. You informed Dr. Lugg on June 11th, 2015, by e-mail sent at 12:58 p.m. with the subject line of Illinois Policy and Law Journal for FY 16, correct?
>
> A. Yes.

Q. And does FY 16 stand for fiscal year 16?

A. Yes.

Q. And is that encompassing the 2015-2016 school year?

A. June 11th, yes.

Q. Okay. And in this e-mail you are indicating that there will be no expenditures for the policy and law online journal for that fiscal year 16?

A. That is correct.

Q. So whereas previously you had budgeted -- reduced the budget from four to two journals, now on June 11th you are reducing it completely?

A. Yes.

Q. Okay. And would you agree this is just under two hours after you were e-mailed that ███████████ had filed the OEOEA complaint?

A. I guess, yes.

Additionally, within a week if not days of plaintiff providing testimony in support of ████████

claim, Dr. Sutton took away a class from plaintiff.  See Exhibit 2, Excerpts from Deposition of

Elizabeth Lugg, 257:16 – 258:3:

… definitely by 9/17/15, Dr. Sutton, by his own words, said that he had been given information by Shane McCreery. I had already in those documents when I looked back at them, had felt that he knew contemporaneously because of four items. One, that ███████ had filed the complaint on the 8th of April 2015; that one week later on the 15th of April 2015 during a faculty meeting, Dr. Sutton referenced that complaint to the faculty at length; that on April 17th, 2015, I provided my testimony and then I believe it was three days -- a week later, Dr. Sutton started in with requests such as -- at that date requesting my syllabus on 521.

See also *id.*, 413:5-10:

A.  … if you look at the timeline of April 8th, the complaint is filed, April 15th Lenford talks about it in some great detail, April 17th, I give testimony and April 21st, all of a sudden now my syllabi is being scrutinized and a class is being taken away from me.

16

See also *id.*, 227:22 – 228:10:

> Q. What did this change in curriculum have to do with ████████
> complaint?
>
> A. It's retaliation. It doesn't have anything directly to do. It has to do that I
> engaged in a protected activity. Lenford Sutton then started to retaliate against me and
> one way he did it was to start to take away my teaching, belittle my expertise, and shut
> down the area that I was hired to teach. It's not a law class. We're going to hand it over
> here. It's you don't get to teach the policy. Bit by bit he was phasing me -- in retaliation,
> he was phasing me out …

Further, regardless of whether Dr. Sutton had actual knowledge that plaintiff was a

witness for ████████ it is now undisputed that he at least <u>believed</u> that she was back in April,

2015. See Ex. 5, Sutton Dep 123:14 – 123:20:

> Q. Is it your testimony that you believed Dr. Lugg was serving as a witness back
> in April, but you did not know that she was serving as a witness until well after the
> filing?
>
> A. That's my -- yes.
>
> Q. That is correct?
>
> A. Yes.

Finally, there is evidence in this record that Dr. Sutton made a direct threat of retaliation against

Lugg (and Diane Dean), stating "If you mess with me, you're going to get it back -- you're going

to feel it;" see Ex. 6, Excerpts from Deposition of Diane Dean, 102:3-20:

> Q. You said Dr. Sutton brought this up during a faculty meeting. Can you tell me
> specifically what happened during that meeting?
>
> A. My memory of that meeting is documented in a letter that I included in the
> package that I sent to you. When we got to the meeting, it was not about what we had
> been called there to discuss. The meeting was about this document that had been left in
> the hallway.
>
> Q. What else happened during that meeting?

A. Dr. Sutton was angry, crying, cussing, making threats.

Q. What threats did he make?

A. Well, he looked right at Betsy Lugg and I, and he said, If you mess with me, you're going to get it back -- you're going to feel it.  And he referred to himself as an old gangster.

24. Sutton considered this process to be best practices for a new department chair. (Exhibit 3, Sutton Aff. at ¶ 15)

**RESPONSE**:  Plaintiff objects as to what Dr. Sutton "considered" to be "best practices" as

irrelevant.  Plaintiff further denies that Dr. Sutton followed this alleged "best practice," but

instead acted out of retaliation.  See above.

25. He also undertook these efforts in order to address perceived problems within the Department. (Exhibit 3, Sutton Aff. at ¶ 15)

**RESPONSE**:  Denies.  On summary judgment, this Court must cannot take Dr. Sutton at his

conclusory word in his Affidavit, but must view the totality of the facts, favorably to plaintiff, as

to the real reason Dr. Sutton did all of the things he did, which, time after time, targeted and

affected the two professors whom Dr. Sutton believed to be "behind" the complaint brought by

███████████████  See Ex. 6, Dean dep., 147:16 – 148:21:

A. Retaliation. When people get widely different amounts of resources; when e-mails to the department chair go unanswered; when my requests for -- I need to have them sign off on something and he refuses to sign my documents; when -- just the general hostility within the department; when I stopped getting all summer teaching employment and my courses started to be given to adjunct faculty; what -- steady string of negative performance appraisals; being penalized or chastised for making some kind of mistake that another faculty -- not -- but no comment on that, gets -- gets -- there's no problem; allowing faculty to treat me disrespectfully and hostilely in meetings, without fulfilling his role as department chair. Having things like fake -- fake grievance hearing -- having -- what do you call -- like a mock grievance committee -- grievance hearing within the department. He sometimes has invented his own ways -- his own use of policy within the department, using committees for what they're not intended to be used or not using ones for what they're intended to be used; making it very difficult for some students -- some of

18

my dissertation advisees to progress normally through the program. Do you want me to go on? I mean, that -- those kind of things.

See also *id.*, 148:22 – 149:12:

> Q. Have you had -- has Betsy -- has Professor Lugg told you that she shares any of these concerns with you, that she feels that they -- she experienced the same thing?
>
> A. I'm aware of the things that happened with a few dissertation committees because I'm on those committees, so I'm aware of that. I'm aware that the law journal was taken away from her. I'm aware of that.
>
> Q. Okay. So she spoke with you about that?
>
> A. I'm aware that she also stopped receiving summer employment and that courses she would normally teach were assigned to adjunct faculty instead.

And see  *id.*, 150:9 – 151:5:

> Q. Okay. Did she ever speak to you about her courses being reassigned to faculty with insufficient knowledge of the subject matter?
>
> A. Yes.
>
> Q. And what did she say?
>
> A. Well, I'm aware that her -- just as some of my -- my summer teaching was reassigned to adjunct faculty with lesser qualifications than me in the subject area, hers was as well.
>
> Q. Are you aware that this is a trend nationwide, that courses are being reassigned to adjunct faculty throughout universities across the country?
>
> A. I am aware of that, but I am aware that within the EAF department, it's really only Betsy Lugg and I that that applies to, other than faculty who normally never want summer teaching.
>
> Q. Okay.
>
> A. I'm aware that other faculty gets full loads in the summer.

See also Ex. 2, Lugg Dep. 188:23 – 189:18:

… similarly situated individuals should be treated similarly and other faculty in the department are -- not only have I been given that for the last 20-plus years, but other people in the department currently, there are some individuals that teach four courses in the summer. There are some individuals whose salary has been doubled through overload and. So it is done routinely. And I'm not going to question that. If they're the most qualified person for whatever position or job that they were getting the additional payment for, you know, more power to them. I wish that every faculty member in our department got paid a king's ransom. But the simple fact is when all those individuals and I am similarly situated and my work is being farmed out to individuals that are either not even faculty or have lesser degrees than I do, then similarly situated individuals are not being treated similarly and it appears to be an arbitrary and capricious decision upon the Chair and perhaps discriminatory as well.

26. Based on statements made by faculty members after he was hired, Sutton understood that there was interpersonal conflict between Lugg and her colleagues. (Exhibit 3, Sutton Aff. at ¶ 17)

**RESPONSE**: Denies. See general objection based on hearsay above.

27. Based on his review of EAF's budget and financial documents, Sutton understood that Lugg had been receiving additional pay in the form of payment for editing a journal that other faculty members did not receive. (Exhibit 3, Sutton Aff. at ¶ 18)

**RESPONSE**: Denies. Plaintiff had agreed to an additional month of salary for editing and writing for the law journal. As money became tight in the mid-2000s, Trisha Klass (former chair) asked if she could break it down to 6 payments of $1000 as it helped with her budget. At that time, plaintiff was earning about $6000 per month. That was how plaintiff was being paid when Dr. Sutton arrived. At about the same time that plaintiff started being paid in installments, we also switched the law journal to an on-line journal to save publication costs. The other two journals are still in print. (Exhibit 1, Lugg Aff. at ¶ 10.)

See also response to ¶ 23 above with citations to record as to questionable timing of the ultimate act of taking away all of plaintiff's budget for her journals less than 2 hours after receiving formal notice of ████████ complaint.

28. Sutton further understood that faculty members believed that Lugg would bully and attack faculty members when they attempted to offer constructive feedback on a student's work while they were serving on comprehensive exam or dissertation committees together. (Exhibit 3, Sutton Aff. at ¶ 19)

**RESPONSE**:  Denies.  This is a false statement as plaintiff did not engage in such behavior and, to her knowledge, no faculty member ever suggested she had. (Exhibit 1, Lugg Aff. at ¶ 11.)


29. Based on statements from faculty members, Sutton also understood that faculty members avoided serving on comprehensive exam and dissertation committees with Lugg. (Exhibit 3, Sutton Aff. at ¶ 19)

**RESPONSE**:  Denies.  See general objection based on hearsay above.  Further responding, plaintiff had no difficulty forming committees. (Exhibit 1, Lugg Aff. at ¶ 12.)


30. Sutton also understood that faculty members believed that Lugg allowed students to take independent studies with her even when the independent study's topic was the same or similar to traditional coursework being offered during the same semester. (Exhibit 3, Sutton Aff. at ¶ 20)

**RESPONSE**:  Denies.  The claims made in this statement never happened.   All independent studies had to be approved by the chair even before Dr. Sutton arrived.  Such would not have been approved. (Exhibit 1, Lugg Aff. at ¶ 13.)


31. Sutton understood that previous department chairs permitted such overlap between independent studies and traditional course work. (Exhibit 3, Sutton Aff. at ¶ 20)

**RESPONSE**:  Denies.  Plaintiff never witnessed or heard of such being allowed. (Exhibit 1, Lugg Aff. at ¶ 14.)


32. Beginning in September 2014, Sutton worked with EAF faculty members to develop corporate governance rules, which included both updated and new policies for EAF. (Exhibit 3, Sutton Aff. at ¶ 21)

**RESPONSE**:  Denies.  Dr. Sutton started looking at policy but no changes in "corporate

governance rules" were enacted until July 2016 (as per his "copyright" on the policies he

drafted.)

(Exhibit 1, Lugg Aff. at ¶ 15.)


33. Some of these new policies were intended to address the concerns that faculty members
expressed to him regarding serving on committees with Lugg. (Exhibit 3, Sutton Aff. at ¶ 22)

**RESPONSE**:  Denies.  This statement is simply false; none of the policies addressed this

specifically as there was nothing to address. (Exhibit 1, Lugg Aff. at ¶ 16.)


35. In the Fall of 2015, with a majority vote by EAF faculty, Sutton transitioned EAF to a cohort
model for student enrollment. The cohort model requires that EAF students be admitted and
cycled through their predetermined courses as a group and at the same pace, as opposed to
choosing and taking classes individually and at their own pace. (Exhibit 3, Sutton Aff. at ¶ 24)

**RESPONSE**:  Denies. EAF moved to a cohort only model but it was just for higher education,

not P12 and not for masters classes in both higher education and P12.  (Exhibit 1, Lugg Aff. at ¶

17.)


36. Under the cohort model, faculty members had less control over who enrolled in their classes.
(Exhibit 3, Sutton Aff. at ¶ 25)

**RESPONSE**:  Denies.  Even though there was a set cohort model, because there were still

traditional students needing classes, there were often additional students registered for courses

and we were still advising students as to which courses to take. (Exhibit 1, Lugg Aff. at ¶ 18.)


37. Independent studies, which were approved by the Department Chair, were also approved
more judiciously by Sutton so that faculty members could not offer an independent study to
students on a subject which was already being taught to the cohort in a traditional classroom
setting. (Exhibit 3, Sutton Aff. at ¶ 23)

**RESPONSE**:  Denies.  This is not a change from prior practice other than Dr. Sutton approved independent studies for some and not others with no explanation. (Exhibit 1, Lugg Aff. at ¶ 19.) See also Ex. 6, Dean Dep. 156:13 – 157:22:

> Q.  Did she {Dr. Lugg] ever tell you that Dr. Sutton interfered with her ability to teach independent studies?
>
> A. Yes, that happened.
>
> Q. What did she tell you about that?
>
> A. Well, she didn't have to tell me, because it -- these things happened within the context of a -- departmentwide e-mails.
>
> Q. Okay. And what was your understanding of how Dr. Lugg was being limited in her independent studies?
>
> A. At some point, she was no longer assigned to teach the research methodology - - -ology course in policy analysis, which is 512.  At some point, there was -- we changed program models, so there was a period of time when students came on one type of model, class once a week, on campus, and then a cohort model.  During the bridge to that, there were not a lot of classes for the former group to take because we were being assigned to the cohort classes, so there was a lot of students seeking independence from faculty at that time. And my memory is that somehow, the impression was that Dr. Lugg and I had too many independent studies, or something like that. I am aware of when I needed -- one of my students needed an independent study, she needed to take an independent study course with Dr. Lugg. And that was an extremely difficult process to get to make that happen. It was a lot of roadblocks put in the way of that.
>
> Q. Who -- who was that student?
>
> A. ▉▉▉▉▉▉▉▉▉

See also Ex. 7, Excerpts from Deposition of ▉▉▉▉▉▉▉▉ 30:5-18:

> When I say "the entire situation," I essentially mean the time that I was at ISU and her interactions with Dr. Sutton.  Dr. Sutton restricted the classes and the coursework that both Dr. Lugg and Dr. Dean were allowed to offer and their independent studies that they were allowed to oversee.  The students that Dr. Lugg oversaw for dissertations had more resistance in their process, and then during the faculty meetings or faculty conversations, whatever you decide to call them, they, Dr. Dean and Dr. Lugg, were often pinpointed as, like, a bad guy.

38. Initially, the switch to the cohort model resulted in reduced enrollment and a decrease in offered classes. However, over the past few semesters, student enrollment has significantly increased. Correspondingly, so too has the number of offered courses. (Exhibit 3, Sutton Aff. at ¶ 26)

**RESPONSE**:  Denies.  (1) Enrollment did not drop because of the cohort model.  The cohort model was only for higher education. Enrollment dropped not because of the adoption of the cohort model, but because higher education did no admissions for one year.  The drop in enrollment was in P12, both doctoral and masters, because of changes in state law for principal and superintendent preparation.  For principals we went from over 100 students always in the type 75 program sometimes necessitating several sections of each course to 12 – 15 students total, all taking the same 2 courses each semester.  EAF stopped admitting students into the P12 doctoral program in preparation to launch the new curriculum required by the new superintendent endorsement law.  We did not launch that curriculum until 2018.  That is what caused our numbers to greatly decline – not a change to the cohort model.

(2) Courses have not greatly increased under the cohort model.  Diane Dean prepared an entire flow chart showing that moving to an all-cohort model would greatly reduce the number of courses offered per semester and thereby leaving faculty without work.  She shared this information with Dr. Sutton and the higher education faculty.

(3) The data do not show a great increase in enrollment.  Although asked numerous times, Dr. Sutton will not provide measurable data on this topic.  From the information I have been able to find, not only has enrollment not markedly increased, but data shows that of the doctoral students that can be counted, approximately 67% are unaccounted for – they have finished classwork but have not yet held a proposal hearing.  That then begs the question, have

24

they actually dropped out but we are just keeping them on the roles to inflate numbers?  No one knows because Dr. Sutton will not share the data. (Exhibit 1, Lugg Aff. at ¶ 20.)

39. In addition to the switch to the cohort model, the faculty approved an additional doctoral sequence titled "Leadership, Equity, and Inquiry," which involved increasing the number of foundations courses that were taught. (Exhibit 3, Sutton Aff. at ¶ 27)

**RESPONSE**:  Denies.  The faculty approved Foundations Faculty to bring a proposal to the faculty for a new degree – Leadership for Equity and Inquiry – and the next thing we know it was in the catalog.  No new foundations courses have been created for this degree. Only the second cohort has been formed – to whom I am teaching higher education law this semester.  In fact, because the rest of the campus training pre-service teachers no longer want to deal with our Foundations faculty, EAF 228 has been drastically reduced cutting numerous classes for Foundations to teach.  In light of the facts, this statement makes no sense.  Dr. Sutton has moved classes and scheduled Foundations classes in the summer when plaintiff used to teach.  For example, for higher education cohorts, higher education faculty placed Ed. Law in the third semester (summer) because it made pedagogical sense.  Hoff's foundations class was in the second semester (spring) because it made pedagogical sense.  Summer of 2017 (the first summer Dr. Sutton was solely responsible for scheduling) law was put in the first semester (fall) and foundations in the third (summer).  Even the students have asked why they are having law (a more advanced course) first.  Dr. Sutton's decision on scheduling and assigning classes, which he has testified is in his sole discretion, is the reason plaintiff has not taught classes in the summer. (Exhibit 1, Lugg Aff. at ¶ 21.)

See also references in response to ¶ 25 above.

41. All curriculum decisions, including the cohort model, were voted on and approved by EAF faculty. (Exhibit 3, Sutton Aff. at ¶ 29)

**RESPONSE**:  Denies.  The cohort was agreed to by higher education faculty only.  No other curricular decisions have come to the faculty as a curriculum committee as a whole. (Exhibit 1, Lugg Aff. at ¶ 22.)


52. Before 2015, EAF faculty members used the course number "EAF 512" as a catchall for courses that did not have their own course number. (Exhibit 4, Lugg Dep. Tr. at pp. 141:11-141:15; Ex. 1, Sutton Dep. Tr. at pp. 83:14-84:7)

**RESPONSE**:  Denies.  EAF 512 is a general methodology class that has been used to teach policy analysis and legal research one semester and advanced qualitative research one semester. Scheduling plaintiff to teach one iteration of 512 was a solution for the ever-increasing number of students who wished to have policy analysis/legal research as a research tool.  Prior to using 512, plaintiff had to teach all content via independent study (Exhibit 1, Lugg Aff. at ¶ 23.)


53. As of the Spring of 2015, there were about six faculty members who were using the EAF 512 course number. (Ex. 1, Sutton Dep. Tr. at pp. 83:14-84:7)

**RESPONSE**:  Denies.  EAF 512 was used to teach qualitative research (Hatt and Otto) and Policy Analysis and Legal Research (plaintiff as she was the only faculty member qualified to teach it).  Erika Hunt ("Hunt") and Lisa Hood ("Hood"), the two Academic Professional staff that currently teach the policy end of the course, did not teach the course at the time and technically should not be teaching it now as they are Academic Professional staff, not faculty. Plaintiff therefore denies that 3 is "about" 6. (Exhibit 1, Lugg Aff. at ¶ 24.)


54. Around that same time, Sutton was trying to decide which iteration of EAF 512 to insert into a new P-12 doctoral program that EAF had started called "C-PAD." (Ex. 1, Sutton Dep. Tr. at pp. 83:14-84:7; Exhibit 11)

**RESPONSE**: Denies. First, it is CPED not CPAD. Second, CPED has nothing to do with curriculum; it only changes how dissertations are written therefore EAF 512 was not involved. Also, in 2015 we were in the process of redoing the superintendent endorsement to comply with the new law. EAF 512 was not part of that reform so no change was needed. We did not start meeting on finalizing curriculum for CPED until 2018. (Exhibit 1, Lugg Aff. at ¶ 25.)

55. To help him decide which iteration to include, Sutton asked each faculty member who was teaching EAF 512 to send him their syllabus for review. (Ex. 1, Sutton Dep. Tr. at pp. 83:14-84:7, Exhibit 12)

**RESPONSE**: Denies. Dr. Sutton specifically asked Hunt and Hood to submit a proposed syllabus even though they were not teaching EAF 512 in any iteration. (Exhibit 1, Lugg Aff. at ¶ 26.)

63. Ultimately, after reviewing the syllabi and course outlines, Sutton and a designated committee decided that the iteration of 512 offered by Erika Hunt ("Hunt") and Lisa Hood ("Hood") was best for the program. (Ex. 1, Sutton Dep. Tr. at pp. 86:9-86:23) Hunt and Hood work in the Center for the Study of Education Policy at Illinois State University. Id.

**RESPONSE**: Denies. See response below. See also Ex. 2, Lugg Dep., 133:1 – 134:13:

> Q. So again, other than the fact that you were no longer teaching 512, was your employment adversely affected in any other way by your -- by the alleged scrutiny of your syllabus?

> A. My competency was called into question. You've got to remember it was Legal Research and Policy Analysis. No one else in the room -- assuming that all those people wanted to do it, none of those individuals know how to teach legal research. They've never had a class in legal research. They don't know how to do legal research. The fact that I was sitting there because I was at the meeting -- sorry I can't remember who presented -- sitting there, everyone in that room knows that I've been teaching this for years. Everyone knows that I'm the only one that can do legal research, and yet Dr. Sutton is auditioning other people for the class. There's a stigma in academia attached to that kind of behavior.

> Q. How has that affected you?

A. With my standing within my peers and that then continues out. You have read things about a claim that people don't want to sit on your committees, et cetera. Academia is a pretty -- as Dr. Sutton has said, a full contact sport. I prepared to get bloody.

Q. Did you lose any compensation other than summer courses as a result?

A. Monetary compensation, no.

Q. Any other form of compensation?

A. My reputation is compensation.

Q. Have you –

A. Because that's what you rely on in order to get things published, in order to get asked to sit on -- reputation's important and that -- it was very severely damaged.

See also *id.*, 137:8-23:

… 512 was taught by Erika Hunt and Lisa Hood, two AP staff that are paid by soft money out of the policy center, not faculty.

Q. When did the alleged scrutiny of your syllabus occur?

A. I believe that was spring of 2015. So my guess is that it would have been summer of 2015 or fall of 2015 that it would have been reassigned.

Q. How do you know that Erika Hunt and Lisa Hood had little to no knowledge of legal research?

A. Neither of them are lawyers. They have never taken a legal research class. They themselves have admitted that they don't do legal research and their current syllabus has no legal research in it.

Q. So they're not teaching legal research?

A. No.

See also *id.*, 140:4 – 141:6

Q. Why are they unqualified in your opinion?

A. Not as qualified as I am. They are not faculty. They do not know legal research. The class was law and policy research or policy analysis and legal research.

Q. What was the class?

A. Legal Research and Policy Analysis.

Q. And what did it cover?

A Legal research and policy analysis.

Q Did anybody else teach it other than you prior to spring 2015?

A No.

Q Ever?

A No.

Q. And it's your contention that it is just the ability to do legal research that distinguished you from the others?

A. My faculty status. You've got to remember when you say no one else has taught it, I've been the individual teaching law, legal research, since 1996. So it's not just my ability to do legal research. It's the fact that I'm faculty. It is the fact that I sit on the dissertations. I chair the dissertations. There are a lot of reasons. When you look at the peers available, I was the one whose qualifications matched and had been doing it successfully, according to student evaluations, for five, six years or more.

64. Sutton recalls that the course outline provided by Lugg was less detailed than all the other faculty member submissions. (Exhibit 3, Sutton Aff. at ¶ 33; Exhibit 13)

**RESPONSE**:  Denies. As plaintiff was the only one teaching the course, the only faculty

member qualified to teach the course, and had no idea she was having to compete for this course,

she just sent Dr. Sutton the syllabus plaintiff used rather than writing up a proposal as if she was

proposing a new course.  Legal research is no longer taught.  No other individuals teaching this

course were removed from the teaching their iteration of 512 and no one else had to "compete"

to teach their course.   (Exhibit 1, Lugg Aff. at ¶ 27.)

68. On or about September 17, 2014, Sutton worked with EAF faculty members to update the independent study policies and procedures to ensure that they were only used to supplement

existing course offerings or to assist with transitioning EAF to a cohort model. (Exhibit 3, Sutton Aff. at ¶ 23; SUMF ¶¶ 32-34)

**RESPONSE**:  Denies.  Dr. Sutton may have started looking at independent studies policy in 2014 but no policy was changed until July 2016. (Exhibit 1, Lugg Aff. at ¶ 28.)

72. It is also against academic norms to pay faculty members for independent studies. (Exhibit 3, Sutton Aff. at ¶ 36)

**RESPONSE**:  Denies.  Paying faculty members for independent studies has been done previously though it is not the norm. Past department chairs have wanted to provide employment to faculty in the summer.  Cutoff is 5 students.  If you have 5 students paying tuition for a 3-hour independent study you have met that thresh hold.  It is a financial decision. (Exhibit 1, Lugg Aff. at ¶ 29.)

76. During the Summer of 2015, there were limited courses available in Lugg's area of teaching because EAF was transitioning to the cohort model in the fall. (Exhibit 3, Sutton Aff. at ¶ 37)

**RESPONSE**:  Denies.  For higher education only, not P12.  Plaintiff documented in discovery the classes that were being offered that she should have been assigned (Exhibit 1, Lugg Aff. at ¶ 30.)  See table summarizing these below (*id*.):

**<u>Summer 2021</u>**
No classes have been assigned to me.  [As there were several semesters had up to three classes on overload, some of those could have been offered in the summer as was done prior to Sutton. It is not that there are no classes but Dr. Sutton has chosen to use scheduling to make it appear that way.]

| | | |
|---|---|---|
| EAF 436 | I should have taught this class | one month pay |
| EAF 596 | I should have taught this class | one month pay |
| Should have had a month's pay for law journal | | one month pay |

**<u>Spring 2021</u>**
EAF 548
EAF 578
Others may have been offered but I have no access to the list

**<u>Fall 2020</u>**
EAF 596
EAF 578
EAF 548
EAF 512        Hood/Hunt        should have been overload              one month pay
EAF 431        Braun            should have been overload              one month pay

**<u>Summer 2020</u>**
No classes assigned to me
EAF 436              I should have taught this class          one month pay
Should have had a month's pay for law journal              one month pay
Others may have been offered but I have no access to the list

**<u>Spring 2020</u>**
EAF 548
EAF 548
Others may have been offered but I have no access to the list

**<u>Fall 2019</u>**
EAF 578        Lugg
EAF 578        Lugg
EAF 596        Lugg
EAF 512        Hood/Hunt        should have been overload              one month pay
EAF 431        Braun            should have been overload              one month pay

**<u>Summer 2019</u>**
EAF 436        DiMartino        I should have taught this class        one month pay
Should have had a month's pay for law journal                 one month pay

**<u>Spring 2019</u>**
EAF 578        Lugg
EAF 466        Lugg

**<u>Fall 2018</u>**
EAF 578        Lugg
EAF 596        Lugg
EAF 512        Hood/Hunt        should have been overload              one month pay
EAF 431        Braun            should have been overload              one month pay

**<u>Summer 2018</u>**
EAF 436        Bertrand         I should have taught this class        one month pay
EAF 436        Puckett          I should have taught this class        one month pay
EAF 586        Hannah           I should have taught this class        one month pay
Should have had a month's pay for law journal                 one month pay

**<u>Spring 2018</u>**

| EAF 578 | Lugg |  |  |
|---------|------|---|---|
| EAF 466 | Lugg |  |  |
| EAF 548 | Braun | should have been overload | one month pay |

**Fall 2017**

| EAF 596 | Braun | should have been overload | one month pay |
|---------|-------|---------------------------|---------------|
| EAF 512 | Hood/Hunt | should have been overload | one month pay |
| EAF 431 | Lugg |  |  |
| EAF 578 | Lugg |  |  |

**Summer 2017**

| EAF 586 | Hannah | I should have taught this class | one month pay |
|---------|--------|---------------------------------|---------------|
| EAF 586 | (not me) | should have been overload | one month pay |
| EAF 436 | Bertrand | I should have taught this class | one month pay |
| EAF 436 | (not me) | should have been overload | one month pay |

**Spring 2017**

| EAF 466 | Lugg |  |  |
|---------|------|---|---|
| EAF 548 | Lugg |  |  |
| EAF 548 | Puckett | should have been overload | one month pay |
| EAF 431 | Braun | should have been overload | one month pay |

**Fall 2016**

| EAF 431 | Lugg |
|---------|------|
| EAF 578 | Lugg |

**Summer 2016**

| EAF 586 | Lugg |  |  |
|---------|------|---|---|
| EAF 436 | Lynn | I should have taught this class | one month pay |
| Should have had a month's pay for law journal | | | one month pay |

**Spring 2016**

| EAF 466 | Lugg |
|---------|------|
| EAF 548 | Lugg |

**Fall 2015**

Sabbatical

**Summer 2015**

| EAF 436 | Lugg |  |  |
|---------|------|---|---|
| Should have had a month's pay for law journal | | | one month pay |

**Spring 2015\***
EAF 466        Lugg
EAF 548        Lugg

\*Because schedules are set almost a year in advance, these were set before April 2015 when the retaliation began so Dr. Sutton had little ability to change.


77. At the same time, EAF was increasing its focus on Foundations coursework and, thus, it continued to increase the number of Foundations courses it offered. (Exhibit 3, Sutton Aff. at ¶ 37)

**RESPONSE**:  Denies.  Schedules summarized above show that this is not the case.  Foundations

courses were not being scheduled to the exclusion of all other classes – especially not in the P12

and higher education curriculum. (Exhibit 1, Lugg Aff. at ¶ 31.)


78. Lugg was not qualified to teach the Foundations courses. (Exhibit 3, Sutton Aff. at ¶ 38)

**RESPONSE**:  Denies.  Plaintiff taught foundations courses in the past and am more qualified to

teach the history of P12 education or education philosophy given her Ph.D included instruction

in both than adjuncts hired to teach her courses that lack J.D.'s, Ph.D.'s or both.  Even without

teaching foundations, we have already documented the courses which I was denied were

plentiful.  (Exhibit 1, Lugg Aff. at ¶ 32.)


79. It was Sutton's understanding based on statements from EAF faculty members that Lugg had repeatedly objected to Foundations courses even being offered in EAF. (Exhibit 3, Sutton Aff. at ¶ 38)

**RESPONSE**:  Denies.  See general objection based on hearsay above.  Further responding, this

statement is patently false: plaintiff never made such a comment. (Exhibit 1, Lugg Aff. at ¶ 33)


84. In 2015, the CAC decided to add Professor Beth Hatt ("Hatt"), who was also an EAF faculty member, to co-teach EAF 436 (Leadership for Diverse Learning Needs) with Lugg because it wanted to strengthen the course and the student experience by adding an additional voice with different experience. (Exhibit 3, Sutton Aff. at ¶ 40)

**RESPONSE**: Denies.  Plaintiff objects as hearsay and foundation as to what the CAC allegedly decided, but affirmatively points out that ultimately any teaching assignment is in the total discretion of the chair, a fact to which Dr. Sutton has already sworn in his affidavit.  The content of this course is highly regulated by state law and had to be approved by the Illinois State Board of Education ("ISBE").  Plaintiff told Dr. Sutton that they had to deliver what they told ISBE they would deliver; if Dr. Sutton wanted to change it then he needed to go to the P12 faculty and they could discuss it.  Dr. Sutton did not decide to change the curriculum of any other course. (Exhibit 1, Lugg Aff. at ¶ 34.)

See also Ex. 2, Lugg Dep. 146:24 – 147:22:

A.  He's obviously disregarding my qualifications when he'll put a licensure specialist in to teach a class on special ed. law when I'm available and asked to teach the class.

Q. Which class was that?

A. 436.

Q. Who did he put -- ask to teach that class instead of you?

A. I can't remember her name, but it was a licensure specialist from ROA 17.

Q. How do you know that she was less qualified than you?

A. Because she had neither a Ph.D. nor a law degree and we're talking special ed. law.

Q. Why do you think that's necessary?

A. If it's not necessary, then why do we have universities. We are hired because of our education and qualifications. If anyone can be put in anywhere, it would be much cheaper for a university to just go out on Main Street and start pulling folks off. I mean, that question -- how do you answer that question. Qualifications are important, otherwise why are we chosen to be hired by universities to do the jobs we do.

See also Ex. 2, Lugg Dep 149:10 -22:

… in what way did hiring someone else to teach EAF 436 adversely impact your employment?

A. Monetarily, reputation.

Q. Monetarily, was that just because you weren't teaching it in the summer anymore?

A. It was always to be taught in the summer, and yes, or overload. It could have been taught during the year.

Q. Hypothetically taught during overload, right?

A. Hypothetically, if 436 is taught and I teach it, I get paid a semester worth of pay for it whether it's in the summer or it's on overload.

86. The CAC recommended that both Lugg and Hatt receive half of their normal pay for the course since it was going to be co-taught. Id.

**RESPONSE**: Plaintiff objects as hearsay and foundation as to what the CAC allegedly

recommended and therefore denies.

88. Lugg and Hatt co-taught EAF 436, Leadership for Diverse Learners, during the Summer of 2015. (Exhibit 5)

**RESPONSE**:  Denies. Plaintiff and Hatt did not co-teach.  Plaintiff tried to teach her course in

half the time in the mornings and Hatt taught her class in the afternoon. (Exhibit 1, Lugg Aff. at ¶

35.)

89. Lugg takes issue with the fact that she had to co-teach the course against her will, and alleges that Sutton unilaterally changed the curriculum of EAF 436 by adding Hatt as a "co-teacher." (Pl. Compl. ¶¶ 15-18)

**RESPONSE**:  Denies.  Plaintiff denies that she was angered that she had to co-teach as she has

co-taught many courses before.  Plaintiff was concerned that Dr. Sutton had inserted the

Assistant chair into her class, a relationship he then used to monitor her class and impede her

ability to do her job, that he had unilaterally changed the curriculum that the State of Illinois had

approved which could cause a penalty against ISU up to removing their ability to certify

principals, and that he "claimed" it was done because students already had too much law

signaling the start of his attempt to justify his retaliation. Under University policy, curriculum

decisions are in the sole control of the faculty and Dr. Sutton's involvement was against policy.

(Exhibit 1, Lugg Aff. at ¶ 36.)

91. During the diagnosis, the students identified several different aspects of the cotaught course that were hindering their efforts to succeed, including divisiveness among faculty; inconsistent practices and expectations from Lugg and Hatt, which was exacerbated by their divisiveness; and a lack of instructors with practical experience as members of K-12 administrative teams. Id.

**RESPONSE**: Denies.  The students were not upset with plaintiff's instruction but with the

insertion of essentially a second course, with the extreme disorganization of the second course,

of the forced deleting of curriculum from plaintiff's course for lack of time, and with the tension

caused by a constant feeling that Dr. Hatt had been placed in the course in an attempt to "get me

in trouble".  Plaintiff's student evaluations for the course were excellent.  (Exhibit 1, Lugg Aff.

at ¶ 37.)

92. After reviewing the findings from this diagnosis, and consulting with the CAC, Sutton decided not to assign this course to Lugg or Hatt going forward. (Exhibit 3, Sutton Aff. at ¶ 46.) Instead, he assigned the course to faculty who had experience working in P-12 learning environments and who would provide a better learning environment to ISU's students. (Exhibit 3, Sutton Aff. at ¶ 46)

**RESPONSE**: Denies.  Dr. Sutton did not assign the class to either Hatt or Plaintiff, but the

individuals who were assigned the class were not qualified to teach the content approved by the

ISBE and required by state law. (Exhibit 1, Lugg Aff. at ¶ 38.)

95. The cohort model was implemented in Fall 2015. (Exhibit 3, Sutton Aff. at ¶ 47)

**RESPONSE**:  Denies.  Cohort model is immaterial for scheduling specific classes because

plaintiff was scheduled to teach masters P12 law and higher education doc law, both of which

could have been switched with spring or summer curriculum. Specifically, because it was a

cohort, all students would have been switched together.  The cohort model simply means that a

group of students as a group take a certain number of classes over a certain number of semesters.

It does not dictate what course is taught in which semester. (Exhibit 1, Lugg Aff. at ¶ 39.)


96. Under the cohort model, EAF has never revised any course schedules to accommodate any
faculty member's sabbatical. Id. (Exhibit 3, Sutton Aff. at ¶ 48)

**RESPONSE**:  Denies. It was done a year or two earlier when Neil Sappington was on

sabbatical; that is why Plaintiff thought it would be done for her. (Exhibit 1, Lugg Aff. at ¶ 40.)


97. Under the cohort model, non-tenured track faculty or adjunct faculty have been retained to
teach courses normally taught by faculty who are on sabbatical. (Exhibit 3, Sutton Aff. at ¶ 48)

**RESPONSE**:  Denies   See response to ¶ 95.


101. Sutton had no knowledge as to whether or not Lin was employed by the university in China.
(Exhibit 3, Sutton Aff. at ¶ 54)

**RESPONSE**:  Denies.  Plaintiff cannot respond as to what is within Dr. Sutton's knowledge as

to Zeng Lin, other than Dr. Sutton knew that Zeng Lin was going to be in China at Wuhan

University, Dr. Sutton assigned Zeng Lin three courses to teach on-line during the time he was

going to be in China, after the ethics complaint was filed Dr. Sutton announced at a faculty

meeting that Zeng Lin had been given a sabbatical out of the blue (although Zeng Lin would

have had to request THROUGH Dr. Sutton the November before), shortly thereafter Dr. Sutton

announced that the sabbatical had been rescinded but he didn't know why, and that there was

never a record of a sabbatical ever being approved by the Board of Trustees. Therefore, logic would say Dr. Sutton was complicit.

(Exhibit 1, Lugg Aff. at ¶ 41.)

102. Lugg alleges: "[b]eginning in the spring of 2016, at the conclusion of her sabbatical and after the filing of the aforementioned ethics complaint, plaintiff was retaliated against and was not assigned to teach two courses which in the past, and currently for other faculty, she would have been assigned on overload as she is the only individual with the qualifications to teach such classes." (Pl. Compl. ¶ 25) Lugg is referring to EAF 548 (Advanced Seminar on Legal Based of Education) and 466 (College Students and the Law). (Exhibit 18)

**RESPONSE**: Denies. Defendants appear to be confused as to what classes were denied in which semester. See list of classes assigned and not assigned in ¶ 76.

103. Lugg did teach both EAF 548 and EAF 466 during the Spring of 2016. (Exhibit 5)

**RESPONSE**: Denies. See response to ¶ 102.

104. The only class that Lugg was not assigned to teach that she had taught in the past was EAF 512. (See SUMF ¶ 53-66; Exhibit 5)

**RESPONSE**: Denies. See response to ¶ 102. Further responding, see Ex.2, Lugg Dep. 165:12 – 166:14

Q. You also complain that you didn't get EAF 586 and 436 in the summer of 2017.

A. Right.

Q. What is 586?

A. Human Resource Administration.

Q. What is 436?

A. That's the special ed. law, special population, special ed. law, homelessness, ELL, early childhood. Basically the law pertaining to all the populations that don't fall within the general population.

Q. Who taught 586?

A. It was either Herschel Hannah or -- my terribleness with names. Now, both of them had been my doctoral students, I chaired their dissertations, or the now Executive Director of the Illinois Association of School Boards.

Q. You must have thought they were qualified if you were the one that chaired their dissertations and they were your students?

A. But the question is I was good enough to chair their dissertations and lead them through a doctoral dissertation, but I wasn't qualified enough to teach the class. That creates gossip. That creates what's wrong with Dr. Lugg that one of her students is teaching the class instead of her.

Q. Did you hear any of that gossip?

A. I have heard that gossip.

See also *id.*, 137:8-23:

… 512 was taught by Erika Hunt and Lisa Hood, two AP staff that are paid by soft money out of the policy center, not faculty.

Q. When did the alleged scrutiny of your syllabus occur?

A. I believe that was spring of 2015. So my guess is that it would have been summer of 2015 or fall of 2015 that it would have been reassigned.

Q. How do you know that Erika Hunt and Lisa Hood had little to no knowledge of legal research?

A. Neither of them are lawyers. They have never taken a legal research class. They themselves have admitted that they don't do legal research and their current syllabus has no legal research in it.

Q. So they're not teaching legal research?

A. No.

See also *id.*, 140:4 – 141:6

Q. Why are they unqualified in your opinion?

A. Not as qualified as I am. They are not faculty. They do not know legal research. The class was law and policy research or policy analysis and legal research.

Q. What was the class?

A. Legal Research and Policy Analysis.

Q. And what did it cover?

A. Legal research and policy analysis.

Q. Did anybody else teach it other than you prior to spring 2015?

A. No.

Q. Ever?

A. No. 18

Q. And it's your contention that it is just the ability to do legal research that distinguished you from the others?

A. My faculty status. You've got to remember when you say no one else has taught it, I've been the individual teaching law, legal research, since 1996. So it's not just my ability to do legal research. It's the fact that I'm faculty. It is the fact that I sit on the dissertations. I chair the dissertations. There are a lot of reasons.  When you look at the peers available, I was the one whose qualifications matched and had been doing it successfully, according to student evaluations, for five, six years or more.

105. In late 2015, copies of a document were circulated around ISU's campus relating to a disciplinary issue that Sutton was involved in before he began working at ISU. (Exhibit 19)

**RESPONSE**: Denies. ████████████████ admitted in her deposition that she left one

copy in DeGarmo and one copy in Milner Library.  Copies were not "circulated," and it is

unknown whether anyone read the documents.  See Ex. 7, Gillespie-Porter Dep. 90:20-25:

Q. Did you share it with anyone else?

A. I had a copy of it printed out and I left it in the library. I left another copy in DeGarmo, and I believe I E-mailed it -- not E-mailed it, I sent it to ELA.

108. Sutton admits that he met with the faculty to discuss this matter. (Exhibit 3, Sutton Aff. at ¶ 55) Sutton further admits that he felt this was a hostile attack because this reprimand from his past had nothing to do with his work at ISU. *Id.*

**RESPONSE**:  Denies.  Plaintiff has no knowledge of what Dr. Sutton "felt" or thought, but the fact that the State of Florida removed his ability to be employed in P12 education in the State of Florida was relevant to his current position as chair of a department training principals and superintendents with an office overlooking a P-8 school, and to his behavior as it showed he had a pattern of bullying, ignoring policy, and retaliation.  (Exhibit 1, Lugg Aff. at ¶ 43.) Further responding, Dr. Sutton did not meet "with the faculty to discuss this matter," but instead to accuse Plaintiff and threaten her with direct retaliation.  See Lugg Dep., 369:8-22:

> Q. … You sent it to Shane and then suddenly, it gets mysteriously circulated within the department as well, correct?
>
> A. That was what was claimed.
>
> Q. Who circulated it?
>
> A. I have no idea.
>
> Q. Did you circulate it?
>
> A. No.
>
> Q. Did you have any knowledge that it was going to be circulated?
>
> A. No. It was done during break supposedly.
>
> Q. Len held a meeting related to that circulation on January 27th and on page 2335, you describe that meeting. Who else was at that meeting?
>
> A. Everyone -- well, not everyone because it was called. He said he needed -- he had information about summer teaching and the budget.
>
> …
>
> Q.  … In the middle of that paragraph you say, "He also vowed to get whoever did it and from his Freudian slips, it was obvious he let everyone in the room know that

he thought I had dropped the document because of course he knew I had a copy because McCreery, director of OEOEA, had told him something I had testified to in confidence." What Freudian slips are you talking about?

A. Talking about the perpetrator of the document drop and inserting my name -- I mean, the person. Betsy, I mean the person.

Q. All right.

A. And obviously it worked because in the Pam Heatlie document, several individuals said we think that Betsy did it. I was not even in town.

See also Dean Dep., 102:3-20:

Q. You said Dr. Sutton brought this up during a faculty meeting. Can you tell me specifically what happened during that meeting?

A. My memory of that meeting is documented in a letter that I included in the package that I sent to you. When we got to the meeting, it was not about what we had been called there to discuss. The meeting was about this document that had been left in the hallway.

Q. What else happened during that meeting?

A. Dr. Sutton was angry, crying, cussing, making threats.

Q. What threats did he make?

A. Well, he looked right at Betsy Lugg and I, and he said, If you mess with me, you're going to get it back -- you're going to feel it.  And he referred to himself as an old gangster.

See also *id.*, 103:3-20:

Q. Okay. What else went on during that meeting?

A. He said he didn't care what we knew about him. He said that we could know anything about him if we wanted. He told us that he had farted in the cereal aisle last night and described the smell for us. Then he said we could watch him pee, if we wanted to, and he hiked up his leg and feigned urination on the podium.

Q. Did you speak to anyone about what happened during that meeting?

A. I wrote a letter, that you have a copy of, to the dean, the provost and the president.

Q. And what was the outcome of that letter?

A. Nothing.

112. Based, in part, on this letter, Dietz requested that Pamela Heatlie ("Heatlie"), who held the title "Specialist" at ISU, conduct a climate assessment in EAF about how the department was operating. (Exhibit 21) The purpose of the climate assessment was to obtain an overall understanding of what was working well within EAF, where there may be areas for improvement, and whether there are overarching discrimination or discriminatory harassment concerns. (Exhibit 21, ISU 003240)

**RESPONSE**:  Denies.  See response above. In additional response, (1) Dietz did not explain his thought process for hiring Heatlie; and (2) Heatlie was not a "specialist" at ISU but was an employee of the University of Michigan where she had taken the position of now ISU OEOEA director, Tony Walesby, who had left the position at the University of Michigan.  Since that time Heatlie has been demoted due to complaints by the Office of Civil Rights of her handling of Title IX complaints. (Exhibit 1, Lugg Aff. at ¶ 44.)

113. The climate assessment, which was completed on May 13, 2016, stated the following (Exhibit 21, ISU 003240-003244)

**RESPONSE**:  Denies this incomplete statement.  See specific objections below.

114. "With a few exceptions, faculty and staff appreciate and like Sutton's leadership style. They find him transparent, fair-minded, and a refreshing change from past leadership." (Exhibit 21, ISU 003243)

**RESPONSE**:  Denies.  Plaintiff objects to the hearsay within hearsay nature of this document. While Plaintiff does not know from how many individuals the comments are taken, she does have personal knowledge that none of her comments or those from Diane Dean were used in the report, and that fewer than half the faculty members in EAF participated in the exercise and only two of the six minority faculty participated.  (Exhibit 1, Lugg Aff. at ¶ 45.)

43

115. "Most faculty and staff indicated that prior to Dr. Sutton's arrival, department chairs seemed to make private arrangements with individual faculty members that operated to that individual faculty member's benefit (e.g., course releases, summer course assignments, other paid assignments, etc.)." (Exhibit 21, ISU 003243)

**RESPONSE**:  Denies.  See objection and response to ¶ 114.

116. "Many faculty indicated that it was their opinion that [Lugg] 'bullied' the department chairs and, as a result, benefitted from special arrangements or opportunities that other faculty weren't even aware existed. As a result, the same advantages reportedly were believed to have gone to the same faculty member year over year." (Exhibit 21, ISU 003243)

**RESPONSE**:  Denies.  See objection and response to ¶ 114.

117. "Dr. Sutton is credited with a new level of transparency and information sharing so that all department faculty are aware of available opportunities. He also uses faculty committees to provide advice on course assignments and other department matters, although he retains final decision-making authority. Faculty report significant satisfaction with their increased involvement in and understanding of department decision-making." (Exhibit 21, ISU 003243)

**RESPONSE**:  Denies.  See objection and response to ¶ 114.

118. "Dr. Sutton is also widely credited with creating an environment in which all faculty are treated with equal respect, including foundations which was previously seen or made to feel as though they had or offered less value to the department." (Exhibit 21, ISU 003243)

**RESPONSE**:  Denies.  See objection and response to ¶ 114.

119. "As much as most faculty admire the positive change Dr. Sutton has brought to EAF, they indicated that they are aggravated by behaviors of their colleague Professor Betsy Lugg. Professor Lugg is not necessarily disliked on a personal level, but her colleagues are frustrated at her unwillingness to accept change, to accept and implement decisions that they make as a faculty (including curriculum), and what in their opinion is a willingness to act intentionally (either directly or through others, such as students_ to cause personal or professional harm to her colleagues in order to influence events or otherwise obtain her goals." (Exhibit 21, ISU 003244)

**RESPONSE**:  Denies. See objection and response to ¶ 114.

120. "Faculty and staff indicate their belief that Professor Lugg's behavior has been a long-standing problem, with many describing it as 'toxic' or 'bullying.'" (Exhibit 21, ISU 003244)

**RESPONSE**:  Denies.  See objection and response to ¶ 114.


121. "[Lugg] is reportedly so difficult to work with or faculty are so worried about falling into disfavor with her because she will "go after" them, that they either avoid her or find indirect ways of conducting work so that she will no know of their involvement." (Exhibit 21, ISU 003244)

**RESPONSE**:  Denies.  See objection and response to ¶ 114.


123. There is no evidence in the record of an email sent in or about February 2016 in which Sutton intimates to colleagues that Lugg acted inappropriately when serving on the admissions committee.

**RESPONSE**:  Denies.  On February 27, 2016, Dr. Sutton forwarded to Michael McCreery the e-mail Dr. Sutton had earlier sent on January 16, 2016 to Amy Hurd stating in part: "so now I have decided to petition the graduate school for ███████ to see if extra hours of independent study can count toward her graduation. I believe ███████ has been ill-advised, manipulated, and abused enough and intend to help her move forward."  (See Exhibit 17, Sutton Dep. Ex. 34, ISU 003533.)


 132. ISU, like many other universities, regularly assigns adjuncts to teach courses. (Exhibit 3, Sutton Aff. at ¶ 50)

**RESPONSE**:  Denies.  As is relevant to this case, it appears adjuncts were hired disproportionately to replace plaintiff See, for example, Sutton 116:21 – 118:6

> Q. Dr. Lugg asserts that in the summer of 2017 she was assigned no courses to teach at all, is that correct?

> A. That is correct.

> Q. Did the other faculty members receive summer teaching opportunities in the summer of 2017?

> A. Yes.

Q. Were there any, other than Dr. Lugg, who did not receive at least an offer to teach summer courses in 2017?

A. I can't recall, but I think she may have been the only one.

Q. Okay. She had specifically requested teaching in the summer of 2017 and you denied it, correct?

A. I'm sure I did.

Q. Why would you have denied her teaching in the summer of 2017?

A. Because I had made the decision about who was the most appropriate person to teach the courses that she was eligible to teach during the summer.

Q. Okay. And for the law course you hired as an adjunct professor a woman with a law degree and a superintendent of a school, is that correct?

A. No, because that was not a law course. That course was called Leadership for Diverse Learners.

Q. Is that 436?

A. That is correct. It's not a law course.

Q. But was the teacher a person with a law degree and a superintendent of a school?

A. No.

See also Sutton, 119:11-20:

Q. Did you have adjunct professors teaching both EAF 436 and EAF 586 in the summer of 2017?

A. I think that's a possibility, yes.

Q. And prior, are those courses that Dr. Lugg had taught?

A. Not 586, to my knowledge. She taught 436, but not 586.

Q. Was she qualified to teach 586?

A. She taught it in the past, so I assume she is.

46

See also Dean Dep. 150:9 – 151:5:

> Q. Okay. Did she ever speak to you about her courses being reassigned to faculty with insufficient knowledge of the subject matter?
>
> A. Yes.
>
> Q. And what did she say?
>
> A. Well, I'm aware that her -- just as some of my -- my summer teaching was reassigned to adjunct faculty with lesser qualifications than me in the subject area, hers was as well.
>
> Q. Are you aware that this is a trend nationwide, that courses are being reassigned to adjunct faculty throughout universities across the country?
>
> A. I am aware of that, but I am aware that within the EAF department, it's really only Betsy Lugg and I that that applies to, other than faculty who normally never want summer teaching.
>
> Q. Okay.
>
> A. I'm aware that other faculty gets full loads in the summer.

133. EAF has an agreement to assign adjuncts to teach its P-12 principal preparation courses so that students have an opportunity to network and learn from instructors with practical experience. (Exhibit 22)

**RESPONSE**: Denies. There is no formal agreement requiring the use of adjuncts to plaintiff's

knowledge. ISU uses adjuncts to supervise internships sometimes or other building task related

courses, but not courses such as law or finance. (Exhibit 1, Lugg Aff. at ¶ 46.)

136. Sutton assigned Braun and Puckett to these courses because of EAF's agreement to assign more adjuncts to teach its P-12 principal preparation courses so that students had a chance to network and learn from instructors with practical experience. (Exhibit 3, Sutton Aff. at ¶ 50)

**RESPONSE**: Denies. There is not an agreement. Braun and Puckett were assigned plaintiff's

courses in order to reduce her salary and tarnish her reputation and standing as retaliation for

engaging in a protected activity.  (Exhibit 1, Lugg Aff. at ¶ 47.)  See also response to ¶ 104

above.

143. Sutton selected an adjunct instructor for EAF 586 during the Summer of 2017 in accordance
with EAF's agreement to assign adjuncts to teach some of the principal preparation courses.
(Exhibit 3, Sutton Aff. at ¶ 53)

**RESPONSE**:  Denies there is not an agreement; Dr. Sutton unilaterally chose to hire an adjunct.

(Exhibit 1, Lugg Aff. at ¶ 48.)  See responses to ¶ 104 and ¶ 132 above.

144. One of the main reasons why Sutton selected this adjunct instructor to teach EAF 586
(Administration in HR) was because he was an associate superintendent of human resources.
(Exhibit 3, Sutton Aff. at ¶ 53; Exhibit 25)

**RESPONSE**:  Denies.  See responses to ¶ 104 and ¶ 132 above.

151. Lugg did not receive overloads or summer courses during 2017 and 2018 because these
courses were assigned to adjuncts in accordance with EAF's agreement to assign more adjuncts
to teach its P-12 principal preparation courses so that students had a chance to network and learn
from instructors with practical experience. (Exhibit 3, Sutton Aff. at ¶ 52)

**RESPONSE**:  Denies.  See response to ¶ 143,

155. The May 3, 2017 email from Sutton to Lugg states as follows: "[m]ultiple EAF faculty have
reported to the Department Chair they do not wish to work on any dissertation committees you
chair. The supervision, advising and mentoring of student research are criteria for the evaluation
of teaching for university faculty (ASPT, p. 61, 2017). For that reason, the DFSC would like to
invite you to a meeting to learn how we might assist you in creating a more welcoming
environment for colleagues who serve on committees with you." (Exhibit 26) Sutton further
stated, "[t]his is an attempt to offer support for your teaching, something you have the right to
refuse." Id.

**RESPONSE**:  Denies.  The e-mail was sent but the statement that made it appear that Plaintiff

was not advising, supervising and mentoring student research based on e-mails written in

retaliation for her filing a police report against a faculty member who assaulted her in a faculty

meeting is untrue.  At all times from 1996 to present, Plaintiff has been advising, supervising,

and mentoring student research although it has become increasingly difficulty due to Dr. Sutton's

retaliation. (Exhibit 1, Lugg Aff. at ¶ 49.)

156. Sutton sent this email to Lugg after several faculty members sent him emails in which they stated that they are not willing to work with Lugg on dissertation committees that she chairs. (Exhibit 27)

**RESPONSE**: Denies. Plaintiff objects to the hearsay within hearsay nature of this document. See also response above.

157. Around this same time, on March 31, 2017, Phyllis McCluskey-Titus ("McCluskeyTitus") sent an email to Sutton stating, "[g]iven the unworkable situation in our department and the Higher Education program with two faculty members, Betsy Lugg and Diane Dean, it is impossible to have any positive effect on the important work we need to do around curriculum development, or dissertation and doctoral exam work. Their continual lack of cooperation and disruption of meetings, disregard for established processes, talking negatively about other faculty in the department to students, bullying faculty, students, and administrators to get what they want, and making exceptions for some students to the detriment of the program has brought tension and stress within the department so much that I cannot be effective in this role, or even in my faculty role in general. I also cannot continue to offer leadership to a doctoral program where I believe students are being cheated out of a quality learning experience by these two despicable faculty members." (Exhibit 28)

**RESPONSE**: Denies. This e-mail was sent one day after Plaintiff filed a police report against

Hoff for an assault by her in a faculty meeting on March 24, 2017. This was the second time that

Hoff had threatened Plaintiff such that another faculty member was forced to intervene and

restrain her before she struck Plaintiff, thereby putting Plaintiff in fear for her safety. Because

Plaintiff taught at night and Hoff's office was two doors down from Plaintiff's, Dr. Lugg wanted

to notify the campus police of her concern. After speaking with them, they offered to provide

and escort to and from her class. (Exhibit 1, Lugg Aff. at ¶ 50.)

See Ex. 2, Lugg Dep. 400:18 – 402:9:

A. We were in a small-ish conference room and Pam Hoff, was sitting between Diane Dean and me and Mohamed Nur-Awahleh was sitting to my right. They were to my left. I believe that Jim Palmer and Phyllis McCluskey-Titus was also there. And Lenford Sutton was -- it was kind of a horse-shaped kind of table and he was sitting in the

indent here. And we were talking and Pam Hoff started to mutter something about you're stealing my students, you're stealing my students, referring -- talking to Diane Dean indirectly. Diane then turned to her and asked her a question about, what do you mean I'm stealing your students. And she got this close to Diane's face and told her to get -- didn't tell her, screamed at her to "get the hell out of this meeting." Diane said, are you -- did you just say that? Did you tell me to get the hell out? And she repeated it at least once more, I think it was twice more. It was very charged. So Diane said fine, got up and left.

I'm just to her right. I'm backing up thinking oh, man, oh, man, and then she turned around and turned on me. And started to yell at me and started to get up out of her chair. Mohamed was sitting to this side and stood in between us.  Lenford sat in the middle of the horseshoe just like this. Didn't say anything when poor Diane Dean was getting screamed at in the face. Didn't say anything to me until everyone was seated again and then he said, "Is there anything you'd like to say?" And I was like, yeah, no. No, I'll just sit here and I scooched over closer to Mohamed. And then shortly she left and Dianne Renn came after the altercation. She was not there for the beginning.

Since that was the second time that Pam Hoff had verbally threatened me in a meeting, I decided this at this point I needed to make a report of it to campus police in case the next time -- the first time Lenford stepped in the way and ushered her out the door because we were in Lenford's office. The next time -- I thought next time I could be all by myself and so I wanted a record with the police.

See also Ex. 6, Dean Dep. 129:7 – 131:8:

A. Pam Hoff was at the meeting. She's not a higher-ed program faculty member. I'm not sure why she was at the meeting. I don't remember exactly what we were talking about, but Pam Hoff began -- began saying -- began making statements about how she felt she was treated, how unfair it was for people to say negative things about her being treated unfavorably -- I can't remember the exact wording, but it had to do with her being treated poorly, in her view. And then I empathized and said I 19 understood because I have experienced that myself.

And then she turned on me, and she began yelling at me. She raised up out of her seat and got in my face. She was telling me I should get the hell out of there because nobody wants me there, Why don't you just get the hell out of there?

And at this time, Mohamed and -- Mohamed -- Mohamed Nur-Awaleh was there. He leaned forward. Dr. Sutton was there. He leaned forward. Betsy Lugg leaned back. And Jim Palmer, like, looked away, like he didn't want to see what was going on.

So she kept yelling at me, berating me and getting into my face. And I was repeating back to her what she was saying to me, just to make sure that I understood what she was saying and to make sure that everybody else understood that we were agreeing that this is what she was saying and also, frankly, because I had hoped Dr. Sutton would intervene as chair of the department and not let one faculty member attack another like

that during a meeting. But nothing happened. And I took it for as long as I was willing to take it, and then I said, Fine, I'll leave. And I packed up my materials and left the meeting.

Q. Do you know what happened after you left?

A. I am aware that after I left the meeting, the -- she just -- Pam then turned -- Pam Hoff then turned her attention onto Betsy Lugg and began yelling at her for some things. And I'm -- I'm told she also -- I believe she stood up -- actually, at that point, she got up out of the chair and Mohamed Nur-Awaleh jumped up and got in between the two of them.

158. McCluskey-Titus further stated that "…for self-preservation, I will not attend or participate in Higher Education doctoral program meetings. I also will not teach any Higher Education doctoral classes. In this way I will not have any contact with either Betsy Lugg or Diane Dean with their negativity and blatant disregard for anyone else (student, faculty or administrators) and the work for which they have been hired. Having to do so is detrimental to my emotional and physical health." Id

**RESPONSE**: Denies. See response above.

159. Sutton had also previously sent Lugg an email regarding a meeting to discuss strategies for improving her communication and collaboration with EAF faculty members, including relating to dissertation activities. (Exhibit 29)

**RESPONSE**: Denies. These e-mails pertained to his removal from a committee Plaintiff

chaired as suggested by the Chair of the Graduate School after his questionable behavior toward

Plaintiff and her female student, ██████████ (Exhibit 1, Lugg Aff. at ¶ 51.)

160. Sutton sent this email on February 25, 2015, almost two months before ███████ filed her internal complaint with OEOEA. (Exhibit 29)

**RESPONSE**: Denies. See response above.

165. There is no evidence in the record indicating that sending a follow-up performance evaluation letter to discuss performance related matters violate the DFSC process.

**RESPONSE**: Denies. According to university policy, unless something is specifically allowed by the ASPT document, it cannot be done. The simple absence of a statement does not make that

behavior allowable.  Under ASPT rules, faculty are evaluated at a specific time once a year.  A

midterm evaluation is not provided; if there were true concerns it should be held until the next

yearly evaluation.  (Exhibit 1, Lugg Aff. at ¶ 52.)


166. Around this same time, the DFSC also sent follow-up performance evaluation letters to two
other EAF faculty members. (Exhibit 31) One of these faculty members identifies as male and
the other as female. Id.

**RESPONSE**:  Denies.  See response above.

167. Notably, Sutton recused himself from participating in any DFSC matters involving Lugg
from 2019 to the present, as a result of her complaints about him. (Exhibit 3, Sutton Aff. at ¶ 59)

**RESPONSE**:  Admits that Dr. Sutton finally recused himself two years after the first Charge of

Discrimination was filed by Plaintiff on May 2, 2017 (See Complaint, ¶ 36), and months after

this lawsuit was originally brought in McLean County, Illinois, on October 2, 2018.  Plaintiff

further affirmatively states that after twenty-one years of excellent evaluations, she received a

negative evaluation in 2017 which was the year she filed the complaint with the Illinois

Department of Human Rights. A negative evaluation in 2018 which was the year she filed suit in

state court. The humiliation of a post-tenure review in 2019 triggered by the two negative

evaluations.  Only remediation noted was to meet with classes when scheduled – something they

had to admit they had no evidence that Plaintiff had ever failed to do. Then in 2020, after Dr.

Sutton recused himself, Plaintiff received a satisfactory evaluation.  (Exhibit 1, Lugg Aff. at ¶

53.)


170. Sutton does not dispute that he told at least one student that they would be better served
using a different chair for their dissertation committee because another faculty member was more
experienced in that area of concentration. (Ex. 1, Sutton Dep. Tr. at pp. 115:8-116:10)

**RESPONSE**:  Admits but denies Dr. Sutton told only one and denies that Dr. Sutton told this

one student out of anything but pure retaliation.  Dr. Sutton told more than one student that they

would have a better chance of graduating if Plaintiff was not their chair.  He also told a student

who wanted to take an independent study with Plaintiff that he should take one with someone

else; that student was doing a policy/law dissertation so there would not have been someone

more qualified. (Exhibit 1, Lugg Aff. at ¶ 54.)

       See also Ex. 2, Lugg Dep. 371:11-24:

         Q. The last bullet it says, "I have been discredited in front of students and suggestions have been made that the students would have a better chance of graduating if those chose a different faculty and/or they have been told point blank that they cannot choose me to chair their dissertation and you wonder why I have difficulty in constituting committees." Which students are you referring to here?

         A. ███████████  Do you need to spell any of these? ████ ████ ████ ████ ██████      ██████     Those are the ones that come to mind right away.

         Q. Who discredited you in front of students?

         A. Lenford Sutton.

See also id., 374:4-25:

         Q. How did the statements that Len made to ███ ████████ ███ and ███████ adversely affect your employment?

         A. For all the reasons I've stated above, plus it is making it almost impossible to do my job when I am being bad-mouthed by the Chair and students are absolutely dependent on his signing off on documents and when the governance document which he drafted,  and I have to say drafted after I had moved back to Iowa City where then he inserted that everything must be done in person, if you read those documents, he must approve every committee and every Chair and every member of every committee. So if he's telling them no, they're scared to death to not do what he says because he can completely keep them from graduating.

See also Exhibit 8, Excerpts from Deposition of ███████████ 63:17 – 64:21:

         Q. Do you have any opinions about her motivation for giving you what you are calling an untruthful assessment?

         A. Opinions?

         Q. Yes.

A. I think she was suggested to be put on my committee to fail me, and I think that there wasn't -- she was a part of the foundation, she was a part of the handpicked crew that I was supposed to choose from from Dr. Sutton, which coincidentally were all foundation's faculty. And she really, throughout the entire process, had very little input, seemed to care very little about providing me an opportunity to succeed. And with very shallow comments and no comments, really, I believed that she was put there to fail me, given as an option to look good on the front end, but to get me out.

Q. So is it your testimony that Dr. Sutton, in order to disadvantage Professor Lugg –

A. By taking away her students.

Q. -- took away her students and went to the extent of placing a faculty member on your dissertation committee who would provide an untruthful assessment of your work in order to fail you just to get at Dr. Lugg?

A. Is that my opinion?

Q. Yes.

A. Yes

See also *id*., 73:5-19

Q. And it is your opinion that all of this treatment was a result of Dr. Sutton wanting to deprive Dr. Lugg of students, and one of those students was you, correct?

A. Yes. I mean, I think it was, yes.

Q. Okay. What is your opinion as to why Professor Sutton wanted to derive Dr. Lugg of students?

A. She's a faculty member. Her job is to work with students. Her job is to be an advocate for students and to teach law. I feel he wanted -- through taking away students and opportunities, wanted -- that was his way of damaging her. That was his way of making that happen.

See also *id*., 80:2 – 82:11:

Q. Did she tell you why she believed those courses were taken away?

A. She just thought it was retaliation. She didn't go into specifics.

Q. Retaliation for what?

A. I don't know.

Q. Did she ever complain that Professor Sutton referred to her training as a joke?

A. No.

Q. That he demeaned and disregarded her qualifications?

A. He certainly did with me in that meeting. I'm not sure, but I would say, yes, we have had conversations about that because she was incredibly frustrated.

Q. Specifically what did she say as to how Professor Sutton demeaned and disregarded her qualifications?

A. I don't recall specifically, but just off the top of my head, taking away courses, taking away a law review journal that she had been writing for several years as part of her tenure portfolio, questioning every part and purpose of the dissertation process with her students as a lived experience.

Q. Anything else?

A. No.

Q. What did Professor Sutton say during the meeting that you had with him that you consider demeaning and disregarding Dr. Lugg's qualifications?

A. Well, the whole meeting itself was to get me to switch from her as my advisor to expand my academic mind. What the hell does that mean? It's like this woman is not good enough to help me expand my academic mind? That when I have a policy in law type of dissertation that I am going to write, that I can't go to the policy and law expert in the department, but rather give me options to go to a guy who is a specialist in community colleges, or a specialist in student affairs, or a specialist in whatever, even international education? Elizabeth Lugg was the law professor in the Department of Educational Administration and Foundations at Illinois State University. She had taught the law courses in my Master's program and my doctoral program. There was no one else, there was no one else that I would have went to for a legal -- for a legal and policy dissertation. There just wasn't. And the whole fact that I had to sit at a meeting with him and have him tell me that other faculty members would be more of a fit for what I wanted to do, even though he didn't give a damn about what I wanted to do, was evidence to me that he didn't respect her.

And, most specifically, see also *id.*, 86:6 – 87:15:

Q. Did Professor Sutton ever tell you that you would have an easier time graduating if you chose a different dissertation chair?

55

A. He didn't come right out and say that, but it was very clear in our meeting that graduating with my current structure was not -- was not in my best interest, it was not going to happen.

Q. What specifically did he say that implied this?

A. That I am not set up for success, that he didn't see -- he saw that my avenue to complete my comprehensive exams and dissertation needed to be under the watch of someone else.

Q. What made you believe that he was making those statements in order to harm Dr. Lugg as opposed to because he was acting in your best interest in trying to help you?

A. Because he gave no reason why those changes needed to be made. There was no – there was no conversation as a part of that meeting that showed me that he had any other reason to believe, he just kind of smirked, and put his hand over his face and rubbed his face. There was nothing substantive there that would make me think that there was a reason other than him just wanting her off my -- off my file, off my dissertation.

Q. Do you have any other basis for that belief, anything else to support it?

A. I mean, no. I just got the pure sense that there was no justification for it. There was no argument as to how I could be positioned better, it was just this is the option that's in front of you.

In fact, Dr. Sutton even put this in writing to ▇▇▇▇▇▇  See Ex. 9, Dr. Sutton Dep., Ex. 14, email from Dr. Sutton to ▇▇▇▇▇ dated January 30, 2017: "Your independent study would have better meaning if you worked with another professor, let me know if you would like to do that.  I will find another colleague to help you."  As plaintiff wrote in her e-mail on this same exhibit to Anthony Walesby: "Here is a message that Dr. Sutton sent to one of my students who then forwarded it to me because he was concerned with Dr. Sutton's statement.  It appears that he is suggesting to students that they would be better off working with a different professor.  Unethical, unprofessional, retaliatory, discriminatory, and harassing.  I told you he was keeping me from doing my job.  Now I see it goes beyond class assignments.  As explained by ▇▇▇▇▇▇ at Ex. 8, 139:10 – 140:18:

Q. What was your expectation of a potential response from Dr. Sutton?

A. Anything to help me meet my half-time status or look at options for 599 being a viable option to reach half-time status.

Q. Now I'm going to scroll up to the response. This was -- I am sorry. That was just a few minutes later, less than minutes later, and he writes directly back to you, "Your independent study would have better meaning if you worked with another professor." How did you take that?

A. I mean, I take it as you need to work with another professor, not Dr. Lugg.

Q. Why would that be if she's basically your dissertation chair who's assisting you with the main project that you have left?

A. That's a great question. I have no response other than that -- … this is a barrier, this is another barrier to finishing. These types of responses of it would have better meaning if you worked with another professor, meaning that I haven't gained what I needed to by the professor that I had, and that's troubling to me.

Q. Your question was somewhat urgent, you had until 10:00 o'clock that night, right?

A. That's correct.

Q. And he really didn't answer your question?

A. No, no.

Likewise, see Exhibit 10, Excerpts from Deposition of ███ ███ 30:5 – 32:23:

A. … The issue that I have if you're asking me as -- myself as a person, if that's what you're getting at, is that I had an issue because this started at the beginning of the semester. He obviously knew that it was my electives. He could have had a meeting with me right away and discussed it with me. Instead I had to sit out an entire semester, which if you know, which I'm sure you do since you're an attorney, when you're on a path of -- and you have a plan and then all of a sudden you're at a stopping point, then it feels very frustrating and it sets you back, which it did. It gave me great mental anguish because I had to do it. So if you're asking me as a person, then that's what happened.

Q. Okay. So to recap, your concern was that -- not with the policy but that you felt that Dr. Sutton could have acted on this earlier in the semester and done things sooner so that you wouldn't have had –

A. Absolutely, absolutely. I can't look at the e-mails right now, but I'm sure if we looked at it, I think that it happened pretty early in the semester where I had an

opportunity to have a discussion with him and with Dr. Lugg. We could have had a discussion and it would have been more professional and I could have said, "hey, I understand that this happened." And I had done two independent studies before and I was a straight A student and had worked hard and had worked hard in the whole program and had a very good track record, that we could have worked it out early on.  And -- but I feel personally that there was tension between Dr. Lugg and Dr. Sutton and so I was not able to have that conversation and that's my opinion.

Q. And what is the basis for your opinion that the delay in Dr. Sutton speaking to you about the elective was a result of tension between him and Dr. Lugg?

A. Based on the e-mails that I've read and that came to my e-mail and your counsel has probably read as well that there was tension from both sides, from Dr. Lugg in e-mails to me and also e-mails that went out to Dr. Sutton, e-mails that went out to the whole -- whatever that group is that Dr. Lugg works within, whoever those colleagues are, that there was tension from the tone of the e-mails and from the tone of his e-mails that were very short. His e-mails were very short, just two lines. "It's your elective." "Something is wrong with your plan; meet with me and your advisor as soon as possible." You know, those kind of things, which I think could have been handled much more professionally in my opinion, that we could have had a conversation, that we could have sat down together and moved forward. So I believe by the tone of the e-mails and by those that came to me even up until I graduated. So when I put in for I want to say it must have been November of 2020 and I put in for my  review, he questioned an independent study that he had approved. So I had to find that e-mail of approval and send it on. So there was the fear of a stopgap there right before my dissertation.

See *id*., 43:18 – 44:4

Q. Do you think he was retaliating against you for anything?

A. Do I think that he made the situation difficult because of my relationship with Dr. Lugg?

Q. Whatever you think –

A. Yes.

Q. Okay. That's fine. Do you think he was retaliating against Professor Lugg for anything?

A. Yes. Through the tone of the e-mails and what we spoke about already during this deposition, yes.

See also id., 47:9-18:

My gut feeling is yes, he would discriminate against me. My gut feeling is that he is not a good boss, that he should not be the chair of our program. My gut feeling is that he treats people unfairly, especially women who are white. That's my gut feeling, okay, that he is not professional in any way, that he tries to intimidate people, that he could have done a much better job with me personally as the chair and as the professional.

Finally, see also Ex. 7, ███████████ Dep. 30:5-18:

When I say "the entire situation," I essentially mean the time that I was at ISU and her interactions with Dr. Sutton.  Dr. Sutton restricted the classes and the coursework that both Dr. Lugg and Dr. Dean were allowed to offer and their independent studies that they were allowed to oversee.  The students that Dr. Lugg oversaw for dissertations had more resistance in their process, and then during the faculty meetings or faculty conversations, whatever you decide to call them, they, Dr. Dean and Dr. Lugg, were often pinpointed as, like, a bad guy.


See also *id.*, 52:10 22:

Q. Do you think that Professor Sutton treated you differently based on your relationship with Professor Lugg?

A. Yes.

Q. Why is that?

A. I'm not quite sure why he decided to treat me differently, and I'm not going to speculate because I don't know his thought process. But I know that I was treated differently than other students.

Q. And based on your relationship with Lugg, as you see it?

A. I think that was a part in it, yes.

In fact, ███████ documented Dr. Sutton's treatment of another advisee of Dr. Lugg, ███████

███████ in ███████ May 13, 2015 e-mail to McCreery (Exhibit 17) as follows:

"Dr. Sutton is trying to make her dissertation process a living hell and even as recently as last week, went to the General Committee in an attempt to remove a professor from her dissertation committee.  This is also the poor girl who had to have her dissertation committee disbanded and reestablished due to Dr. Sutton. … Her dissertation defense is to begin in a matter of minutes.  I already know that she was planning on filing a formal complaint after she was no longer capable of receiving the wrath of Dr. Sutton …"

171. EAF faculty members are not compensated for chairing dissertation committees. (Exhibit 3, Sutton Aff. at ¶ 21)

**RESPONSE**:  Denies.  It is considered teaching so we are compensated using the ASPT process

(Exhibit 1, Lugg Aff. at ¶ 55.)

172. Lugg's compensation would not be affected by students choosing other faculty members to chair their dissertation committees. (Exhibit 3, Sutton Aff. at ¶ 13)

**RESPONSE**:  Denies.  As stated throughout defendants' Statement of Facts, chairing

dissertations is an important part of the work of faculty and if they do not do it then they get

negative performance evaluations (See, for example, Def. SOF ¶ 6: "One of the key duties for

EAF faculty is to sit on comprehensive examination and dissertation committees for doctoral

students who have completed their coursework. (Exhibit 3, Sutton Aff. at ¶ 13),) which then

directly affects compensation through raises (Exhibit 1, Lugg Aff. at ¶ 56.)

173. Although EAF faculty are generally expected to serve on committees, there is no evidence that Lugg ever had an insufficient number of committees to fulfil this requirement. (Exhibit 3, Sutton Aff. at ¶ 34; Exhibit 4, Lugg Dep. Tr. at pp. 233:24-234:2)

**RESPONSE**:  Denies.  See previous response.  Additionally, Plaintiff has had a gradual decrease

in students since 2015.  See Exhibit A attached to Plaintiff's Affidavit.  Plaintiff has also lost

students who were afraid of retaliation (Exhibit 1, Lugg Aff. at ¶ 57.)  See also citations in

response to ¶ 170.

179. The DFSC included this section in Lugg's evaluation based on her communications with ISU faculty and students. (Exhibit 3, Sutton Aff. at ¶ 58)

**RESPONSE**:  Denies. The statements that were alleged that Plaintiff made to students did not

exist but were perpetrated by Dr. Sutton to the DFSC as retaliation against Plaintiff. (Exhibit 1,

Lugg Aff. at ¶ 58.)

183. There is no evidence in the record of an agreement that entitles Lugg to compensation for a journal or granting her a ten-month contract. (Exhibit 3, Sutton Aff. at ¶ 62)

**RESPONSE**:  Denies.  While there was no written agreement, the fact that Plaintiff had been

paid every year on these terms is evidence that the University and Plaintiff had an agreement that

was negotiated as an incentive to get her to leave the top ranked program at Penn State.  Another

incentive was that the $2000 normally allowed for moving expenses was increased to $6000 as

Plaintiff said the lower amount was insufficient. (Exhibit 1, Lugg Aff. at ¶ 59.)

186. During his deposition, Dr. Sutton testified that in 2014, he told Lugg that he was going to revisit the compensation levels of the journal because she was the only faculty member receiving monetary compensation for a journal. (Ex. 1, Sutton Dep. Tr. at pp. 66:18-70:4)

**RESPONSE**:  Denies.  Dr. Sutton so testified, but the undisputed fact is that Dr. Sutton did not

take away plaintiff's compensation for journals entirely until an hour and 58 minutes after

receiving the e-mail providing him formal notice of ███████ complaint.  See references in

response to ¶ 23.

188. Sutton also testified that he made this decision so that his decisions relating to faculty pay were fair for all faculty. (Ex. 1, Sutton Dep. Tr. at pp. 68:20-69:1)

**RESPONSE**:  Denies.  While Dr. Sutton testified to this, it must be for the trier of fact to decide

what Dr. Sutton's actual motivations were, and how "fair" he was being toward Plaintiff.  See

references in response to ¶ 23.

189. Sutton also testified that during the Summer of 2015, he decided that he could no longer pay Lugg for the journal. (Ex. 1, Sutton Dep. Tr. at pp. 91:21-92:14)

**RESPONSE**:  Denies. Dr. Sutton so testified, but the undisputed fact is that Dr. Sutton did not

take away Plaintiff's compensation for journals entirely until an hour and 58 minutes after

receiving the e-mail providing him formal notice of ███████ complaint.  See references in

response to ¶ 23.  Further, he could pay $35,000 for new positions he had created such as

program coordinators; this would suggest that there was sufficient money, but he chose to

unilaterally reduce Plaintiff's salary and change her employment contract by discontinuing the

journal. (Exhibit 1, Lugg Aff. at ¶ 60.)

190. Sutton testified that the journal was being funded with variance money, which is money
remaining with the department because faculty are on leave from the university. (Exhibit 34; Ex.
1, Sutton Dep. Tr. at pp. 91:21-92:14)

**RESPONSE**:  Denies.  Dr. Sutton so testified, but the undisputed fact is that Dr. Sutton did not

take away Plaintiff's compensation for journals entirely until an hour and 58 minutes after

receiving the e-mail providing him formal notice of ████████ complaint.  See references in

response to ¶ 23.

191. In 2015, EAF lacked variance money for the journal because all the faculty were coming
back from leave. Id.

**RESPONSE**:  Denies.  Dr. Sutton so testified, but the undisputed fact is that Dr. Sutton did not

take away Plaintiff's compensation for journals entirely until an hour and 58 minutes after

receiving the e-mail providing him formal notice of ████████ complaint.  See references in

response to ¶ 23.  Further, he could pay $35,000 for new positions he had created such as

program coordinators; this would suggest that there was sufficient money, but he chose to

unilaterally reduce Plaintiff's salary and change her employment contract by discontinuing the

journal. (Exhibit 1, Lugg Aff. at ¶ 60.)

192. Sutton testified that he had been directed by the Dean of the College of Education to spend
all variance money exclusively on instruction. (Ex. 1, Sutton Dep. Tr. at pp. 91:21-92:14)

**RESPONSE**:  Denies.  Dr. Sutton so testified, but the undisputed fact is that Dr. Sutton did not

take away Plaintiff's compensation for journals entirely until an hour and 58 minutes after

receiving the e-mail providing him formal notice of ████████ complaint.  See references in response to ¶ 23.  Further, he could pay $35,000 for new positions he had created such as program coordinators; this would suggest that there was sufficient money, but he chose to unilaterally reduce Plaintiff's salary and change her employment contract by discontinuing the journal. (Exhibit 1, Lugg Aff. at ¶ 60.)

193. Sutton also testified that he was instructed by the Dean to be cautious about costs. (Ex. 1, Sutton Dep. Tr. at pp. 94:3-94:15)

**RESPONSE**:  Denies.  Dr. Sutton so testified, but the undisputed fact is that Dr. Sutton did not take away Plaintiff's compensation for journals entirely until an hour and 58 minutes after receiving the e-mail providing him formal notice of ████████ complaint.  See references in response to ¶ 23.  Further, he could pay $35,000 for new positions he had created such as program coordinators; this would suggest that there was sufficient money, but he chose to unilaterally reduce Plaintiff's salary and change her employment contract by discontinuing the journal. (Exhibit 1, Lugg Aff. at ¶ 60.)

195. Sutton offered Lugg this project to replace the money that she had received from editing the journal in the past. (Exhibit 3, Sutton Aff. at ¶ 64)

**RESPONSE**:  Denies.  While Plaintiff has no idea why he paid Plaintiff and three others each $6000 to redo the superintendent program – Neil Sappington, Norm Durflinger, and Lisa Hood were also on that committee.  (Exhibit 1, Lugg Aff. at ¶ 61.)

198. However, instead of accepting a course release, Lugg decided that she would no longer edit the journal. (Exhibit 3, Sutton Aff. at ¶ 65; Exhibit 36)

**RESPONSE**:  Denies.  Dr. Sutton said that he would pay for two issues which Plaintiff understood as $2000 for a year of journals and Plaintiff said either pay the full amount or it is not

cost effective to use her time in that manner.  Plaintiff also did not agree to his unilateral change

to her employment agreement. (Exhibit 1, Lugg Aff. at ¶ 63.)


199. On April 15, 2019, Sutton told Lugg that if she had a proposal to restart the journal then he
would like to hear it. (Exhibit 37) He also reminded her again that she could receive a course
release. Id.

**RESPONSE**:  Denies.  The evidence proffered does not support these statements.  In Exhibit 37,

Plaintiff said that she would restart the law journal for 1 course release in the fall, 1 course

release in the spring, and three months of salary and benefits over the summer.  She never agreed

to edit the journal for just one course release.  (See Exhibit 37)


 200. Lugg sent Sutton a proposal to restart the journal for a course release on April 18, 2019.
(Exhibit 38)

**RESPONSE**:  Denies.  See response to ¶ 199.


203. However, Lugg never met with the CAC to discuss her proposal to restart the journal.
(Exhibit 3, Sutton Aff. at ¶ 68)

**RESPONSE**:  Denies. Plaintiff was never invited to a meeting in fall 2019.  (Exhibit 1, Lugg

Aff. at ¶ 64.)


### C.  Disputed Immaterial Facts.

184. In 2014, when Sutton reviewed the department's budget and financial documents upon his
arrival at ISU, he learned that Lugg had been receiving compensation for editing the Illinois
State Education Law and Policy Journal. (Ex. 1, Sutton Dep. Tr. at pp. 66:18-70:4; SUMF ¶¶ 23,
27)

**RESPONSE**:  Immaterial and disputed. Plaintiff has insufficient knowledge to confirm or deny.


185. Sutton also learned that no other faculty member was receiving monetary compensation for
editorial service; rather, they were given course releases, meaning they are required to teach one
fewer course in exchange for work on a publication. (Ex. 1, Sutton Dep. Tr. at pp. 66:18-70:4,
94:3-94:15)

**RESPONSE**:  Immaterial and disputed; Plaintiff has no knowledge how others are compensated

196. Sutton made this decision despite the fact that the CAC recommended against it. (Exhibit 3, Sutton Aff. at ¶ 64)

**RESPONSE**:  Immaterial and disputed. Plaintiff has Insufficient knowledge to confirm or deny.

197. Sutton also informed Lugg that she could receive a course release for the journal instead of monetary compensation, like the other EAF faculty members who edited journals. (Exhibit 3, Sutton Aff. at ¶ 65; Ex. 1, Sutton Dep. Tr. at p. 95:18-24; Ex. 1, Sutton Dep. Tr. at pp. 96:18-97:4)

**RESPONSE**:  Immaterial and disputed.  Plaintiff only recalls Dr. Sutton telling her the others received a course release. (Exhibit 1, Lugg Aff. at ¶ 62.)

205. However, ISU investigated Lugg's claims and ultimately determined that: (1) many of the acts alleged by Lugg, even if true, would not be considered materially adverse or in violation of ISU's policies; (2) Lugg's claims failed to meet the requisite burden of proof (preponderance of evidence); (3) Lugg did not meet the required burden as to causation as Sutton provided numerous legitimate business reasons for the decision he made that impacted Lugg; and (4) the temporal distance between Lugg's alleged participation in ████████ complaint (April 2015) and many of the alleged retaliatory acts (2017) does not support that retaliation occurred. (Exhibit 39)

**RESPONSE**:  Immaterial and disputed.  Exhibit 39 is dated February 15, 2019, not only two years after Plaintiff brought her initial Charge of Discrimination, but several months after this lawsuit was filed on October 2, 2018.  Plaintiff denies ISU's self-serving document is material, accurate, or in any way reflects the record before this Court.

206. The investigation also determined: "…there is insufficient evidence to support that any changes to her teaching schedule were based on a retaliatory motive. Dr. Sutton provided legitimate and non-discriminatory reasons for any changes or lack of teaching assignments, and while Dr. Lugg disagrees vehemently with many of those reason, Dr. Lugg has not provided any rebuttal evidence to support her assertion that she experienced any actions due to a retaliatory 32 motive, other than speculative ones. Thus, [Lugg] fails to meet the preponderance of the evidence standard as set forth in university policy." Id.

**RESPONSE**:  Immaterial and disputed.  See above.

**D.  <u>Undisputed Immaterial Facts</u>**.

40.

113.-121.

**E.  <u>Additional Material Facts</u>**.

1.  On April 8, 2015, a Ph.D. student, ██████ ██████ filed a Title IX complaint against Dr. Sutton, the Chair of the Department of Administration and Foundation.  (Complaint, ¶ 8.)

2.  On April 17, 2015, Lugg provided corroborating evidence in support of the Title IX complaint of gender discrimination in support of Ph.D. candidate ████████████ Title IX discrimination complaint. (Complaint, ¶ 9.)

3.  Dr. Lenford Sutton became aware or was aware in April, 2015 that ████████████ had made or filed a Title IX discrimination complaint against him.  (See, for example, Ex. 5, Sutton dep., 123:14-20.)

4.  Dr. Sutton believed, in April, 2015, that Dr. Lugg was serving as a witness to ████████ Title IX Complaint.  (Ex. 5, Sutton Dep. 123:14 – 123:20.)

5.  Dr. Sutton conceded, in answer to the question, "Wouldn't you suspect, then, that Dr. Lugg would be a potential witness to these allegations if she's named that many times with that detail?" the following: "Based on what's written here, yes." (Ex. 5, Sutton Dep. 75:8-23.)

6.  Plaintiff testified "he must have known because in a faculty meeting he kept talking about that girl, I didn't do anything to that girl. And then talked about her enough that faculty started to say, that's ████████ that's ████████ (Ex. 2, Lugg Dep. 199:16 – 200:8.)

7.  Plaintiff specified that "on the 15th of April 2015 during a faculty meeting, Dr. Sutton referenced that complaint to the faculty at length." (Id., 257:16 – 258:3.)

8. On April 21, 2015, Sutton e-mailed Plaintiff requesting a copy of her "current syllabus for the iteration of EAF 512 for which you have served as an instructor." (Exhibit 11, Sutton Dep. Ex. 7.)

9. In response to Dr. Lugg's e-mail at 3:26 on April 21, 2015 stating "Take it up with the professors at the University of Iowa College of Education, one of the top colleges of education in the U.S. Just telling you what I was taught and what has rung true in my personal experience;" Sutton e-mailed the following at 3:48: "Those rankings are a joke!" (*id*.)

10. Plaintiff testified that "April 17th, I give testimony and April 21st, all of a sudden now my syllabi is being scrutinized and a class is being taken away from me." (Id., 413:5-10.)

11. Plaintiff further testified that she believed not being assigned summer classes in 2015 was related to ████████████ complaint "because that's the first time ever that I was not assigned classes." (Id., 200:17-25.)

12. On May 13, 2015, ████████████ sent an e-mail to Shane McCreery stating in part "Dr. Sutton has also increased the discrimination and bullying against Dr. Dean and Dr. Lugg in the last couple weeks to a matter of extremes …" (See Ex. 12, ████████████ Dep. Ex. 4.)

13. At 11:00 a.m. on June 11, 2015, M. Shane McCreery, ISU's Ethics Officer and Title IX Coordinator at that time, sent an e-mail to Lenford Sutton providing formal notice of the complaint filed against him by a student, stating in part that:

> This letter is to inform you that the Office of Equal Opportunity, Ethics, and Access (OEOEA) has received a complaint filed by ████████████ alleging that you violated the University's Anti-Harassment and Non-discrimination Policy by discriminating against her on the basis of her color and sex. (See Ex. 3, Sutton Dep. Exhibit 25)

14. The June 11, 2015 e-mail from McCreery (Ex. 2) further informed Sutton:

> Please note that Illinois State University's Anti-Harassment and Non-Discrimination Policy prohibits retaliation against a complainant or those who are

67

asked to cooperate in an ongoing OEOEA investigation. Any allegation of retaliation, initiated by anyone participating in this investigation, will be deemed a separate and distinct violation of the Illinois State University Anti-Harassment and Non-Discrimination Policy and will be independently investigated. (*Id.*)

15.  At 12:58 p.m. on June 11, 2015, Dr. Sutton sent an e-mail to Plaintiff informing her that there would be "no expenditures for the policy and law online journal for next year." (See Ex. 4, Sutton Dep. Ex. 8.)

16.  Dr. Sutton's e-mail sent at 12:58 p.m. on June 11, 2015 was within 2 hours of receiving the e-mail sent at 11:00 a.m. on June 11, 2015 from M. Shane McCreery  (Ex. 5, Sutton Dep., 88:15 – 90:22.)

17.  On June 25, 2015, Plaintiff filed separate requests for Title IX investigation of gender discrimination and retaliation.  (Complaint, ¶ 19.)

18.  On January 6, 2016, Dr. Sutton sent an e-mail addressed to the EAF department stating:

> Colleagues I need to hold an emergency meeting tomorrow morning @ 11 am concerning the budget, summer school courses, and pending personnel changes in EAF. Given the personnel information, call-ins will not be allowed.  I know this is short notice colleagues, but it's extremely important that I speak to you all together ASAP.  Please let me know if you are able to attend.  (See Ex. 13, Sutton Dep. Exhibit 10.)

19. Diane Dean testified "Dr. Sutton asked us all to come in on a Friday before the semester started for a meeting about budget and personnel issues and instead it was a 45-minute meeting about that document," referring to a document regarding a reprimand Dr. Sutton had received from the State of Florida in 1999 that had been left in a school building or buildings. (Ex. 6, Dean Dep. 100:9-13.)

20. Dr. Dean testified that at this meeting on January 7, 2016, Dr. Sutton "looked right at Betsy Lugg and I, and he said, If you mess with me, you're going to get it back -- you're going to feel it." (Ex. 6, Dean Dep. 102:3-20.)

21.   Dr. Dean testified that at this meeting on January 7, 2016, Dr. Sutton "referred to himself as an old gangster." (*Id*.)

22.  In his response to Dr. Diane Dean's Ethics Complaint, Dr. Sutton admits to using the term "OG" at this meeting on January 7, 2016.  (Ex., Sutton Dep. Ex. 21.)

23. In his response to Dr. Diane Dean's Ethics Complaint, Dr. Sutton admits to stating at this meeting on January 7, 2016: "I told the faculty that they did not want to mess with me …". (Ex. 14, Sutton Dep. Ex. 21.)

24. Plaintiff testified that at this meeting on January 7, 2016, Dr. Sutton "vowed to get whoever … had dropped the document." (Ex. 2, Lugg Dep. 369:8-22.)

25. Plaintiff testified that at this meeting on January 7, 2016, Dr. Sutton "let everyone in the room know that he thought I had dropped the document. By his "Freudian slips … Talking about the perpetrator of the document drop and inserting my name -- I mean, the person. Betsy, I mean the person." (Ex. 2, Lugg Dep. 369:8-22.)

26.  Dr. Dean testified that ISU Provost Krejci told her that Dr. Dean's name and Dr. Lugg's name were not kept confidential but were revealed to Dr. Sutton in connection with ███████████████ complaint. See Ex.6, Dean Dep. 67:7-16, 22-24:

> Q. How are you so sure?

> A. Because Provost Krejci had revealed that.

> Q. So the provost told you that your name was in the materials that Len received in order to formulate his response to ████████████ complaint?

A. The provost revealed that our identities were not kept confidential by the OEOEA office during that investigation.

Q. And when you say "our identities," who are you referring to?

A. Well, Betsy Lugg also.

27.  Plaintiff testified:

A. In life, there is not always going to be a document for everything. We as lawyers would love that if we could have a smoking gun everywhere. Sometimes you have to just use logic.  So I know that in fall while I was on sabbatical of 2015 that -- okay, let me back -- I know that before January 2016 that Lenford had -- had been given by Shane a copy of that document.

Q. Let me stop you there.

A. No. Please let me finish my story. Please let me finish my testimony and then you can ask any question you want because if I don't tell this together, when you keep interrupting, everything gets confused.  So we know we do have a document where he says that by the beginning of January 2016 that he already had knowledge given to him by Shane McCreery that a document about his discipline in Florida had been given to him several months earlier while I was on sabbatical. And so that tells me Shane is providing confidential documents that I provided to Shane, which then goes, well, then that makes his behavior right around the time that ████████ filed her suit and I provided testimony to make more sense because if Shane is giving off this confidential information as soon as he gets it in the fall, and then all of a sudden it gets dropped by someone when only administrators and staff were there -- this was break, there were no students, so whoever dropped it must not have really wanted it to be seen or they would have picked a better time, but I digress -- if we know that he's giving him information there, then it explains his behavior. Why would he go after ████████ in fair specificity in a faculty meeting, enough where people knew who he was talking about, a week after she had filed that and then why out of the blue does he start moving to take away one of my classes a week after I testify.  If he's giving him direct documents here, it would make sense that he's gaining information.  Move forward almost a year and the provost basically confirms that. We've heard from other people. We have concerns. And bam, within months Shane is no longer working at ISU. And when you called OEOEA, all you got is, he is no longer employed by us. There was no farewell party.  There was -- so though we'd like to have a document for everyone, I think that that makes a great deal of sense. And I think any rational person without an agenda would see that that makes  -- why would he give specific documents here and not here when it sure looks like he's got specific information.  (Ex. 2, Lugg Dep. 418:23 – 421:1.)

70

28.  On March 31, 2016, Dr. Sutton sent a formal complaint letter to Dr. Katrin Paehler, Vice-Chair, AFEGC.  (See Ex. 15, Sutton Dep. Exhibit 11.)

29.  Dr. Sutton's March 31, 2016, formal complaint letter asserted claims against Dr. Lugg and Dr. Dean. (*Id*.)

30.  In his March 31, 2016, formal complaint letter, Dr. Sutton alleges, in part, "Both Lugg and Dean and their student-surrogate have engaged in 'bringing unfounded charges motivated by malice, or failure to treat colleagues and students fairly, with respect, civility and decency, without exploitation and without discrimination based on irrelevancies' which constitutes a violation of the Code of Ethics." (*Id*.)

31.  In his March 31, 2016, formal complaint letter, Dr. Sutton also alleges, in part, "███████ ████████ an advisee for Dr. Lugg was employed by Lugg and Dean to file numerous complaints with the EEO office ...." (*Id*.)

32.  In his March 31, 2016, formal complaint letter, Dr. Sutton also alleges, in part, "Betsy Lugg proceeded to dig into my background and located the details of a reprimand I received from the state of Florida in 1999 and, through her minions, distributed the document across the ISU campus ...." (*Id*.)

33.  ███████████ admitted in her deposition that she printed out a copy of the document referring to Dr. Sutton's reprimand from the state of Florida in 1999 and "I left it in the library. I left another copy in DeGarmo ..." (Ex. 7, ███████████ Dep. 90:20-25.)

34.  Dr. Lugg had nothing to do with this document being left in these two places.  (See *id*., 93:11-12); see also Ex. 2, Lugg Dep. 368:7-24, and 369:8-22, ("I was not even in town.")

35.  On April 18, 2016, Plaintiff sent an e-mail at 7:10 a.m. to Dr. Sutton stating:

"With all respect due, I must ask why you need a copy of the exam answers for this foreign national since all papers are in order and the request is a deviation from normal procedure. I need to understand why you are asking me to deviate from procedure for ███████████████ I need to make sure that you are not targeting another one of my students in order to retaliate against me. I already have one student whose request to be moved from your supervision to Dean Schoon's for the remainder of her studies was approved. I have a second student for whom you tried several ways to block her graduation. I have substantive reasons to doubt your motives. A simple explanation as to why you need copies of the 125 pages of exam answer is all I request; an explanation as to why it is "important." My request is reasonable given the circumstances."  (Exhibit 16, Sutton Dep. Exhibit 6.)

36. Dr. Sutton responded at 12:16 with the following: "I am calling a meeting tomorrow and will let your colleagues share their concerns about the examination." (*Id.*)

37.  Plaintiff replied at 12:41:

"Again, with all respect due, for what purpose? The exam was done 2 years ago according to policy. We don't do doctoral exam by a committee of the faculty of the whole. If the faculty as a whole wants to change policy for future doctoral exams to have the entire faculty read the exams that is its prerogative. If you have a concern other than you don't like the topic or the methodology or the student or me, I would suggest you just state it and we can move from there rather than attempting to bully me where you believe no one can see you. Not only is calling such a meeting an abuse of your position, unless you are going to call meetings for the same examination of every exam done over the last two years by all faculty members this is harassment, retaliation, attempted infringement on academic freedom of both faculty and student, and potential discrimination based on national origin. Quit harassing me."  (*Id.*)

38. At the beginning of this exhibit, Plaintiff e-mailed Anthony Walesby the following on February 15, 2017:

This series of e-mails (start reading from the bottom) concerned a doctoral student - ████████████████████ - a French national who works in Digital Collections at Milner Library. Two years after he had successfully completed his doctoral exam and one week before he supposed to defend his dissertation, two years but less than four months after I filed an ethics concern with Shane at OEOEA that one member of the committee, with the knowledge and assistance of Sutton was in violation of the state ethics law, Dr. Sutton was attempting to nullify his doctoral exam. Since I had suffered a computer crash within those two years I didn't have the documentation needed to prove what had happened; all I had were the records which are the first two e-mails on the string. The meeting on the doctoral exam referred to in this e-mail string was, in reality, an ambush where Dr. Sutton harassed and demeaned me in front of my

peers and attempted to force me to change the committee even though according to graduate school policy it was too late to do so. In my 20 years here, this has never been done to a student and his or her adviser before or since; it also burned a lot of bridges and irreparably poisoned the well.

  This also precipitated my conversation with Provost Krejci about lack of confidentiality at OEOEA and my belief that information was being leaked. Within 6 months Shane was gone, Dean Schoon was on leave, and Provost Krejci was gone by the end of the year. Coincidence? (*Id.*)

39.  In summer, 2017, Dr. Sutton assigned Dr. Lugg no courses to teach. (Ex. 5, Sutton Dep. 116:21 – 118:6.)

40.  Dr. Lugg requested teaching in the summer of 2017. (*Id.*)

41. Dr. Lugg was the only teacher who did not receive at least an offer to teach summer courses in 2017.  (*Id.*)

42.  Dr. Sutton assigned adjunct professors to teach EAF 436 and EAF 586 in the summer of 2017.  (Ex. 5, Sutton Dep.119:11-20.)

43. Dr. Dean testified "I have observed that things have been made unusually difficult for Dr. Lugg's students and for some of mine, that Dr. Sutton has made things unusually difficult for them in the dissertation process." (Ex. 6, Dean Dep. 158:20 – 159:3.)

44. ▮▮▮▮▮▮▮▮▮▮ testified "Dr. Sutton restricted the classes and the coursework that both Dr. Lugg and Dr. Dean were allowed to offer and their independent studies that they were allowed to oversee.  The students that Dr. Lugg oversaw for dissertations had more resistance in their process, and then during the faculty meetings or faculty conversations, whatever you decide to call them, they, Dr. Dean and Dr. Lugg, were often pinpointed as, like, a bad guy."  (Ex. 7, Gillespie-Porter Dep. 30:5-18.)

45. Plaintiff testified that Dr. Sutton discredited her in front of students, including ▮▮ ▮▮▮▮ ▮▮▮ ▮ Judith▮ and ▮▮▮ ▮▮▮ (Ex. 2, Lugg Dep. 371:11-24.)

73

46. Plaintiff testified that Dr. Sutton told these students they "would have a better chance of graduating if those chose a different faculty and/or they have been told point blank that they cannot choose me to chair their dissertation." (Ex. 2, Lugg Dep. 371:11-24.)

47. ████████ testified that Dr. Sutton took away Dr. Lugg's students and went to the extent of placing a faculty member on ████████ dissertation committee who would provide an untruthful assessment of ████████ work in order to fail him just to get at Dr. Lugg.  (Exhibit 8, ████████ Dep. 63:17 – 64:21.)

48. ████████ testified as follows as to whether Dr. Sutton told him he would have an easier time graduating if he chose a different dissertation chair from Dr. Lugg:

> Q. Did Professor Sutton ever tell you that you would have an easier time graduating if you chose a different dissertation chair?

> A. He didn't come right out and say that, but it was very clear in our meeting that graduating with my current structure was not -- was not in my best interest, it was not going to happen.

> Q. What specifically did he say that implied this?

> A. That I am not set up for success, that he didn't see -- he saw that my avenue to complete my comprehensive exams and dissertation needed to be under the watch of someone else.

> Q. What made you believe that he was making those statements in order to harm Dr. Lugg as opposed to because he was acting in your best interest in trying to help you?

> A. Because he gave no reason why those changes needed to be made. There was no – there was no conversation as a part of that meeting that showed me that he had any other reason to believe, he just kind of smirked, and put his hand over his face and rubbed his face. There was nothing substantive there that would make me think that there was a reason other than him just wanting her off my -- off my file, off my dissertation.

> Q. Do you have any other basis for that belief, anything else to support it?

> A. I mean, no. I just got the pure sense that there was no justification for it. There was no argument as to how I could be positioned better, it was just this is the option that's in front of you. (*Id.*, 86:6 – 87:15.)

49.  In an email from Dr. Sutton to ████████████ dated January 30, 2017, Dr. Sutton wrote: "Your independent study would have better meaning if you worked with another professor, let me know if you would like to do that.  I will find another colleague to help you." (Ex. 9, Sutton Dep., Ex. 14.)

50. Judith ████ testified that Dr. Sutton made her situation at ISU more difficult because of her relationship with Dr. Lugg:

> Q. Do you think he was retaliating against you for anything?
>
> A. Do I think that he made the situation difficult because of my relationship with Dr. Lugg?
>
> Q. Whatever you think –
>
> A. Yes.
>
> Q. Okay. That's fine. Do you think he was retaliating against Professor Lugg for anything?
>
> A. Yes. Through the tone of the e-mails and what we spoke about already during this deposition, yes.  (Exhibit 10, ████ Dep. 43:18 – 44:4.)

51. ████████████████ testified that Dr. Sutton treated her differently from other students at ISU because of her relationship with Dr. Lugg:

> Q.  Do you think that Professor Sutton treated you differently based on your relationship with Professor Lugg?
>
> A. Yes.
>
> Q. Why is that?
>
> A. I'm not quite sure why he decided to treat me differently, and I'm not going to speculate because I don't know his thought process. But I know that I was treated differently than other students.
>
> Q. And based on your relationship with Lugg, as you see it?
>
> A. I think that was a part in it, yes.  (Ex. 7, Gillespie-Porter Dep. 52:10 22.)

52.  Plaintiff testified "the retaliation, discrimination, harassment has continued since we filed the Complaint in 2018. It is now 2020. Since that time, I've continued to be denied teaching classes that I was the most qualified individual and should have been assigned to teach while others were being assigned full or overloads in the summer and overloads during the fall and spring semester." (Ex. 2, Lugg Dep. 153:9-16.)

53. Plaintiff testified "It is my belief and I think a reasonable belief that if you have curriculum that is primarily law and you've got an education law professor that was hired to teach law that you have that individual teach it." (Ex. 2, Lugg Dep. 225:20-24.)

54.  Plaintiff testified "I engaged in a protected activity. Lenford Sutton then started to retaliate against me and one way he did it was to start to take away my teaching, belittle my expertise, and shut down the area that I was hired to teach. It's not a law class. We're going to hand it over here. It's you don't get to teach the policy. Bit by bit he was phasing me -- in retaliation, he was phasing me out of the -- and it was also a way then to create monetary damages which it appears from -- to create monetary damages." (Ex. 2, Lugg Dep. 227:22 – 228:10.)

55.     Plaintiff testified "similarly situated individuals should be treated similarly and other faculty in the department are -- not only have I been given that for the last 20-plus years, but other people in the department currently, there are some individuals that teach four courses in the summer. There are some individuals whose salary has been doubled through overload and. So it is done routinely…. But the simple fact is when all those individuals and I am similarly situated and my work is being farmed out to individuals that are either not even faculty or have lesser degrees than I do, then similarly situated individuals are not being treated similarly and it appears

to be an arbitrary and capricious decision upon the Chair and perhaps discriminatory as well."

(Ex. 2, Lugg Dep.188:23 – 189:18.)

56. Plaintiff testified "This will be my answer for every time you ask if I felt entitled: I believe as a faculty member who was hired to teach certain classes or classes in certain areas, when classes in those areas become available that I should be assigned to teach them, including summer and including overload. That has been the past practice for two decades and if you want to call that an entitlement, then yes, I am entitled, as is the statistician entitled to each stat classes that need to be covered and the higher ed. finance professor who was hired to do that is entitled to the higher ed. finance classes if they become available and so on and so forth." (Ex. 2, Lugg Dep. 197:13-25.)

57. Dr. Dean testified as to her own retaliation at the hands of Dr. Sutton as follows:

> A. Retaliation. When people get widely different amounts of resources; when e-mails to the department chair go unanswered; when my requests for -- I need to have them sign off on something and he refuses to sign my documents; when -- just the general hostility within the department; when I stopped getting all summer teaching employment and my courses started to be given to adjunct faculty; what -- steady string of negative performance appraisals; being penalized or chastised for making some kind of mistake that another faculty -- not -- but no comment on that, gets -- gets -- there's no problem; allowing faculty to treat me disrespectfully and hostilely in meetings, without fulfilling his role as department chair. Having things like fake -- fake grievance hearing -- having -- what do you call -- like a mock grievance committee -- grievance hearing within the department. He sometimes has invented his own ways -- his own use of policy within the department, using committees for what they're not intended to be used or not using ones for what they're intended to be used; making it very difficult for some students -- some of my dissertation advisees to progress normally through the program. Do you want me to go on? I mean, that -- those kind of things.  (Ex. 6, Dean Dep. 147:16 – 148:21.)

58. Dr. Dean testified as to her knowledge of Dr. Lugg's retaliation at the hands of Dr. Sutton as follows:

> Q. Have you had -- has Betsy -- has Professor Lugg told you that she shares any of these concerns with you, that she feels that they -- she experienced the same thing?

A. I'm aware of the things that happened with a few dissertation committees because I'm on those committees, so I'm aware of that. I'm aware that the law journal was taken away from her. I'm aware of that.

Q. Okay. So she spoke with you about that?

A. I'm aware that she also stopped receiving summer employment and that courses she would normally teach were assigned to adjunct faculty instead.

…

Q. Okay. Did she ever speak to you about her courses being reassigned to faculty with insufficient knowledge of the subject matter?

A. Yes.

Q. And what did she say?

A. Well, I'm aware that her -- just as some of my -- my summer teaching was reassigned to adjunct faculty with lesser qualifications than me in the subject area, hers was as well.

Q. Are you aware that this is a trend nationwide, that courses are being reassigned to adjunct faculty throughout universities across the country?

A. I am aware of that, but I am aware that within the EAF department, it's really only Betsy Lugg and I that that applies to, other than faculty who normally never want summer teaching.

Q. Okay.

A. I'm aware that other faculty gets full loads in the summer. (Id., 148:22 – 149:12 and 150:9 – 151:5.)

59. Defendants attach as Exhibit 18 to their motion an excerpt from page 5 of the report of plaintiff's expert, Dr. Stan Smith, stating in part: "The net loss of earnings capacity is $998,315 to age 75 for annual employment." (See Def. Ex. 18.)

60.  Attached hereto as Exhibit 18 is an excerpt from the Report of Defendants' Expert, William M.G. Pearson, page 6, where he summarizes his calculations of Dr. Lugg's alleged lost earnings and employee benefits to be in a range from $273,000 to $657,000.

My calculations of Dr. Lugg's alleged lost earnings and employee benefits using probabilities that she would have been and will be working in each year in the future yield a value of her loss of approximately $657 thousand. Using, in addition, a more plausible assumption about the number of income-generating courses Dr. Lugg claims to have been illegally withheld from her and using a more reliable method of incorporating that information yields a value of her lost earnings and employee benefits of approximately $273 thousand.

## III. <u>ARGUMENT</u>

### A.  <u>Summary Judgment Standards</u>

Very briefly, as recognized by this court in *Citizens for a Better Environment v. Caterpillar, Inc.*, 30 F.Supp.2d 1053, 1056 (C.D. Ill. 1998):

> "A motion for summary judgment will be granted where there are no genuine issues of material fact. ... Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1996)."

Importantly, as noted in *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), District Courts must avoid "the temptation to decide which party's version of the facts is more likely true:"

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1138 (7th Cir.1994); *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1041 (7th Cir.1993). Rather, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. *Shepherd v. Slater Steels Corp.,* 168 F.3d 998, 1009 (7th Cir.1999). As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants. *Weeks v. Samsung Heavy Indus.,* 126 F.3d 926, 933 (7th Cir.1997); *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir.1997); *Wohl v. Spectrum Mfg.,* 94 F.3d 353, 358 (7th Cir.1996); *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir.1992).

**B.   This Court Previously Rejected Defendants' Argument That Lugg's Ethics Act Retaliation Claim Against Sutton in His Official Capacity Should Be Dismissed.**

Defendants first argue "Count I of Lugg's Complaint alleges that Sutton retaliated against her in violation of the Ethics Act. Lugg brings this claim against Sutton in his official capacity. … This official capacity claim is redundant to her Ethics Act retaliation claim against ISU and, thus, it should be dismissed."  This Court, in its February 20, 2019 Order denying Defendants' Motion to Dismiss, already (correctly) noted that "paragraph 4 names Sutton as a Defendant 'in both his individual capacity and in his capacity as agent and representative of Illinois State University' and paragraphs 54-55 state Count I is brought against Sutton under the individual liability provisions in Section 15-10." (*Lugg v. Sutton*, 368 F. Supp. 3d 1257, 1260 (C.D. Ill. 2019).)

The Court then concluded "From the language of the statute and the legislative intent that can be inferred from adding 'State employee' to Section 15-10, the Court finds that State employees in their individual capacities may be subject to liability under the Act." (368 F. Supp. 3d at 1262.) Defendants provide this Court with no new argument, and their request to dismiss Count I must be rejected.

**C.   Lugg's Retaliation Claims in Counts I, II, and IV Against Sutton and ISU**

As summarized by Defendants, "Lugg brings retaliation claims pursuant to the Ethics Act against Sutton (Count I) and ISU (Count II) and pursuant to Title VII against ISU (Count IV). She claims that Sutton and ISU retaliated against her for complaining about gender discrimination against her and others within EAF: (1) for participating in ▮▮▮▮ ▮▮▮▮ discrimination complaint against Sutton in April 2015, (2) for filing an internal ethics complaint against her colleague Zeng Lin in November 2015, (3) for her ongoing internal formal and informal complaints of discrimination based on sex beginning in or around June 2015, and (4)

for filing charges of discrimination with the Illinois Department of Human Rights on May 22, 2017 and December 7, 2017." (Def. Motion at 33.)

Plaintiff does not take issue with Defendants' manner of a consolidated issue presentation of the retaliation claims[1] in Counts I, II, and IV together in this one section,  As noted by Defendants, the framework is essentially the same: "on a Title VII retaliation claim, Lugg must prove that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Lewis*, 909 F.3d at 866."  (Def. Motion at 34.)

Likewise, "on an Ethics Act retaliation claim, Lugg must prove that: (1) she disclosed to a public body an activity, policy, or practice of any other state employee that she reasonably believes is in violation of a law, rule, or regulation; and (2) that conduct was a contributing factor in the retaliatory action she alleges. *See Hosick v. Chi. State Univ. Bd. of Trs*., 924 F. Supp. 2d 956, 974 (N.D. Ill. 2013)." (Def. Motion at 34.)  Thus, the ultimate question under either claim is whether Dr. Elizabeth Lugg's admittedly protected activities were "a contributing factor in the retaliatory action she alleges."

1. **Plaintiff engaged in a statutorily protected activity**

Defendants concede the first element: "For purposes of summary judgment, Defendants do not contest that any of these actions constituted protected activities."  (Def. Motion at 34.)

2. **Plaintiff suffered an adverse employment action**

Defendants essentially concede the second element. Contrary to defendants' claim at page 35 that "almost none of the actions she complains of constitute adverse employment actions," (which necessarily implies that at least some do), clearly, under the Seventh Circuit's

---

[1] As noted by defendants, "Lugg brings retaliation claims pursuant to the Ethics Act against Dr. Sutton (Count I) and ISU (Count II) and pursuant to Title VII against ISU (Count IV)." Def. Motion at 33.)

"broad" definition, all of these, at least inasmuch as they resulted in loss of income, qualify as adverse actions.  See *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999):

> "An employee claiming retaliation must show that he suffered a 'materially adverse employment action.' *McDonnell v. Cisneros*, 84 F.3d 256, 258 (7th Cir.1996). We have defined the phrase broadly in this circuit; **it of course includes readily quantifiable losses such as loss or reduction of pay or monetary benefits**, but it can encompass many other forms of adversity. *See Smart,* 89 F.3d at 441 (citing examples)."

As Plaintiff testified: "Remember my salary's been cut by 40 percent." (Lugg Dep. 54:13.)

Between pages 34 and 48 at page 34 of its Summary Judgement Motion, Defendants ignore the second element of adverse employment actions by focusing solely on the third element and/or mixing its discussion of causal links/independent nondiscriminatory justification defense with an implied argument that any adverse action was therefore "de minimis."  Technically, it appears the defendants waive the issue of "adverse employment" action by not briefing the issue.  But in the event the issue was inferred, the response is as follows:

List of economic consequences of adverse employment actions:

- Cancellation of law Journal and $6,000/year income
- Denied summer teaching  income and compensation
- Denied overloads and additional income.

It should be noted that in their statement of facts, defendants reference plaintiff's expert economist and his opinion that plaintiff has suffered economic damages of "$998,315 to age 75." (See Def. Ex. 18.)  This could hardly be described as "de minimis."  Nonetheless, as set forth in defendants' own expert's report (Plaintiff's Exhibit 18), he summarizes his calculations of Dr. Lugg's alleged lost earnings and employee benefits to be in a range from $273,000 to $657,000. This, too, could hardly be described as "de minimis."

### 3.   There is a causal link between the protected activity and the adverse action

The only real fighting issue is causation.  Plaintiff takes great issue with Defendants' specific

method of analyzing the causation element of the retaliation claims in its Argument.  First,

Defendants are simply incorrect as a matter of law in arguing "Title VII and Ethics Act

retaliation claims cannot survive summary judgment where a defendant has set forth a legitimate,

non-retaliatory reason for its decision." (Def. Motion at 34.) This argument entirely and

obviously ignores the last step in the analysis – pretext. As summarized in *Robertson v. Dep't of*

*Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020):

> To succeed on a Title VII retaliation claim, a plaintiff "must produce enough
> evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected
> activity; (2) the [employer] took a materially adverse action against her; and (3) there existed
> a but-for causal connection between the two." *Burton*, 851 F.3d at 695; *Lord v. High Voltage*
> *Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).
>
> When the plaintiff establishes a prima facie case of retaliation, an employer may
> produce evidence which, if taken as true, would permit the conclusion that it had a legitimate
> non-discriminatory reason for taking the adverse employment action. *See Lord*, 839 F.3d at
> 564. If the employer meets this burden, the plaintiff, to avoid summary judgment, then must
> produce evidence that would permit a trier of fact to establish, by a preponderance of the
> evidence, that the legitimate reasons offered by the employer were not its true reasons but
> were a pretext for discrimination. *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir.
> 2008).

Thus, even if this Court were to agree that Defendants met their burden of establishing

"legitimate, non-retaliatory" reasons for this 6-year pattern of retaliation, that in no way means

they prevail on their motion. Of course, Plaintiff still has the opportunity to "produce evidence

that would permit a trier of fact to establish … that the legitimate reasons offered by the

employer were not its true reasons but were a pretext for discrimination."

Second, instead of analyzing causality as a whole, and entirely failing to point out and

rebut any evidence favorable to Plaintiff, (for example, it is noteworthy and damning that

Defendants do not cite to even a single deposition of any of the students deposed in this case),

what Defendants do from pages 34-48 of their Argument is parse out each individual element of

alleged damage. As stated in the Introduction:

> What defendants attempt to do in their motion is parse out each individual claim
> of damage (for example, each individual class – EAF 512, 436, etc. -- taken away for
> each semester, her summer classes taken away, her independent studies taken away, her
> journals taken away) and then justify or rationalize those decisions based on some alleged
> business reason (or merely Sutton's discretion), but employment law does not work this
> way.

Instead, discrimination and retaliation cases recognize that district courts on summary judgment

must view the complete picture of the case as a whole, not parsed out individual puzzle pieces as

defendants do in their Argument.

Although the Seventh Circuit, in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765

(7th Cir. 2016), did away with the "convincing mosaic" methodology for analyzing employment

cases, it nonetheless recognized that "Evidence must be considered as a whole, rather than asking

whether any particular piece of evidence proves the case by itself:"

> That legal standard, to repeat what we wrote in *Achor* and many later cases, is
> simply whether the evidence would permit a reasonable factfinder to conclude that the
> plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or
> other adverse employment action. Evidence must be considered as a whole, rather than
> asking whether any particular piece of evidence proves the case by itself—or whether just
> the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant
> evidence must be considered and irrelevant evidence disregarded, but no evidence should
> be treated differently from other evidence because it can be labeled "direct" or "indirect."

> Some opinions have observed that the methods largely rely on the same pieces of
> evidence. See *Harper*, 687 F.3d at 314 ("[T]he line between circumstantial evidence
> under the direct method and indirect evidence of discrimination or retaliation under the
> burden-shifting approach has been blurred by the gradual integration of these
> methodologies."); *Hutt*, 757 F.3d at 691. Why have two tests if they consider the same
> information and answer the same question?

> True, some cases permit easy inferences, such as the fabled employer who admits
> to firing an employee because of race. But even then factfinders must ask themselves
> what the admission means. Few discrimination cases are so straightforward—indeed they

are often factually complex and require sifting through ambiguous pieces of evidence. And the direct-and-indirect framework does nothing to simplify the analysis. Instead it complicates matters by forcing parties to consider the same evidence in multiple ways (and sometimes to disregard evidence that does not seem to fit one method rather than the other).

Accordingly, instead of following Defendants' model of parsing out each individual adverse action, Plaintiff will place the evidence in its logical context, "considered as a whole," to demonstrate that, as posited by *Igasaki:* "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" See *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.,* 988 F.3d 948, 959 (7th Cir. 2021):

> Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). As with discrimination claims, the question for a retaliation claim should always be: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016); *see Ortiz*, 834 F.3d at 765

### a. Temporal Proximity

Plaintiff's first argument is that she has that rare evidence of timing proximal and suspicious enough to show causation and preclude summary judgment.  As noted in *Igasaki*, 988 F.3d at 959:

> Under our caselaw, "[s]uspicious timing is rarely enough to create a triable issue." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). So "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012).

Here, Plaintiff has at least two examples of suspicious timing, one within days, and the other within 2 hours!

First, within days of providing corroborating evidence, Sutton asked for the syllabus for one of Dr. Lugg's courses, and within approximately one week had taken away that class.  See Elizabeth Lugg Deposition, 257:16 – 258:3:

> … ▮▮▮▮▮ had filed the complaint on the 8th of April 2015; that one week later on the 15th of April 2015 during a faculty meeting, Dr. Sutton referenced that complaint to the faculty at length; that on April 17th, 2015, I provided my testimony and then I believe it was three days -- a week later, Dr. Sutton started in with requests such as -- at that date requesting my syllabus on 521.

See also *id*., 413:5-10:

> A.  … if you look at the timeline of April 8th, the complaint is filed, April 15th Lenford talks about it in some great detail, April 17th, I give testimony and April 21st, all of a sudden now my syllabi is being scrutinized and a class is being taken away from me.

It is undisputed that whether Sutton knew with absolute certainty that plaintiff was a witness to ▮▮▮▮▮ complaint, Sutton admitted in his deposition that he "believed" that she was in April, 2015. See Lenford Sutton Dep 123:14 – 123:20:

> Q. Is it your testimony that you believed Dr. Lugg was serving as a witness back in April, but you did not know that she was serving as a witness until well after the filing?
>
> A. That's my -- yes.
>
> Q. That is correct?
>
> A. Yes.

And without question, Sutton knew for a fact that this formal complaint had been brought against him by June 11, 2015 because he admits receiving the e-mail sent at 11:00 a.m. on June 11, 2015 from M. Shane McCreery, ISU's Ethics Officer and Title IX Coordinator at that time, to Sutton stating in part:

> This letter is to inform you that the Office of Equal Opportunity, Ethics, and Access (OEOEA) has received a complaint filed by ▮▮▮▮▮ ▮▮▮▮▮ alleging that you violated the University's Anti-Harassment and Non-discrimination Policy by

discriminating against her on the basis of her color and sex.  (See Ex. 3, Sutton Exhibit 25)

Within **2 hours** of receiving formal notice, Sutton sent an e-mail to plaintiff at 12:58 informing her that there would be "no expenditures for the policy and law online journal for next year." (See Ex. 4, Sutton Dep. Ex. 8.)  As Sutton admitted:

> Q. So whereas previously you had budgeted -- reduced the budget from four to two journals, now on June 11th you are reducing it completely?
>
> A. Yes.
>
> Q. Okay. And would you agree this is just under two hours after you were e-mailed that ███████████ had filed the OEOEA complaint?
>
> A. I guess, yes.  (Sutton Dep., 88:15 – 90:22.)

On summary judgment, this Court cannot ascribe some innocent, coincidental justification for Sutton's immediate removal of plaintiff's budgeting for journals, a source of $6000 annual income!

In support, in L*ord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016), the Court allowed this inference of retaliation based on suspicious timing where the actors involved, "Bohlen and Kopecky fired Lord two days after he talked to Bohlen about Reimer. Kopecky was aware of Lord's complaint because Bohlen immediately forwarded it to him."

> Lord relies entirely on evidence of suspicious timing. He was fired within two days of his complaint about Reimer's conduct and only one day after telling Kent that he was "close to filing a complaint with the [Illinois Department of Human Resources] and EEOC." Suspicious timing by itself will rarely support an inference of retaliation, but it may do so "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Culver*, 416 F.3d at 546 (quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). The record supports drawing the inference here. Bohlen and Kopecky fired Lord two days after he talked to Bohlen about Reimer. Kopecky was aware of Lord's complaint because Bohlen immediately forwarded it to him.

Likewise, in *Stading v. DFC Transp. Sys. Int'l, Inc.*, No. 92 C 1801, 1993 WL 338987, at *5

(N.D. Ill. Sept. 1, 1993):

> Because there is evidence of both the decisionmakers' knowledge of Stading's activities and a telling proximity between the protected activity and the adverse employment action, a jury could reasonably infer a causal connection between Stading's complaints about overtime compensation and his discharge. DFC's alternative explanation for the timing of the criticism—that the switch from the regional to personal dispatch system made it possible, for the first time, to detect Stading's performance deficiencies—obviously is another possible inference from the record. The court may not, however, at this juncture determine which explanation is more credible. As a result, the record contains a genuine issue of fact regarding the causal connection

This Court also may not, at the summary judgment juncture "determine which explanation is

more credible."  It is undisputed that Dr. Sutton received the formal complaint sent at 11:00 a.m.,

and one hour and fifty-eight minutes later took material, adverse action against Plaintiff.  On this

basis alone, summary judgment must be denied.


### b.   Other Evidence that Supports the Inference of a Causal Link

To the extent this Court ignores Sutton's admissions that he took at least one of his

earliest retaliatory actions against plaintiff within 2 hours of receiving a Title IX Complaint

regarding which he not only admits he knew Plaintiff was a witness, but which he would later

allege in his own ethics complaint she essentially masterminded, there is certainly "other

evidence" in this record supporting the inference of a causal link.  See *Igasaki*, 988 F.3d at 960:

> When suspicious timing alone is insufficient to carry the plaintiff's burden, a plaintiff may 'survive summary judgment if there is other evidence that supports the inference of a causal link.' " *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).

As noted in *Bilinski v. Foote-Jones/Illinois Gear*, No. 92 C 3687, 1993 WL 502330, at *4 (N.D.

Ill. Dec. 3, 1993): "Proof of this causal connection necessarily entails an inquiry into the

employer's intent. In actions for retaliatory discharge, the issue of intent is usually

a question of fact, and is therefore not normally subject to summary judgment. See also *Stading*

*v. DFC Transp. Sys. Int'l, Inc.*, No. 92 C 1801, 1993 WL 338987, at *7 (N.D. Ill. Sept. 1, 1993):

> Issues of causation or "retaliation," like most issues of motive and intent, are
> generally questions of fact. *Hamann v. Gates Chevrolet, Inc.,* 910 F.2d 1417, 1420 n. 4
> (7th Cir.1990). While no factual question may be resolved on summary judgment unless,
> based on the evidence, no reasonable or rational trier of fact could find in favor of the
> non-moving party, this general standard is to be applied with extra vigor where intent is
> involved. *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th
> Cir.1992).

Mindful of the admonition in *Ortiz* that "Evidence must be considered as a whole, rather

than asking whether any particular piece of evidence proves the case by itself—or whether just

the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence

must be considered and irrelevant evidence disregarded, but no evidence should be treated

differently from other evidence because it can be labeled 'direct' or 'indirect,'" Plaintiff has

numerous pieces of evidence, which, taken together, must at least show a triable issue of fact

exists for the jury as to whether there is an inference of a causal link.

First, it must be a question of fact whether Sutton explicitly threatened retaliation against

Plaintiff: "If you mess with me, you're going to get it back -- you're going to feel it." See

Deposition of Diane Dean, 102:3-20:

> Q. You said Dr. Sutton brought this up during a faculty meeting. Can you tell me
> specifically what happened during that meeting?
>
> A. My memory of that meeting is documented in a letter that I included in the
> package that I sent to you. When we got to the meeting, it was not about what we had
> been called there to discuss. The meeting was about this document that had been left in
> the hallway.
>
> Q. What else happened during that meeting?
>
> A. Dr. Sutton was angry, crying, cussing, making threats.
>
> Q. What threats did he make?

89

> A. Well, he looked right at Betsy Lugg and I, and he said, If you mess with me, you're going to get it back -- you're going to feel it.  And he referred to himself as an old gangster.

This statement by Dr. Sutton that "you're going to get it back -- you're going to feel it," must be construed favorably to Plaintiff.  And the only fair construction of that statement is that it reveals the very personality trait which Plaintiff suspected in the immediate aftermath of her being a witness for ███████████ in April, 2015, and reinforced on this record by his act of taking away Plaintiff's journals less than 2 hours after receiving ██████ formal complaint.  He lashes out in anger and pure retaliation whenever anyone, particularly a female, dares to question or assert a complaint against him. Just look at the context of the statement.  He becomes aware of the copy of some document relating to his Florida reprimand being left on campus, and immediately sends an e-mail calling an emergency meeting the next day for which attendance was mandatory (and it should be noted that this was on winter break), under the pretense of a budget meeting.  And clearly the real purpose of the meeting was to accuse, falsely, Plaintiff with having left the document.  And it must be for the jury whether the true reasons for his repeated adverse actions towards Plaintiff was exactly this retaliatory motive: "If you mess with me, you're going to get it back -- you're going to feel it."

Second, Sutton's retaliatory motives were revealed when he brought his own claim against Plaintiff on March 31, 2016, in which he referred to Ms. ██████ as Plaintiff's (as well as Dr. Diane Dean's) "student-surrogate" and "minion," and whom he falsely accused of being "employed by Lugg" to file complaints against him.

Third, the only professors who did "feel it" were Dr. Lugg and Dr. Dean, the only two to bring claims against him and the two he believed (falsely) to be behind the student complaint against him.  As Diane Dean summarized in her deposition at 147:16 – 148:21:

90

A. Retaliation. When people get widely different amounts of resources; when e-mails to the department chair go unanswered; when my requests for -- I need to have them sign off on something and he refuses to sign my documents; when -- just the general hostility within the department; when I stopped getting all summer teaching employment and my courses started to be given to adjunct faculty; what -- steady string of negative performance appraisals; being penalized or chastised for making some kind of mistake that another faculty -- not -- but no comment on that, gets -- gets -- there's no problem; allowing faculty to treat me disrespectfully and hostilely in meetings, without fulfilling his role as department chair. Having things like fake -- fake grievance hearing -- having -- what do you call -- like a mock grievance committee -- grievance hearing within the department. He sometimes has invented his own ways -- his own use of policy within the department, using committees for what they're not intended to be used or not using ones for what they're intended to be used; making it very difficult for some students -- some of my dissertation advisees to progress normally through the program. Do you want me to go on? I mean, that -- those kind of things.

See also *id.*, 148:22 – 149:12:

Q. Have you had -- has Betsy -- has Professor Lugg told you that she shares any of these concerns with you, that she feels that they -- she experienced the same thing?

A. I'm aware of the things that happened with a few dissertation committees because I'm on those committees, so I'm aware of that. I'm aware that the law journal was taken away from her. I'm aware of that.

Q. Okay. So she spoke with you about that?

A. I'm aware that she also stopped receiving summer employment and that courses she would normally teach were assigned to adjunct faculty instead.

150:9 – 151:5:

Q. Okay. Did she ever speak to you about her courses being reassigned to faculty with insufficient knowledge of the subject matter?

A. Yes.

Q. And what did she say?

A. Well, I'm aware that her -- just as some of my -- my summer teaching was reassigned to adjunct faculty with lesser qualifications than me in the subject area, hers was as well.

Q. Are you aware that this is a trend nationwide, that courses are being reassigned to adjunct faculty throughout universities across the country?

A. I am aware of that, but I am aware that within the EAF department, it's really only Betsy Lugg and I that that applies to, other than faculty who normally never want summer teaching.

Q. Okay.

A. I'm aware that other faculty gets full loads in the summer.

Fourth, contrary to Defendants' entire construct of parsing out each individual decision, the view favorable to Plaintiff is that this entire history of taking away one class after another, one summer session after another, when Suttton admits Lugg was the **only** professor not offered summer school for some years, for removing plaintiff (and Diane Dean) from classes and replacing her (and Dean, the only other professor to bring a claim against Sutton), with adjuncts, from explicitly advising students not to use Lugg as the dissertation advisor, all must be considered together, not individually, to show causality.  See Lugg Dep. 227:22 – 228:10:

Q. What did this change in curriculum have to do with ███████████ complaint?

A. It's retaliation. It doesn't have anything directly to do. It has to do that I engaged in a protected activity. Lenford Sutton then started to retaliate against me and one way he did it was to start to take away my teaching, belittle my expertise, and shut down the area that I was hired to teach. It's not a law class. We're going to hand it over here. It's you don't get to teach the policy. Bit by bit he was phasing me -- in retaliation, he was phasing me out  …

See also Lugg Dep. 153:9-16: "the retaliation, discrimination, harassment has continued since we filed the Complaint in 2018. It is now 2020. Since that time, I've continued to be denied teaching classes that I was the most qualified individual and should have been assigned to teach while others were being assigned full or overloads in the summer and overloads during the fall and spring semester."

Fifth, as testified by both Dr. Lugg and Dr. Dean, for all of Defendants' many excuses from pages 35-48, these adverse actions happened only to Lugg and Dean. Plaintiff testified "similarly situated individuals should be treated similarly and other faculty in the department are -- not only have I been given that for the last 20-plus years, but other people in the department currently, there are some individuals that teach four courses in the summer. There are some individuals whose salary has been doubled through overload and. So it is done routinely…. But the simple fact is when all those individuals and I am similarly situated and my work is being farmed out to individuals that are either not even faculty or have lesser degrees than I do, then similarly situated individuals are not being treated similarly and it appears to be an arbitrary and capricious decision upon the Chair and perhaps discriminatory as well." (Ex. 2, Lugg Dep.188:23 – 189:18.)

See also Dean Dep. 150:9 – 151:5: "within the EAF department, it's really only Betsy Lugg and I that that applies to, other than faculty who normally never want summer teaching. … I'm aware that other faculty gets full loads in the summer."

Sixth, Defendants ignore all of the voluminous testimony of their own students, who, without exception, testified that Dr. Sutton extended his retaliation of Dr. Lugg to affect, directly, both Dr. Lugg and the students themselves. In support, see Dean Dep. 158:20 – 159:3: "I have observed that things have been made unusually difficult for Dr. Lugg's students and for some of mine, that Dr. Sutton has made things unusually difficult for them in the dissertation process."

In specific support, see ████████ 63:17 – 64:21:

Q. Do you have any opinions about her motivation for giving you what you are calling an untruthful assessment? …

93

A. I think she was suggested to be put on my committee to fail me, and I think that there wasn't -- she was a part of the foundation, she was a part of the handpicked crew that I was supposed to choose from from Dr. Sutton, which coincidentally were all foundation's faculty. And she really, throughout the entire process, had very little input, seemed to care very little about providing me an opportunity to succeed. And with very shallow comments and no comments, really, I believed that she was put there to fail me, given as an option to look good on the front end, but to get me out.

Q. So is it your testimony that Dr. Sutton, in order to disadvantage Professor Lugg –

A. By taking away her students.

Q. -- took away her students and went to the extent of placing a faculty member on your dissertation committee who would provide an untruthful assessment of your work in order to fail you just to get at Dr. Lugg?

A. Is that my opinion?

Q. Yes.

A. Yes

See also *id.*, 73:5-19

Q. And it is your opinion that all of this treatment was a result of Dr. Sutton wanting to deprive Dr. Lugg of students, and one of those students was you, correct?

A. Yes. I mean, I think it was, yes.

Q. Okay. What is your opinion as to why Professor Sutton wanted to derive Dr. Lugg of students?

A. She's a faculty member. Her job is to work with students. Her job is to be an advocate for students and to teach law. I feel he wanted -- through taking away students and opportunities, wanted -- that was his way of damaging her. That was his way of making that happen.

See also *id.*, 80:2 – 82:11:

Q. Did she tell you why she believed those courses were taken away?

A. She just thought it was retaliation. She didn't go into specifics.

Q. Retaliation for what?

94

A. I don't know.

Q. Did she ever complain that Professor Sutton referred to her training as a joke?

A. No.

Q. That he demeaned and disregarded her qualifications?

A. He certainly did with me in that meeting.  I'm not sure, but I would say, yes, we have had conversations about that because she was incredibly frustrated.

Q. Specifically what did she say as to how Professor Sutton demeaned and disregarded her qualifications?

A. I don't recall specifically, but just off the top of my head, taking away courses, taking away a law review journal that she had been writing for several years as part of her tenure portfolio, questioning every part and purpose of the dissertation process with her students as a lived experience.

Q. Anything else?

A. No.

Q. What did Professor Sutton say during the meeting that you had with him that you consider demeaning and disregarding Dr. Lugg's qualifications?

A. Well, the whole meeting itself was to get me to switch from her as my advisor to expand my academic mind. What the hell does that mean?  It's like this woman is not good enough to help me expand my academic mind? That when I have a policy in law type of dissertation that I am going to write, that I can't go to the policy and law expert in the department, but rather give me options to go to a guy who is a specialist in community colleges, or a specialist in student affairs, or a specialist in whatever, even international education? Elizabeth Lugg was the law professor in the Department of Educational Administration and Foundations at Illinois State University. She had taught the law courses in my Master's program and my doctoral program. There was no one else, there was no one else that I would have went to for a legal -- for a legal and policy dissertation. There just wasn't.  And the whole fact that I had to sit at a meeting with him and have him tell me that other faculty members would be more of a fit for what I wanted to do, even though he didn't give a damn about what I wanted to do, was evidence to me that he didn't respect her.

And, most specifically, see also *id.*, 86:6 – 87:15:

Q. Did Professor Sutton ever tell you that you would have an easier time graduating if you chose a different dissertation chair?

A. He didn't come right out and say that, but it was very clear in our meeting that graduating with my current structure was not -- was not in my best interest, it was not going to happen.

Q. What specifically did he say that implied this?

A. That I am not set up for success, that he didn't see -- he saw that my avenue to complete my comprehensive exams and dissertation needed to be under the watch of someone else.

Q. What made you believe that he was making those statements in order to harm Dr. Lugg as opposed to because he was acting in your best interest in trying to help you?

A. Because he gave no reason why those changes needed to be made. There was no – there was no conversation as a part of that meeting that showed me that he had any other reason to believe, he just kind of smirked, and put his hand over his face and rubbed his face. There was nothing substantive there that would make me think that there was a reason other than him just wanting her off my -- off my file, off my dissertation.

Q. Do you have any other basis for that belief, anything else to support it?

A. I mean, no. I just got the pure sense that there was no justification for it. There was no argument as to how I could be positioned better, it was just this is the option that's in front of you.

In fact, Sutton even put this in writing to ███████   See Ex. 9, Sutton Dep., Ex. 14, email from

Sutton to ██████ dated January 30, 2017: "Your independent study would have better

meaning if you worked with another professor, let me know if you would like to do that.  I will

find another colleague to help you."  As Plaintiff wrote in her e-mail on this same exhibit to

Anthony Walesby: "Here is a message that Dr. Sutton sent to one of my students who then

forwarded it to me because he was concerned with Dr. Sutton's statement.  It appears that he is

suggesting to students that they would be better off working with a different professor.

Unethical, unprofessional, retaliatory, discriminatory, and harassing.  I told you he was keeping

me from doing my job.  Now I see it goes beyond class assignments.  As explained by ██████

at Ex. 8, 139:10 – 140:18:

Q. What was your expectation of a potential response from Dr. Sutton?

A. Anything to help me meet my half-time status or look at options for 599 being a viable option to reach half-time status.

Q. Now I'm going to scroll up to the response. This was -- I am sorry. That was just a few minutes later, less than minutes later, and he writes directly back to you, "Your independent study would have better meaning if you worked with another professor." How did you take that?

A. I mean, I take it as you need to work with another professor, not Dr. Lugg.

Q. Why would that be if she's basically your dissertation chair who's assisting you with the main project that you have left?

A. That's a great question. I have no response other than that -- … this is a barrier, this is another barrier to finishing. These types of responses of it would have better meaning if you worked with another professor, meaning that I haven't gained what I needed to by the professor that I had, and that's troubling to me.

Q. Your question was somewhat urgent, you had until 10:00 o'clock that night, right?

A. That's correct.

Q. And he really didn't answer your question?

A. No, no.

Likewise, see Deposition of ███ ███ 30:5 – 32:23:

A. … The issue that I have if you're asking me as -- myself as a person, if that's what you're getting at, is that I had an issue because this started at the beginning of the semester. He obviously knew that it was my electives. He could have had a meeting with me right away and discussed it with me. Instead I had to sit out an entire semester, which if you know, which I'm sure you do since you're an attorney, when you're on a path of -- and you have a plan and then all of a sudden you're at a stopping point, then it feels very frustrating and it sets you back, which it did. It gave me great mental anguish because I had to do it. So if you're asking me as a person, then that's what happened.

Q. Okay. So to recap, your concern was that -- not with the policy but that you felt that Dr. Sutton could have acted on this earlier in the semester and done things sooner so that you wouldn't have had –

A. Absolutely, absolutely. I can't look at the e-mails right now, but I'm sure if we looked at it, I think that it happened pretty early in the semester where I had an opportunity to have a discussion with him and with Dr. Lugg. We could have had a

discussion and it would have been more professional and I could have said, "hey, I understand that this happened." And I had done two independent studies before and I was a straight A student and had worked hard and had worked hard in the whole program and had a very good track record, that we could have worked it out early on.  And -- but I feel personally that there was tension between Dr. Lugg and Dr. Sutton and so I was not able to have that conversation and that's my opinion.

Q. And what is the basis for your opinion that the delay in Dr. Sutton speaking to you about the elective was a result of tension between him and Dr. Lugg?

A. Based on the e-mails that I've read and that came to my e-mail and your counsel has probably read as well that there was tension from both sides, from Dr. Lugg in e-mails to me and also e-mails that went out to Dr. Sutton, e-mails that went out to the whole -- whatever that group is that Dr. Lugg works within, whoever those colleagues are, that there was tension from the tone of the e-mails and from the tone of his e-mails that were very short. His e-mails were very short, just two lines. "It's your elective." "Something is wrong with your plan; meet with me and your advisor as soon as possible." You know, those kind of things, which I think could have been handled much more professionally in my opinion, that we could have had a conversation, that we could have sat down together and moved forward. So I believe by the tone of the e-mails and by those that came to me even up until I graduated. So when I put in for I want to say it must have been November of 2020 and I put in for my  review, he questioned an independent study that he had approved. So I had to find that e-mail of approval and send it on. So there was the fear of a stopgap there right before my dissertation.

See *id*., 43:18 – 44:4:

Q. Do you think he was retaliating against you for anything?

A. Do I think that he made the situation difficult because of my relationship with Dr. Lugg?

Q. Whatever you think –

A. Yes.

Q. Okay. That's fine. Do you think he was retaliating against Professor Lugg for anything?

A. Yes. Through the tone of the e-mails and what we spoke about already during this deposition, yes.

See also *id*., 47:9-18:

My gut feeling is yes, he would discriminate against me. My gut feeling is that he is not a good boss, that he should not be the chair of our program. My gut feeling is that

98

he treats people unfairly, especially women who are white. That's my gut feeling, okay, that he is not professional in any way, that he tries to intimidate people, that he could have done a much better job with me personally as the chair and as the professional.

Finally, see also Ex. 7, ▮▮▮▮▮▮▮ Dep. 30:5-18:

When I say "the entire situation," I essentially mean the time that I was at ISU and her interactions with Dr. Sutton.  Dr. Sutton restricted the classes and the coursework that both Dr. Lugg and Dr. Dean were allowed to offer and their independent studies that they were allowed to oversee.  The students that Dr. Lugg oversaw for dissertations had more resistance in their process, and then during the faculty meetings or faculty conversations, whatever you decide to call them, they, Dr. Dean and Dr. Lugg, were often pinpointed as, like, a bad guy.

See also *id.*, 52:10 22:

Q. Do you think that Professor Sutton treated you differently based on your relationship with Professor Lugg?

A. Yes.

Q. Why is that?

A. I'm not quite sure why he decided to treat me differently, and I'm not going to speculate because I don't know his thought process. But I know that I was treated differently than other students.

Q. And based on your relationship with Lugg, as you see it?

A. I think that was a part in it, yes.

For all of these reasons, in addition to the suspicious timing, which cannot be ignored

whether this Court believes it sufficient to preclude summary judgment by itself, a jury, and not

Dr. Sutton, must be allowed to decide whether the inference of a causal link is appropriate in this

case. See *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011)

Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible. See, e.g., *Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("very close" temporal proximity can suffice); *Casna v. Loves Park,* 574 F.3d 420, 427 (7th Cir.2009); *Spiegla v. Hull,* 371 F.3d 928, 943 (7th Cir.2004); *McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796–97 (7th Cir.1997). Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context, just as an

evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory. The district court's apparent belief that timing *never* supports an inference of causation is untenable. The closer two events are, the more likely that the first caused the second. We think that an inference of causation would be reasonable here. A jury, not a judge, should decide whether the inference is appropriate.

## D. <u>Plaintiff's Title VII Gender Discrimination Claim</u>

Without repeating the arguments above as to pretext, Defendants' argument as to plaintiff's Title VII gender discrimination claim is that "Lugg's claim fails because she cannot present a single shred of evidence to support that any of Sutton's or ISU's decisions were based on her gender." (Def. Motion at 49.)  This is patently false.

See, for example, Lugg Dep.300:19 – 301:18:

A. …The male faculty member is not admonished for failing to communicate. He had had an entire semester to get the questions right. And yet even though Chair criticized the white female faculty member for failing to communicate information regarding a course and not apologizing to white female when it became obvious that she was not at fault for any lack of communication. That was communication about EAF 436. There is gender discrimination. Why was the male member not required, not criticized by the Chair, the male Chair, for not getting his act together and having this set before he went to Africa, and yet when the male Chair did not like the way I had communicated about a course, he didn't hesitate to criticize me. Two different standards.

Q. Other than the fact that you are female and the fact that he is male, is there any other basis for your belief that this has to do with your gender?

A. Well, I think that's the basis of gender discrimination, when like situated individuals --  yes, it does, if two people are expected to do the same thing and they're treated differently because of it.

See also *id.*, 303:1-23:

Q. And in the highlighted portion here, the highlight in the original, you say, "Bottom line, if you are black and especially if you are a black male, you are above reproach from the Chair. If you are a female, and especially a white female who does not fit the female stereotype, you are always at fault even if the facts say otherwise." What do you mean by not fit the female stereo type?

A. Differential (*sic*, deferential) there to serve, function as -- although called an assistant chair, function as the interior decorator of the department and the note-taker for

100

the male Chair. If you speak up, if you're strong, if you stand your ground, that's -- like Dr. Sutton said in one of the first stories that he told us not once but twice when he first came, it appears that -- he said that he was the youngest or one of the youngest in a large family and he loved to watch his brothers bring home dates who then tried to prove to his mother what good wives they'd make by helping in the kitchen and clearing off dishes. That is the typical stereotype.

See also Dean Dep 162:14-24:

> Q. Looking at the first sentence of that paragraph, Dr. Lugg writes, Lenford Sutton has been attempting to marginalize Dr. Dean and me for almost a year now in retaliation for being white females who have publicly disagreed with him, something that females, and especially white females, are forbidden to do in his world. Do you agree with that sentence?

> A. That has been my experience of Dr. Sutton, yes.

Defendants further claim that Dr. Sutton's alleged "revitalizing led him to enact significant changes in the department. These widespread changes affected all faculty members regardless of their gender." (Def. Motion at 49.)  This is belied by the only evidence in this record.  A jury must be allowed to determine whether "one or more similarly situated individuals outside her protected class received better treatment," (*Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018),) when, time after time, academic year after academic year, summer session after summer session, it is only the two females, Dr. Lugg and Dr. Dean, who receive this discriminatory treatment.[2] See Dean Dep. 150:9 – 151:5: "within the EAF department, it's really only Betsy Lugg and I that that applies to … other faculty gets full loads in the summer.

---

[2] As to any argument that Plaintiff was not performing satisfactorily, plaintiff had universally stellar performance reviews prior to Dr. Sutton, and had a fine review in 2020 when Dr. Sutton finally recused himself, and definitely asserts that Dr. Sutton's reviews were "phony."  Thus, under Seventh Circuit authority the second and fourth elements of the prima facie case merge; see *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687–88 (7th Cir. 2007)

> Where, as here, an employee claims that she "performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying." *Hague v. Thompson Distrib. Co.,* 436 F.3d 816, 823 (7th Cir.2006); *see Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir.1997) ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem *688 to merge.").

See also Lugg Dep. 188:23 – 189:18:

> … similarly situated individuals should be treated similarly and other faculty in the department are -- not only have I been given that for the last 20-plus years, but other people in the department currently, there are some individuals that teach four courses in the summer. There are some individuals whose salary has been doubled through overload and. So it is done routinely. ...  But the simple fact is when all those individuals and I am similarly situated and my work is being farmed out to individuals that are either not even faculty or have lesser degrees than I do, then similarly situated individuals are not being treated similarly and it appears to be an arbitrary and capricious decision upon the Chair and perhaps discriminatory as well.

## CONCLUSION

In their Conclusion, Defendants' close with the insulting statement "Lugg has been permitted to waste the State's time and money long enough—her lawsuit should be dismissed in its entirety and with prejudice for the reasons stated above."   Plaintiff will refrain from responding in kind.  For all of the reasons set forth above, summary judgment is inappropriate, and Defendants' Motion for Summary Judgment should be denied.

ELIZABETH TIMMERMNAN LUGG,
Plaintiff


By:  /s/ John F. Doak
        John F. Doak, Bar #6204122

For:
KATZ NOWINSKI P.C.
Attorneys for Plaintiff
1000 - 36th Avenue
Moline, IL 61265-7126
Telephone:  309-797-3000
Fax:  309-797-2167
jdoak@katzlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was served on the 26th day of March, 2021 by electronic service through the Court's ECF System to the following:

Monica H. Khetarpal – Monica.Khetarpal@jacksonlewis.com
Nicholas A. Simpson – Nicholas.Simpson@jacksonlewis.com

/s/ John F. Doak
KATZ NOWINSKI P.C.
Attorneys for Plaintiffs
1000 - 36th Avenue
Moline, IL 61265-7126
Telephone:  309/797-3000
Fax:  309/797-2167
E-mail: jdoak@katzlawfirm.com