E-FILED
Wednesday, 18 August, 2021  03:03:27 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ELIZABETH TIMMERMAN LUGG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-1412-JES-JEH |
| | ) | |
| LENFORD SUTTON, individually, and in his capacity as Chair, Department of Education Administration and Foundations at Illinois State University, BOARD OF TRUSTEES OF ILLINOIS STATE UNIVERSITY, an Agency of the State of Illinois, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendants' Motion (Doc. 32) for Summary Judgment. Plaintiff has filed a Response (Doc. 35) and Defendants filed a Reply (Doc. 36).

Plaintiff Elizabeth Timmerman Lugg is an Associate Professor in the department of Educational Administration and Foundations ("EAF") who began working at Illinois State University ("ISU") in 1996 then became tenured in 2001. Eighteen years after Lugg became a professor at ISU, Defendant Lenford Sutton was hired as the new Chair of the EAF Department in 2014. Sutton immediately began making changes to policies, procedures, and structure to better suit budgetary and student needs. Many faculty members appreciated those changes; Lugg was not among them. Within months of his arrival, Lugg began making internal complaints against Sutton including accusations that he, as a black male, discriminated against her and her student, as white females. Those complaints were investigated by ISU and ultimately declared unfounded. Similarly here, the Court finds Lugg's complaints devoid of any merit. While

Professor Lugg may, by her own words, be "entitled,"[1] it is Defendants who are entitled to summary judgment. Thus, for the reasons set forth below, Plaintiff will need to again take her complaints elsewhere because those alleged here are not actionable in federal court.

### BACKGROUND

As indicated above, Plaintiff Lugg is an Associate Professor at ISU in the EAF Department and Defendant Sutton is the Chair of that Department. Doc. 32, at SOF ¶¶ 9, 12. The ISU Board of Trustees is also named as a Defendant in this case. Each individual member of the Board in their official capacity as a member of the Board of Trustees of ISU were previously named as Defendants.[2] In Count I of her Complaint, Lugg alleges Sutton retaliated against her in violation of the Illinois Ethics Act ("Ethics Act"), 5 ILCS 430/15-10, after she complained of age and gender discrimination and assisted with a Title IX claim. Doc. 1-1, at 12-15. In Count II, Lugg alleges the Board also retaliated against her in violation of the Ethics Act. In Counts III and IV, she alleges the Board and the Board members discriminated and retaliated against her violation of Title VII of the Civil Rights Act of 1964. *Id.* at 18-24.

On December 31, 2018, Defendants filed a Motion to Dismiss, which the Court granted in part and denied in part. *See* Docs. 5, 8. The Court held Lugg may proceed on Count I against Sutton in his individual and official capacities, on Count II against the Board, and on Counts III and IV against the Board only. Doc. 8, at 12. The Court dismissed Counts III and IV against the individuals Board members because "Plaintiff fail[ed] to allege that the Board members were involved in the alleged discrimination or retaliation or that they were even aware of it." *Id.* at 10.

---

[1] *See* Plaintiff's Response, Doc. 35, at 12.
[2] Defendants Robert Churney, Robert Dobski, Rocco Donahue, Julie Annette Jones, Mary Ann Louderback, John Rauschenberger, Sharon Rossmark, and Sarah Aguilar were dismissed on February 20, 2019. Doc. 8, at 12.

Before discussing the undisputed facts, the Court makes the following admonition to Plaintiff. Simply put, the response section to Defendants' proposed material facts is no place for argument or pointing out other facts to explain away the proposed fact. That is the purpose of the argument section or additional material facts section. For example, see Plaintiff's four-page response to SOF ¶ 23 that includes pure argument and facts completely divorced from the proposed fact that Sutton, in his role as Chair, reviewed budgets and financial documents when he began working at ISU. Doc. 35, at 14-18. The first line of Plaintiff's Response represents that she has complied with Federal Rule of Civil Procedure 56 and Local Rule 7, then later dedicates an entire section to reminding the Court of the federal rules and local rules (from another district). *See id.* at 3, 8-9. Yet, the Court finds numerous deficiencies in Plaintiff's Response.

As the Court has informed parties in previous cases,

> While strict, the requirements imposed on the parties by Rule 56 and Local Rule 7.1(D) are not meant to be punitive. "Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own." *Waldridge*, 24 F.3d at 923. Thus, strict compliance with these rules is necessitated because of the very efficiency concerns Plaintiff identifies in the argument section of [her] brief.

*McMahon v. Dunlap Cmty. Unit Sch. Dist. No. 323*, 274 F. Supp. 3d 836, 842–43 (C.D. Ill. 2017).

Local Rule 7.1(D)(2)(a) states a response to a motion for summary judgment must include an introduction that *briefly* summarizes the legal and factual basis for opposition to the motion *without* citations. Instead, Plaintiff spends six pages marshalling through her argument of the facts by way of lengthy block quotes and citations to her Complaint, deposition testimony, and exhibits. While the Court may generally overlook an introduction that is a bit lengthy, Plaintiff's disregard for the local rules continues. Local Rule 7.1(D)(2)(b) provides that a

response to the motion must also state, in separate subsections: undisputed material facts,

disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional

material facts. As indicated in the voluminous footnotes below, Plaintiff often failed to

distinguish between disputed material facts and undisputed immaterial facts through

unresponsive and argumentative responses that do not actually dispute the proposed fact. Fed. R.

Civ. P. 56(e)(2) provides that when a party fails to properly address another party's assertion of

fact as required by Rule 56(c), the court may, *inter alia*, "consider the fact undisputed for the

purposes of the motion." Likewise, Local Rule 7.1(D)(2)(b)(6) cautions, "[a] failure to respond

to any numbered fact will be deemed an admission of the fact." *Id*. Argumentative responses that

simultaneously deny the veracity of a defendant's proposed material fact and present separate,

additional facts risk the possibility that the Court will consider defendant's proposed fact as

undisputed. *See e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

Plaintiff's blatant disregard for summary judgment rules is not well-taken. Her failure to

follow these requirements resulted in her response to material facts and additional facts sections

spanning nearly 80 pages. To the extent Plaintiff responded to Defendants' proposed material

facts with additional facts that were unresponsive to the proposed facts, the Court disregarded

those additional facts, unless Plaintiff added them to her "Additional Material Facts" section for

Defendants to respond. But Plaintiff generally has not done so. Plaintiff also committed other

errors she accuses Defendants of, such as, "[i]t is inappropriate to make legal arguments in a

Rule 56.1 statement of facts[,]" and "a party's statement of material facts submitted pursuant to

Local Rule 56.1 is improper where it fails to cite to the record and is 'filled with irrelevant

information, legal arguments, and conjecture.'" Doc. 35, at 9 (citing *Cady v. Sheahan*, 467 F.3d

1057, 1060 (7th Cir. 2006); *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529

F.3d 371, 382 n. 2 (7th Cir. 2008)). Plaintiff further points out, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* at 8. Yet, her Response is replete with facts attested to in affidavits that are clearly not within the knowledge of the affiant, such as some of her own statements and quotes from Professor Diane Dean and students, which the Court later discusses.

### 1.   Sutton's Arrival and Changes to the EAF

Unless otherwise noted, the following facts are undisputed. ISU's College of Education is comprised of several departments including the EAF, which focuses on preparing people of diverse backgrounds for leadership roles in education. Doc. 32, SOF ¶¶ 4-5.[3] In the EAF Department, Lugg is a member of the Pre-kindergarten through Grade 12 Education ("P-12") tenure line. SOF ¶¶ 10-11.[4] EAF programs are offered to undergraduate, masters, and doctorate level students. SOF ¶¶ 5, 10. ISU, like many universities, hires adjuncts to teach courses. SOF ¶ 132.[5] Sutton was hired as the Chair of EAF in July 2014. SOF ¶ 12. Based on statements made during his 2014 interview for the Chair position and based on what he learned immediately upon starting as Chair, Sutton understood that prior to his hire, there were issues in the EAF related to leadership, lack of structure, and interpersonal/conflict issues among faculty, and students were sometimes aware of or even participants in conflict between faculty members. SOF ¶¶ 20-21.[6]

---

[3] Unless otherwise indicated, the Court takes the undisputed facts from Defendants' Motion at Doc. 32, cited as SOF ¶ ___.

[4] Plaintiff disputes SOF ¶ 10 but based on her Response and deposition, she does not dispute her status as a P-12 member.

[5] Plaintiff does not dispute that ISU and other universities regularly engage in this practice, but disputes SOF ¶ 132 on the basis that "adjuncts were hired disproportionately to replace plaintiff." As discussed later, Plaintiff fails to offer evidence of this disproportion.

[6] Plaintiff denies on grounds of hearsay. However, the specific statements are not being offered but rather a generalization of Sutton's perception of the Department at the time of his arrival. They are not offered for their truth to prove these issues occurred but rather their effect on Sutton and how they factored into his decision-making, which is directly at issue. Thus, SOF ¶¶ 20-21 are undisputed.

In September 2014, Sutton began working on and reviewing various aspects of the EAF Department. He started working with EAF faculty members to update the independent study policies and procedures to ensure that they were only used to supplement existing course offerings or to assist with transitioning EAF to a cohort model (ultimately implemented in Fall 2015). SOF ¶ 68.[7] In 2014, Sutton started working with EAF faculty to develop corporate governance rules as well. SOF ¶ 32. He also asked Lugg on December 30, 2014, to review "vitas" from potential adjunct professors (non-tenured track "NTT") who would teach some EAF courses. SOF ¶ 134. Lugg responded with a few comments on the vitas and asked why there was a call out for adjuncts to teach law. SOF ¶ 135 (citing Ex. 24). Sutton answered that there was not an official call out *yet* and the two agreed to meet further about the topic. Doc. 32-3, at 18. Lugg had, with some frequency, taught law related EAF courses. SOF ¶ 10.[8]

As Chair, Sutton has full discretion, based on student and Department needs, to assign classes to faculty members. SOF ¶ 13. Summer courses are offered and assigned by the EAF Chair based on student needs. SOF ¶ 17.[9] Teaching a "full load" generally means the faculty member taught two courses in the fall semester and two courses in the spring semester. SOF ¶ 14.[10] If a faculty member teaches more than two courses during a fall or spring semester or teaches a course in the summer, the each extra courses are considered an "overload" for which

---

[7] Plaintiff only disputes that the independent studies policy was not changed until July 2016, therefore, SOF ¶ 68 is undisputed.

[8] Plaintiff disputes the characterization that she "often teaches law-related class" on the basis that "she is the only professor who was hired to teach law class." Doc. 35, at 12. She does not provide a frequency with which she taught these law courses or even allege that she is the only professor who has ever taught these courses. Additionally, since she does not allege that she makes hiring decisions, it is unclear how it would be within her personal knowledge that no other professor has ever been hired to teach law classes. Regardless, the above statement is undisputed.

[9] Plaintiff disputes this fact solely on the basis that "[t]here is no way to know why the chair assigns summer teaching." Doc. 35, at 13. However, because Sutton is the Chair, this would be within his knowledge and Plaintiff already agreed based on her response to SOF ¶ 13 that the Chair has full discretion to do this "based on student and department needs." Thus, SOF ¶ 17 is considered undisputed.

[10] Plaintiff disputes SOF ¶ 14 only to the extent she asserts professors are required to teach 3 courses per semester and one is waived for work on dissertations. She then proceeds to provide a lengthy quote about "entitlement" which has no bearing on this disputed fact. She does not dispute the definition of a "full load."

they receive additional compensation. SOF ¶¶ 15, 18. Except for when she was on sabbatical, Lugg has never taught fewer than two courses during any fall or spring semester. SOF ¶ 19.

In Fall 2014, Sutton also placed a moratorium on independent studies so that he could study the policy and procedures before making any changes. SOF ¶ 34. EAF faculty members do not receive monetary compensation for independent studies. SOF ¶ 73. However, during her deposition, Lugg claimed that previous department chairs allowed the combination of independent studies to form a single, compensable class. SOF ¶ 67. But Sutton has not allowed any faculty member to receive compensation by combining independent study students to make a single, compensable course. SOF ¶ 71. Therefore, he denied Lugg's request to do so. SOF ¶ 70.

After a majority vote by EAF faculty, Sutton later transitioned all or a portion of the EAF to a cohort model for student enrollment. SOF ¶ 35.[11] The cohort model requires that EAF students be admitted and cycled through their predetermined courses as a group and at the same pace, as opposed to choosing and taking classes individually and at their own pace. *Id*. Under the model, Sutton did not want independent studies offered on the same subjects the cohort was being taught in the traditional classroom setting. SOF ¶¶ 37, 68.[12] Initially, the change to a cohort model resulted in a decrease in course offerings. SOF ¶ 38; Doc. 35, at 24. Additionally, a new doctoral degree for "Leadership for Equity and Inquiry" was added. SOF ¶ 39; Doc. 35, at 25.[13]

Additionally, Sutton reviewed the Department's budget and financial documents upon his arrival at ISU in 2014 and learned that Lugg had been receiving compensation for editing the

---

[11] Plaintiff disputes this fact on the basis that "EAF moved to a cohort only model but it was just for higher education, not P12 and not for master's classes in both higher education and P12." Doc. 35, at 22. Therefore, the Court uses the phrase "all or some."

[12] Plaintiff only disputes SOF ¶ 37 on the basis that "Sutton approved independent studies for some and not others with no explanation." Doc. 35, at 23. She does not dispute his reasoning as it relates to independent studies and the cohort model, therefore, the above is undisputed.

[13] Plaintiff does not contest that this new degree was added, rather, she disputes how it was added and whether it required increasing the number of foundation courses that were taught. Plaintiff also takes issue with the fact that Sutton "scheduled Foundations classes in the summer when plaintiff used to teach." Doc. 35, at 25.

Illinois State Education Law and Policy Journal. SOF ¶ 184.[14] However, there is no written evidence of Lugg being entitled to compensation for the journal or having a ten-month contract. SOF ¶ 183.[15] Sutton also learned that no other faculty member was receiving monetary compensation for editorial service; rather, they were given course releases, meaning they are required to teach one fewer course in exchange for work on a publication. SOF ¶ 185.[16] During his deposition, Sutton testified that in 2014, he told Lugg that he was going to revisit compensation levels of the journal because she was the only faculty member receiving monetary compensation for a journal. SOF ¶ 186.[17]

## 2. Spring 2015

On February 24, 2015, Sutton told Lugg that he was reducing the budget for the journal because: "[b]udget decisions are based on the investment of resources that will have the greatest return for the academic unit. For that reason, a number of longstanding items in EAF will be adjusted away from antiquated rationale for spending." SOF ¶ 187. In his deposition, Sutton testified that he made this decision so that his decisions relating to faculty pay were fair for all

---

[14] Plaintiff disputes this but fails to offer any evidence negating Sutton's knowledge other than her statement that she "has insufficient knowledge to confirm or deny." However, "the nonmovant in a summary judgment action may not rest on general denials or lack of knowledge in his pleadings to contest the movant's evidence." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 237 (7th Cir. 1991). Further, Plaintiff concedes and vehemently argues that she was receiving compensation for her work on this journal. Thus, SOF ¶ 184 is undisputed.

[15] SOF ¶ 183 is undisputed to the extent Plaintiff concedes there was no written agreement. Instead, she claims she was paid every year on these terms but does not provide additional evidence of her pay.

[16] Again, Plaintiff disputes this but fails to offer any evidence negating Sutton's knowledge other than her statement that she "has no knowledge how others are compensated." *See Bank Leumi Le-Israel, B.M.*, 928 F.2d at 237. For example, Plaintiff could have pointed to even just one other person that received compensation in an effort to potentially rebut this fact, but she did not. Additionally, Plaintiff later concedes in response to SOF ¶ 197 that she recalled "Sutton telling her the others received a course release." Doc. 35, at 65. Thus, SOF ¶ 185 is undisputed.

[17] Here, Plaintiff disputes this statement but does not even cite to her own affidavit, or anything, for support that he did not say this. "[F]lat denials, without reference to supporting materials, have no standing under the local rule." *Kibler v. United States*, 46 F. Supp. 3d 844, 849 (C.D. Ill. 2014). Thus, this fact is undisputed. Instead, Plaintiff makes a non-responsive remark regurgitating the timing of Sutton's email regarding the journal a year later, which is another basis for deeming this fact undisputed. *See also* Doc. 36, at 23 (highlighting Plaintiff's improper "disputes").

faculty. SOF ¶ 188.[18] On June 11, 2015, Sutton sent another e-mail to Plaintiff informing her that

there would be "no expenditures for the policy and law online journal for next year. *All full time*

*faculty are returning to EAF next, therefore there will be little or no variance money to support*

*this effort*." Doc. 35, Plaintiff's SOF ¶ 15 (citing Ex. 4).[19] Sutton later testified that the journal

was being funded with variance money, which is money remaining with the Department because

faculty are on leave from the university. Doc. 32, SOF ¶ 190.[20] He also testified that the Dean of

the College of Education directed him to spend all variance money exclusively on instruction and

to be cautious about costs. SOF ¶¶ 192-93.[21] A few months later, Sutton paid Lugg $6,000 to co-

author a report relating to the redesign of the superintendent endorsement. SOF ¶ 194.

As of Spring 2015, multiple faculty members including Lugg, Beth Hatt, and Otto

(according to Lugg) had been teaching different iterations of the EAF 512 course number. SOF

¶¶ 52-53.[22] It was a "catch-all general methodology course." Doc. 35, at 26 (citing Lugg. Dep.

141:11-141:15). Around that same time, Sutton was trying to decide which iteration of EAF 512

to move forward with in the EAF program. SOF ¶ 54.[23] To assist, he began asking faculty

---

[18] Plaintiff marks SOF ¶ 188 as disputed but does not dispute that Sutton made this testimony, rather, she *argues* it is up to the trier of fact to decide what his actual motivations were and how "fair" he was being. Argument is meant for the argument section. Plaintiff could have addressed this in the burden-shifting framework where she can rebut Defendants' evidence, not here, where the purpose is to streamline the disputes of fact. Thus, SOF ¶ 188 is undisputed to the extent that this was his testimony.
[19] The Court has added the second sentence in the email for completeness based on Plaintiff's citation to this page.
[20] Here, Plaintiff disputes this statement but does not even cite to her own affidavit, or anything, for support. "[F]lat denials, without reference to supporting materials, have no standing under the local rule." *Kibler*, 46 F. Supp. 3d at 849. Thus, this fact is undisputed. Instead, Plaintiff makes a non-responsive remark regurgitating the timing on Sutton's email regarding the journal a year later, which is another basis for deeming this fact undisputed.
[21] Undisputed based on the same as noted in the above footnote. Plaintiff makes another unresponsive remark that Sutton could pay $35,000 for new positions he had created, such as program coordinators, but does not support that notion with evidence and it is unclear how this would be within her personal knowledge. She also failed to include this fact in her additional material facts section.
[22] Plaintiff disputes the exact number of faculty that were teaching iterations, however, the word "multiple" encompasses both Parties' description of this fact.
[23] Plaintiff does not dispute that Sutton was trying to decide which iteration of EAF 512 to use, but she disputes that a change to EAF 512 was needed.

members in February 2015 to send him their EAF 512 syllabi for review. SOF ¶ 55.[24] Lugg was among the faculty members who was offering an iteration of EAF 512. SOF ¶ 57.

On April 21, 2015, Sutton again emailed Lugg asking her to forward him a copy of her current syllabus and textbook for EAF 512. SOF ¶ 58 (citing Ex. 12).[25] Lugg responded that she was not using a textbook because "[l]egal research is [her] brain." She also stated, "[a]s I was taught, the teacher is in charge of the instruction and uses a textbook ONLY if necessary, to enhance that instruction. Teachers who rely on or march through textbooks are not teaching." SOF ¶ 59. Sutton responded that he disagreed with Lugg's description of teachers who depend on textbooks. SOF ¶ 60. Lugg retorted, "[t]ake it up with the professors at the University of Iowa College of Education, one of the top colleges of education in the U.S. Just telling you what I was taught and what has rung true in my personal experience," to which Sutton responded, "[t]hose rankings are a joke!" SOF ¶¶ 61-62. During that spring, Sutton also stated to faculty members: "I strongly urge research faculty to begin developing a new version of this offering using all resources available to EAF." SOF ¶ 56 (citing Ex. 11). Ultimately, after reviewing the syllabi and course outlines, Sutton and a committee decided that the iteration of 512 offered by Erika Hunt and Lisa Hood was best for the program. *Id.*[26]; *see* Doc. 32-2, at 11-37 (collecting syllabi).

---

[24] Based on other evidence submitted, it appears Sutton began asking for syllabi at least as early as February 2015. Doc. 36-1, at 2. Lugg denies SOF ¶ 55 because "Dr. Sutton specifically asked Hunt and Hood to submit a proposed syllabus even though they were not teaching EAF 512 in any iteration." Doc. 35, at 27. Thus, Lugg does not deny that she and other professors teaching the course were asked to submit syllabi, but rather adds that other professors who did not teach the iteration were asked to submit as well. Therefore, ¶ 55 is undisputed. Lugg should have added that additional fact to her section of material facts rather than inappropriately characterizing ¶ 55 as disputed.

[25] For context, by the Court's review of these cited pages, the email chain began on April 15, 2015, when Lugg emailed because "Len wanted to set up a meeting next week."

[26] Plaintiff disputes SOF ¶ 63, but it appears to only be on the basis that she believes she was best qualified to teach EAF 512. It is unclear what the content of the course ultimately became considering there were different iterations of it and if so, how Hunt and Hood were not qualified to teach it. Qualifications for Plaintiff's specific iteration of the course do not speak to whether Sutton and the committee believed a different course iteration was "best for the program." Thus, the above portion of this fact is appropriately considered undisputed. Plaintiff then provides a long soliloquy from her deposition about how her reputation was hurt (without factual support) that is unresponsive to the fact proposed. Therefore, that unresponsive portion is disregarded.

On April 17, 2015, B.G., an EAF doctoral student, met with Michael Shane McCreery, ISU's former Director of the Office of Equal Opportunity, Ethics, and Access ("OEOEA"), Title IX Coordinator, ADA Coordinator, and Ethics Officer regarding her complaint that Sutton was discriminating against B.G. based on her gender and race, as a white female. SOF ¶ 42; Doc. 32, Ex. 10. Lugg, who was B.G.'s academic advisor, attended that meeting and served as a witness in support of B.G.'s complaint. SOF ¶¶ 42-43. Three days later, B.G. filed her formal complaint with the OEOEA alleging that Sutton discriminated against her based on her sex and color by denying her requests for certain course and tuition waivers and by denying her independent study proposal for the Spring of 2015. SOF ¶ 45. In April 2015, Sutton became aware of the Title IX discrimination complaint against him and believed that Lugg was serving as a witness to the complaint. Doc. 35, Plaintiff's SOF ¶¶ 3-4.

On June 11, 2015, McCreery sent a formal "Notice to Respondent" letter to Sutton regarding B.G.'s complaint. Doc. 32, at SOF ¶ 46. The notice informed Sutton that ISU's Anti-Harassment and Non-Discrimination policy prohibits retaliation against a complainant or those who are asked to cooperate in an ongoing OEOEA investigation. SOF ¶ 47. The OEOEA ultimately found there was insufficient evidence, based on the preponderance of the evidence standard, to conclude that Sutton violated ISU's Anti-Harassment and Non-Discrimination policy by discriminating against B.G. on the basis of her sex/gender or race/color. SOF ¶ 48. On June 25, 2015, Plaintiff also filed requests for a Title IX investigation of gender discrimination and retaliation. Doc. 35, Plaintiff's SOF ¶ 17.[27]

---

[27] Defendants dispute Plaintiff's additional material SOF ¶ 17 on the basis that "[t]he party opposing summary judgment may not rely on the allegations contained in the pleading" and Plaintiff merely cites her Complaint as evidence that she filed formal complaints. Doc. 36, at 19. While the Court agrees a party cannot merely rely on her Complaint as evidence, Defendants later concede that Plaintiff's "internal informal and formal sex discrimination complaint beginning around June 2015" was a protected activity for the purposes of this Motion. Therefore, this fact is undisputed. At the same time, the Court can also consider the lack of evidence offered regarding those internal complaints.

3.  **Summer 2015**

The EAF Chair's Advisory Council ("CAC") is comprised of faculty members, elected to

three-year terms, from areas of concentration within the EAF, including Foundations, Higher

Education, P-12, and Research. Doc. 32, SOF ¶ 81. The CAC's work is facilitated by the

Department Chair. SOF ¶ 82. Its duties include the following: reviewing and updating the EAF

governance document; reviewing, critiquing, updating, and revising the Department's course

content and programs regularly; reviewing curriculum course numbers, rotations, academic

content, learning outcomes, assessment, course design and redesign, and university catalogs; and

reviewing teaching schedules, course rotations, teaching assignments, and approving

independent study requests. SOF ¶ 83. In 2015, a decision was made to have Hatt, who was also

an EAF faculty member, co-teach EAF 436 (Leadership for Diverse Learning Needs) with Lugg.

SOF ¶ 84.[28] During the Summer of 2015, Lugg and Hatt did co-teach EAF 436. SOF ¶ 88.[29]

Lugg's compensation was not affected by the fact that she co-taught EAF 436 with Hatt because

Sutton exercised his discretion to provide Lugg her full pay, rather than half. SOF ¶¶ 85, 87.

On July 9, 2015, the Director of ISU's Center for Teaching, Learning, and Technology,

Dr. Claire Lamonica, conducted a small group instructional diagnosis with students in the EAF

Principal Preparation Program Cohort 2. SOF ¶ 90 (citing Ex. 16). At the time, the students in

this cohort were taking the co-taught EAF 436 course. *Id*. In the diagnosis, the students identified

---

[28] Plaintiff disputes whether it was Sutton or CAC who made the decision that the course be co-taught but does not dispute that a decision was made. Doc. 35, at 34.

[29] SOF ¶ 88 is another example of an unnecessary objection by Plaintiff. Plaintiff objects to use of the term "co-teach," because she claims, "Plaintiff tried to teach her course in the half the time in the mornings and Hatt taught her class in the afternoon." Doc. 35, at 35. However, this objection contradicts Plaintiff's repeated admission in other SOFs that the two "co-taught" EAF 436. *See e.g. id.* ("Plaintiff denies that she was angered that she had to co-teach as she has co-taught many courses before"). Plaintiff also failed to dispute other SOFs that used the term "co-teach." *See* SOF ¶¶ 85, 90. Furthermore, Plaintiff's Response undercuts her argument that being assigned to co-teach was an adverse action where she admits she has co-taught before. Likewise, it appears EAF 512 was ultimately co-taught as well. *See* Doc. 32-2, at 26; SOF ¶ 63.

several aspects of the course that hindered their efforts to succeed, including divisiveness among faculty; inconsistent practices and expectations from Lugg and Hatt, which was exacerbated by their divisiveness; and a lack of instructors with practical experience as members of K-12 administrative teams. SOF ¶ 91.[30] After reviewing the findings from this diagnosis, and consulting with the CAC, Sutton decided not to assign this course to Lugg or Hatt going forward. SOF ¶¶ 92, 141.[31]

### 4. Fall 2015

The cohort model was implemented in Fall 2015. SOF ¶ 95.[32] Lugg was on sabbatical during Fall 2015, and she claims[33] she was retaliated against because less qualified and underqualified individuals were hired to teach her classes "even though past precedent for other faculty was to rearrange schedules so that courses could be taught by tenure line faculty." SOF ¶ 94. Under the cohort model, the EAF has never revised any course schedules to accommodate any faculty member's sabbatical, and non-tenured track faculty or adjunct faculty have been retained to teach courses normally taught by faculty who are on sabbatical. SOF ¶¶ 96-97.[34]

---

[30] Plaintiff disputes SOF ¶ 91. In reviewing her dispute, she does not dispute Exhibit 16 which is summarized in SOF ¶ 91, rather, she disputes the reasoning behind the students' frustration. Plaintiff further states that her course reviews for the course were excellent but fails to provide any of them as exhibits. Even if her evaluations were stellar, that does not change the fact that students clearly took issue with how Sutton and Hatt worked together to "co-teach." In sum, SOF ¶ 91 is properly characterized as undisputed—Exhibit 16 speaks for itself and portions of it appear to be accurately summarized in SOF ¶ 91.

[31] Plaintiff does not dispute this portion of SOF ¶ 92. Therefore, this fact is considered undisputed.

[32] Plaintiff lists SOF ¶ 95 as a disputed material fact but proceeds to simply argue the cohort model is immaterial for scheduling specific classes. She does not dispute the implementation date of the cohort model, which is the only fact listed in SOF ¶ 95. This fact should have been categorized as "undisputed and immaterial" for the reasons stated in Plaintiff's Response. Because Plaintiff does not dispute that the cohort model was in fact implemented in Fall 2015, the Court considers this fact undisputed.

[33] Plaintiff appears to have dropped this theory of discrimination related to how ISU scheduled courses while she was on sabbatical as she does not discuss it in the argument section of her Response.

[34] Plaintiff disputes these SOFs and indicates these were done a year or two years prior, for other another unnamed faculty member. However, this response fails to account for the fact that these facts were prefaced with the time frame "under the cohort model," which was undisputedly implemented in Fall 2015. Thus, Plaintiff's response is unresponsive and disregarded as she would need to address Fall 2015 onward. Moreover, based on Plaintiff's response, she may be referring to a time before Sutton was even hired at ISU and the focus of this lawsuit is on his actions and alleged retaliation, so the Court fails to see the relevance of how things were previously run unless Plaintiff is alleging that she was singled out in a policy change. She fails to do that.

Lugg's compensation was not affected by the identities or qualifications of those hired to teach EAF courses while she was on sabbatical. SOF ¶ 98.

While Lugg was on sabbatical, she filed an ethics complaint on November 30, 2015 with McCreery about an EAF faculty member, Zeng Lin, who was allegedly working at both ISU and another university in China in violation of the state ethics law. SOF ¶ 99 (citing Ex. 17). Lugg believed Sutton was involved in Lin's violation because Sutton assigned him classes even though he knew that Lin would be in China. SOF ¶ 100. Sutton disclaims any knowledge as to whether or not Lin was employed by the university in China. SOF ¶ 101.[35] Upon her return from sabbatical, Lugg taught both EAF 548 and EAF 466 during Spring 2016. SOF ¶ 103.[36]

### 5. Spring and Summer 2016

In late 2015, copies of a document were circulated[37] around ISU's campus relating to a disciplinary issue that Sutton was involved in 15 years prior to him working at ISU. SOF ¶ 105. On January 6, 2016, Sutton sent an e-mail addressed to the EAF Department stating:

> Colleagues I need to hold an emergency meeting tomorrow morning @ 11 am concerning the budget, summer school courses, and pending personnel changes in EAF. Given the personnel information, call-ins will not be allowed. I know this is short notice colleagues, but it's extremely important that I speak to you all together ASAP. Please let me know if you are able to attend.

Doc. 35, Plaintiff's SOF ¶ 18. The Parties differ in their accounts of the exact words stated in this meeting and the overall purpose for the meeting but agree that the meeting did occur, the

---

[35] Plaintiff disputes this fact then admits that she cannot respond to what was within Sutton's knowledge, then proceeds to add additional facts to make an inferential leap that he knew. These facts should have been included in her additional facts section but were not. Therefore, the Court disregards them and considers SOF ¶ 101 undisputed.

[36] Plaintiff disputes this fact then points the Court to her response to SOF ¶ 102, which then points the Court to her response to SOF ¶ 76, which includes a chart Plaintiff prepared. However, that chart states exactly what Defendants stated—Lugg taught EAF 466 and 548. Thus, it is Plaintiff who is confused, and this fact is undisputed by Plaintiff's own admission. *See* Doc. 35, at 38 (citing *Id.* at 30, 38). Moreover, Plaintiff does not list any courses that she "should have taught as an overload" in Spring 2016 or include the chart in her additional facts section.

[37] Plaintiff disputes the use of the word "circulated" then contradicts her own dispute by pointing to deposition testimony discussing multiple outlets where the copies were shared. Thus, this fact is undisputed.

circulation of the document was a topic of discussion, and Sutton was upset.[38] One week later,

EAF faculty and staff members sent a letter to ISU President Larry Dietz regarding the

circulation. Doc. 32, at SOF ¶ 109 (citing Ex. 19). In part, the letter to Dietz stated, "[f]inally, we

emphatically state our support of Dr. Sutton, who has consistently acted with the highest level of

integrity and whose talented and unflagging leadership has improved the Department

dramatically, benefiting students, faculty members, and the campus community." SOF ¶ 110. The

only EAF faculty members who did not sign the letter were Lugg, Dean, and Lin, who was out of

the country at the time. SOF ¶ 111. Following the circulation, Sutton sent a formal complaint to

the Vice-Chair on March 31, 2016, asserting claims against Lugg and Dean for their alleged

involvement in the incident in violation of the ethics code. Doc. 35, Plaintiff's SOF ¶¶ 28-30.

That same spring, Dietz requested that Pamela Heatlie conduct a climate assessment in

the EAF about how the Department was operating, including an overall understanding of what

was working well, what areas may need improvement, and whether there were overarching

discrimination or harassment concerns. Doc. 32, SOF ¶ 112.[39] The climate assessment was

completed on May 13, 2016 and included the following remarks:

> Most faculty and staff indicated that prior to Dr. Sutton's arrival, department chairs
> seemed to make private arrangements with individual faculty members that
> operated to that individual faculty member's benefit (e.g., course releases, summer
> course assignments, other paid assignments, etc.)
> * * *
> Many faculty indicated that it was their opinion that [Lugg] "bullied" the
> department chairs and, as a result, benefitted from special arrangements or
> opportunities that other faculty weren't even aware existed. As a result, the same
> advantages reportedly were believed to have gone to the same faculty member year
> over year.

---

[38] The Court further discusses the contents of this meeting in the discussion section of this Opinion and why the
actual words are not material.

[39] Plaintiff disputes the reason for hiring Pamela Heatlie (including whether it was because of the letter that
circulated) and what her title was, but she does not dispute that the climate assessment occurred or its purpose.
Therefore, this portion of SOF ¶ 112 is undisputed. Notably, the assessment specifically stated that it was requested
by Dietz in February 2016 because of the January 2016 letter from faculty raising concerns of racial hostility in the
EAF department and the anonymous distribution of the document related to Sutton.

* * *

Dr. Sutton is credited with a new level of transparency and information sharing so that all department faculty are aware of available opportunities. He also uses faculty committees to provide advice on course assignments and other department matters, although he retains final decision-making authority.

* * *

Dr. Sutton is also widely credited with creating an environment in which all faculty are treated with equal respect, including foundations which was previously seen or made to feel as though they had or offered less value to the department.

* * *

As much as most faculty admire the positive change Dr. Sutton has brought to EAF, they indicated that they are aggravated by behaviors of their colleague Professor Betsy Lugg. Professor Lugg is not necessarily disliked on a personal level, but her colleagues are frustrated at her unwillingness to accept change, to accept and implement decisions that they make as a faculty (including curriculum), and what in their opinion is a willingness to act intentionally (either directly or through others, such as students) to cause personal or professional harm to her colleagues in order to influence events or otherwise obtain her goals.

* * *

Faculty and staff indicate their belief that Professor Lugg's behavior has been a long-standing problem, with many describing it as "toxic" or "bullying."

* * *

[Lugg] is reportedly so difficult to work with or faculty are so worried about falling into disfavor with her because she will "go after" them, that they either avoid her or find indirect ways of conducting work so that she will no know of their involvement.

SOF ¶¶ 113-121 (citing Ex. 21).[40]

During Summer 2016, Lugg taught EAF 586 (Administration of HR). SOF ¶ 125. The only class that she was not assigned to teach that she had taught in the past was EAF 436, which Sutton did not assign her due to the co-teaching experience in Summer 2015. SOF ¶ 126.

### 6.   2017 Performance Issues and the DFSC

The Department Faculty Status Committee ("DFSC") is an EAF committee that evaluates faculty members' performances. SOF ¶ 154. It is comprised of a Chair and faculty members who

---

[40] Plaintiff lists SOF ¶¶ 113-121 as "undisputed immaterial facts" but also lists them as disputed material facts. In her disputed facts section, Plaintiff, without argument, objects on grounds of hearsay within hearsay. Regardless of whether Plaintiff disputes these paragraphs or not, Exhibit 21 and the statements in it are being offered to show Lugg was not performing as expected and support a non-retaliatory reason for some of Defendants' actions such as policy changes and the basis for concerns regarding Lugg's performance. Doc. 32, at 50. Therefore, Plaintiff objection is overruled. However, the Court does not find SOF ¶ 114 to fit this purpose, therefore it is disregarded.

are elected by EAF faculty members to two-year terms. *Id*. Sutton is the Chair of the DFSC. *Id*.

On January 31, 2017, the DFSC sent Lugg her annual performance review for 2016, which was

prepared by DFSC members Sutton, Eckrich, Evans-Winters, Renn, and Nur-Awaleh. SOF ¶ 175

(citing Ex. 32). The DFSC stated,

> [T]he DFSC believes it is vital that students not be immersed within department politics, conflicts, or disagreements. **More specifically, making or sharing negative comments about one another with students or using students in an effort to promote personal and competitive agenda's [sic] regarding other faculty is a clear violation** . . . As a way to ensure that our community maintains its values, members of the academic community are expected to behave responsibly and to treat colleagues fairly, with respect, civility, and decency. In so doing, they should refrain from making rash statements in criticism of coworkers, from ascribing unworthy motives to them, and from spreading malicious gossip. Faculty and staff should refrain at all times from making derogatory comments about their colleagues when students are present.

SOF ¶ 176-177 (citing Illinois State University Policy & Procedures, 1.17a: Professional

Relationships) (emphasis in original). The DFSC also reminded Lugg that further violations of

this policy could result in disciplinary action. SOF ¶ 178.

> On March 31, 2017, Phyllis McCluskey-Titus sent an email to Sutton stating in part,

> Given the unworkable situation in our department and the Higher Education program with two faculty members, Betsy Lugg and Diane Dean, it is impossible to have any positive effect on the important work we need to do around curriculum development, or dissertation and doctoral exam work. Their continual lack of cooperation and disruption of meetings, disregard for established processes, talking negatively about other faculty in the department to students, bullying faculty, students, and administrators to get what they want, and making exceptions for some students to the detriment of the program has brought tension and stress within the department . . . for self-preservation, I will not attend or participate in Higher Education doctoral program meetings.

SOF ¶¶ 157-158.[41] Around this time, several other faculty members sent Sutton emails stating

that they were not willing to work with Lugg on dissertation committees that she chairs. SOF ¶

---

[41] Plaintiff does not dispute that this email was sent but rather argues it was sent a few days after she had an altercation with another faculty member. Because this "dispute" is non-responsive to the fact proposed, SOF ¶¶ 157-58 are undisputed.

156 (citing Ex. 27).[42] For context, after a student passes a comprehensive exam measuring the student's competency, then the student moves into the dissertation phase of the degree. SOF ¶ 7. While in the dissertation phase, the student works with a committee of EAF faculty members. SOF ¶ 8. EAF faculty are generally expected to serve on dissertation committees. SOF ¶ 173.[43] The committee's duties include assessing the student's dissertation proposal, determining whether the proposed work is sufficient for a dissertation, and evaluating the final dissertation defense in determining whether to grant the student their PhD. SOF ¶ 8. Although the Parties dispute his reasoning, at some point, Sutton told a student that he would be better served using a different chair (other than Lugg), for his dissertation committee. SOF ¶ 170; Doc. 35, at 52-53.

On May 3, 2017, Sutton sent an email with the subject line "Confidential DFSC Communication" to Lugg stating:

> Multiple EAF faculty have reported to the Department Chair they do not wish to work on any dissertation committees you chair. The supervision, advising and mentoring of student research are criteria for the evaluation of teaching for university faculty (ASPT, p. 61, 2017). For that reason, the DFSC would like to invite you to a meeting to learn how we might assist you in creating a more welcoming environment for colleagues who serve on committees with you . . . This is an attempt to offer support for your teaching, something you have the right to refuse.

Doc. 32, SOF ¶ 155 (citing Ex. 26).[44] A few weeks after the DFSC communication, Lugg filed charges of discrimination against Sutton and ISU on May 22, 2017 with the Illinois Department

---

[42] Plaintiff, without argument, objects on grounds on hearsay within hearsay. However, these documents speak to Sutton's state of mind with respect to his May 3, 2017 email, which Plaintiff alleges to be a form of retaliation threatening discipline. The senders are generally speaking about their personal experiences. The Court does not consider these emails for the purpose that Plaintiff did in fact do the things described in the emails. These emails are also relevant to whether Defendants can show a legitimate business reason for some of their actions. Further, Plaintiff does not object to SOF ¶ 164, which reiterates the content of these emails, "DFSC has learned that eight colleagues, mostly research faculty, have identified the following reasons for not wanting to serve on doctoral exam or dissertation committees with you, or at least not committees you chair." SOF ¶ 164 (citing Ex. 30).

[43] Plaintiff disputes SOF ¶ 173 but not the above portion of it.

[44] Plaintiff does not dispute that she received this email. She only disputes the reason for the email being sent. Therefore, the Court considers this fact undisputed to the extent Lugg received this email and this is what it stated.

of Human Rights ("IDHR"). SOF ¶ 137. Lugg alleged that Sutton threatened her on May 3, 2017 by stating he would call a meeting regarding her performance. SOF ¶ 153.

On June 16, 2017, the DFSC sent Lugg a letter to follow-up on her annual performance evaluation for 2016. SOF ¶ 162 (citing Ex. 30). The letter stated, "[i]t is intended to highlight continuing areas of concerns about your performance, to suggest actions you might take to improve that performance, and to reiterate a standing invitation to work with the DFSC to assist in your work responsibilities." SOF ¶ 163. The letter further stated, "it is vital that students not be immersed in department politics, conflicts, or disagreements. Inimical communication with students about fellow colleagues in face-to-face or electronic communication should be avoided at all costs[,]" and "making or sharing negative comments about faculty or department affairs with students or using students to promote personal and competitive agendas regarding other faculty is a clear violation of University Policy 1.17a: Professional Relationships." *Id*.

Additionally, the letter stated the DFSC learned of eight colleagues including mostly research faculty, that did not want to serve on doctoral exam or dissertation committees with Lugg, or at least not committees she chaired for the following reasons:

- They think you do not respect their suggestions or constructive criticism intended to strengthen the student's work.
- They feel bullied into playing the role you want them to, and into being or staying on committees or being removed against their will.
- They question the integrity and quality of student work being produced on committees you chair. Your goal seems to move the student on and out even when the methodology is inadequate or quality of the written work low.
- Some faculty feel threatened for or unnecessarily supervised by you in their work with students of color.
- Colleagues believe in the past you have undermined the department's programs by offering independent studies for courses already offered by colleagues. While procedures are in place to curtail this practice, its residual effects are still felt.

SOF ¶ 164. Around the same time, the DFSC also sent follow-up performance evaluation letters to two other EAF faculty members, one who identifies as male and the other as female. SOF ¶ 166 (citing Ex. 31).[45] Lugg filed her Second Amended Charges of Discrimination with the IDHR against Sutton and ISU on December 7, 2017. SOF ¶ 168.

### 7. 2017 and 2018 Courses

Plaintiff urges the Court to not focus on the specific courses she alleges demonstrated retaliation, so the Court briefly summarizes the facts as it relates to those presented. Doc. 35, at 83-44. In Spring 2017, Lugg taught a full course load, including EAF 548 (Legal Bases of Higher Education), and EAF 466 (College Students and the Law). Doc. 32, SOF ¶¶ 128-29. The only other courses offered that semester that Lugg was qualified to teach were EAF 431 (School Leadership and the Law) and a second section of EAF 548. SOF ¶ 130. Sutton assigned adjunct professors David Braun to teach EAF 431 and Tiffany Puckett to teach EAF 548. SOF ¶ 131.

Lugg made a request to teach in the summer of 2017 but was not assigned to teach any courses. Doc. 35, SOF ¶¶ 39-40. Only one section of EAF 586 was offered during Summer 2017. Doc. 32, at SOF ¶ 142. EAF 586 is an Administration in Human Resources course. SOF ¶ 144; Doc. 35, at 38. Sutton chose an adjunct instructor who was an associate superintendent of human resources to teach it that summer. SOF ¶¶ 143-144 (citing Ex. 25, which includes the resume of that individual).[46] EAF 436 was also offered that summer but Sutton chose not to assign Lugg or Hatt to teach it due to the co-teaching experience of Summer 2015. SOF ¶ 141. In sum, in the fall and spring semesters of 2017 and 2018, Lugg taught full course loads each semester. SOF ¶ 150.

---

[45] Plaintiff disputes SOF ¶ 166, however, her response states "see responses above," yet the responses above are still unresponsive to the proposed fact. Therefore, SOF ¶ 166 is undisputed. Further, Plaintiff fails to cite any evidence refuting that the DFSC did indeed send these follow-up letters to performance reviews, which is unsurprising considering Defendants provided evidence of the letters.

[46] Plaintiff disputes Sutton's reasoning for hiring this adjunct to the teach the course but does not dispute that the chosen adjunct was an associate superintendent of human resources. Thus, the above is undisputed.

She was the only faculty member who taught EAF 596 (Negotiated Agreement Administration and Development) during Fall 2017. SOF ¶ 152. Lugg did not receive overloads those semesters because those courses were assigned to adjuncts. SOF ¶ 151.[47] The Parties dispute the characterization of the EAF Department's "Section 5.0 Staffing Requirements" (Doc. 32, Ex. 22) and whether it is a considered an "agreement to assign adjuncts." Lugg does not dispute or object to the document itself, rather she simply claims Sutton unliterally chose to hire adjuncts. Doc. 35, at 48. Exhibit 22 states, "Adjunct Faculty shall teach no more than 80% of the coursework in the principal preparation program." Sutton based various decisions to assign courses to adjuncts on this document as well as other qualifications he discusses.

### 8. ISU Internal Investigations

Although Plaintiff claims that retaliation ensued for "6 years!" this is where the facts end, except to the extent ISU issued a final report on February 15, 2019 regarding Lugg's internal discrimination and retaliation claims against Sutton. SOF ¶¶ 205-206 (citing Ex. 39). Plaintiff disputes Exhibit 39 on the basis that it was issued two years after Plaintiff brought her initial charge of discrimination, four months after this lawsuit was filed, and it is self-serving. Doc. 35, at 65. The Court would agree that this report should not be considered based on it having been finalized over a year after Plaintiff's last protected activity and four months after the initiation of this lawsuit, thereby diminishing its relevance. At the same time, Lugg claims she made multiple complaints to ISU regarding Sutton and alleges continuing violations through 2020. Therefore, it becomes relevant to Lugg's allegation that ISU failed to stop the discrimination and Lugg could have attempted to use it as such in her Response to Defendants' Motion. *See* Doc. 32, at 49. The report focuses on ISU's investigation efforts throughout 2017 and only discusses evidence

---

[47] Again, Plaintiff does not dispute that this occurred but disputes the reasoning for hiring adjuncts stating, "there is not an agreement; Dr. Sutton unilaterally chose to hire an adjunct." Doc. 35, at 48.

considered from 2015-2018, which supports it relevance. The report indicates, "[b]oth parties (Lugg and Sutton) were given an opportunity to review a preliminary draft of the report and all of the evidence gathered to date," then provides a discussion of each party's response, which suggests this report originated much earlier than the finalization date. Doc. 32-6, at 57. Based on these considerations, the Court considers Exhibit 39 for the limited purpose that ISU ultimately determined Lugg failed to provide sufficient evidence to support her claims against Sutton.

### 9. Plaintiff's Remaining Additional Material Facts

There are numerous statements listed in Plaintiff's additional material facts section that Defendants do not dispute in their Reply but generally assert that they are immaterial because they are conclusory allegations, unsupported speculations, and mere opinions. *See e.g.*, Doc. 35, Plaintiff's SOF ¶¶ 11-12, 27, 43-44, 46-48, 50-55, 57-58. The Court generally agrees with Defendants and addresses these facts in the discussion section where Lugg offers them as evidence of retaliation. To the extent the Court has not discussed or addressed other facts listed in Plaintiff's Response, they were either found to be redundant of previously undisputed facts or irrelevant, such as Lugg's long-winded remarks from her deposition that do not address material issues or demonstrate a material factual dispute exists.[48]

---

[48] *See e.g.*, Doc. 35, at 77, Plaintiff's Additional Material Fact 56:
> Plaintiff testified "This will be my answer for every time you ask if I felt entitled: I believe as a faculty member who was hired to teach certain classes or classes in certain areas, when classes in those areas become available that I should be assigned to teach them, including summer and including overload. That has been the past practice for two decades and if you want to call that an entitlement, then yes, I am entitled . . . ." (Ex. 2, Lugg Dep. 197:13-25).

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In resolving the motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Id.* at 249-50. Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions, or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment." *Waldridge*, 24 F.3d at 920.

### DISCUSSION

Things appear very heated in the EAF Department at ISU. One might have thought at the inception of this lawsuit that Sutton could be the driving force, however, at summary judgment the evidence revealed a different account than that of Plaintiff's Complaint. It seems Lugg had an issue with Sutton before he was even hired. *See* Doc. 35, at 13-14 ("Several of us were shocked with his behavior [during his interview in 2014]; concluded he must have been told he was going to be hired and so was just going through the motions."). Although this differs from her statement to an OEOEA investigator: "[Lugg] stated that, at first, she thought [Sutton] was the best candidate for the Chair position and added that she had 'high hopes' with his arrival." Doc. 32-6, at 47. She also had an issue with the way Sutton spoke at times: "[H]e told us he was an 'Old Gangsta' and broke into a hip-hop lingo that only the black faculty (not the Africans, but the American Blacks) seemed to understand." Doc. 32-2, at 58. Lugg's issues with Sutton culminated in various internal complaints and this lawsuit. Based on Defendants' Motion and Lugg's Response which fails to show a material dispute of fact exists that requires a trial, Defendants' Motion (Doc. 32) is GRANTED for the reasons discussed below.

In their summary judgment briefing, the Parties consolidate their discussion of the retaliation claims alleged in Counts I, II, and IV pursuant to the Ethics Act and Title VII. Then, the Parties briefly address Lugg's Title VII gender discrimination claim in Count III. *See* Doc. 35, at 100. The Court will the address these issues in the same order here.

### A. Retaliation pursuant to the Ethics Act and Title VII of the Civil Rights Act

The Parties agree that the framework for prevailing on an Ethics Act or Title VII retaliation claim is essentially the same. Both statutes prohibit retaliating against an employee who has exposed or participated in the investigation of an unlawful employment practice. 42

U.S.C. § 2000e-3(a). For her Title VII claim, Lugg must prove that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. Doc. 32, at 34; Doc. 35, at 81 (citing *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)). Similarly, for her Ethics Act retaliation claims, Lugg must prove that (1) she disclosed to a public body regarding an activity, policy, or practice of any other state employee that she reasonably believed to be a violation of law, rule, or regulation, and (2) that conduct was a contributing factor in the retaliatory act she alleges. *Id*. (citing *Hosick v. Chi. State Univ. Bd. of Trs.*, 924 F. Supp. 2d 956, 974 (N.D. Ill. 2013)). The Parties then focus on the element of causation citing only federal cases addressing Title VII. The Court will follow the Parties' issue presentation.

In her Response, Lugg agrees with applying the direct method of establishing a prima facie case for retaliation, then faults Defendants for not discussing the burden-shifting framework under the indirect method.[49] To be clear, these two methods are "just means to consider whether one fact ... caused another ... and therefore are not elements of any claim." *Lewis*, 909 F.3d at 866 (quoting *Ortiz v. Werner Enterprises*, 834 F.3d 760, 763 (7th Cir. 2016) (internal quotation marks omitted)). While indirect or direct evidence are still appropriate considerations, the legal standard is "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Contrary to Lugg's interpretation, *Ortiz* cautioned against bucketing indirect versus direct evidence categories, but it did not preclude a defendant from responding to each piece of evidence the plaintiff offers. Rather, *Ortiz* instructs courts to take a holistic approach in viewing the evidence.

---

[49] *But see* Doc. 32, at 49 where Defendants discuss the *McDonnell Douglas* framework.

*See id.* at 766. The Court can, and does, take a holistic approach to viewing the evidence even though Defendants succinctly parsed out the alleged instances of retaliation or inferences of retaliatory motives into sub-sections, a method which Lugg attempts to mirror in her Response.[50]

Plaintiff then makes it a point to explain that she gets the opportunity to argue pretext, but it becomes unclear where she intended to do that. The Court will assume that her "corroborating evidence section" and footnote 2 of page 101 are meant for that. To the extent Plaintiff argues pretext, in evaluating pretext, the Court does not determine whether the employer's explanation was reasonable or valid, it assesses the honesty of the explanation. *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013) (citing *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 636-37 (7th Cir. 2011); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 396–97 (7th Cir. 2010); *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010)). Indeed, as often reiterated in Title VII cases, "courts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002).

1. **Statutorily Protected Activities**

Lugg claims she engaged in the following statutorily protected activities: (1) she participated in a student, B.G.'s, discrimination complaint against Sutton in April 2015, (2) she made internal informal and formal sex discrimination complaints beginning around June 2015, (3) she filed an internal ethics complaint against Professor Lin in November 2015, and (4) she filed discrimination charges with the Illinois Department of Human Rights on May 22, 2017 and December 7, 2017. Doc. 35, at 80-81. For the purposes of summary judgment, Defendants concede that these actions were protected activities. Doc. 32, at 33. Lugg generally claims that

---

[50] Lugg did not respond to each argument by Defendants.

Sutton implemented changes in the EAF in an effort to retaliate against her for engaging in protected activity. Meanwhile, Defendants argue that Lugg cannot show her conduct contributed to any of the alleged retaliatory conduct, Defendants articulated legitimate, non-retaliatory reasons for their actions, Sutton would have implemented those changes regardless of Lugg's activities, some of that implementation pre-dates Lugg's protected activities, and many of Lugg's allegations are not supported by the record. Doc. 35, at 2, 53.

### 2. Adverse Employment Actions

In her Response, Lugg reduces[51] her list of purported adverse employment actions to the following: (1) the law review journal she worked on was cancelled and she lost $6,000 per year of income, (2) she was denied summer teaching and lost income/compensation, and (3) she was denied overloads resulting in a loss of additional income. Doc. 35, at 82. According to Lugg's expert, these losses amount to economic damages just shy of $1,000,000. *Id*. Therefore, the Court focuses on those instances in this Opinion. Affording a liberal construction to the term "adverse action," the above could be considered adverse actions.[52] Likewise, Defendants do not dispute that the above three actions as materially adverse. Thus, the Court focuses of causation.

---

[51] As Defendants noted in their Reply, Doc. 36, at 20:

> [Plaintiff made] no response to the argument that the following allegations were not adverse employment actions: referring to her academic training (actually to law school rankings) as a joke; assigning Beth Hatt to co-teach EAF 436 (while still compensating Plaintiff the full amount); hiring adjunct professors to teach her classes while she was on sabbatical and unavailable to teach them anyway; implying that Plaintiff distributed inflammatory information about a reprimand received during Sutton's prior job; sending her the May 3rd letter regarding her performance; recommending that a student select another professor for his committees; participating in negative performance reviews; or participating in the DFSC follow up letter in 2017.

However, the Court considers these actions to the extent Plaintiff offered them as "corroborating evidence."

[52] The Ethics Act defines "retaliatory action" as "the reprimand, discharge, suspension, demotion, denial of promotion or transfer, or change in the terms or conditions of employment of any State employee, that is taken in retaliation for a State employee's involvement in protected activity, as set forth in Section 15–10." 5 ILCS 430/15–5. "For Title VII retaliation purposes, a materially adverse action 'need not be one that affects the terms and conditions of employment, but it 'must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Lewis*, 909 F.3d at 867. But the provision only protects an individual from "retaliation that produces an injury or harm." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

### 3. Causation

### A. Suspicious Timing

Lugg's first argument to show causation, as articulated on pages 85-88 of her Response and repeated throughout her response to proposed material facts section,[53] is that Lugg has "rare evidence of timing proximal and suspicious enough to show causation." Doc. 35, at 85. While a few hours or days can certainly constitute temporal proximity, depending on the circumstances, the Court disagrees that Lugg has this "rare" evidence.

The Court recognizes the well-establish precedent quoted by Lugg that suspicious timing can establish an inference of retaliation "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)). However, close temporal proximity alone is rarely sufficient to show causation in a retaliation claim. *Coleman v. Donahoe*, 667 F.3d 835, 860–61 (7th Cir. 2012); *see also McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020) (rejecting plaintiff's argument that suspicious timing alone was enough to survive summary judgment). Illinois courts agree. *See Flick v. S. Illinois Healthcare*, 21 N.E.3d 82, 88 (Ill. App. Ct. 2014) ("[C]lose timing is usually not enough to establish a causal connection standing alone"). But proximity alongside other corroborating evidence may support an inference of retaliatory motive and permit a plaintiff to survive summary judgment. *Coleman*, 667 F.3d at 860–61. Where an inference of causation would be reasonable in a particular case, "[a] jury, not a judge, should decide whether the inference is appropriate." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). However, a

---

[53] *See e.g.*, Plaintiff's responses to SOF ¶¶ 23, 27. Doc. 35, at 14-17, 20.

submission to the jury on this issue depends on the unique facts of the case – it is not automatic. *McCann*, 965 F.3d at 593 n.72.

As to the rare evidence of proximity, Lugg first asserts that Sutton asked for her syllabus for a class (EAF 512[54]) within days of Lugg providing corroborating evidence on April 17, 2015 for B.G.'s complaint. For that argument to begin to work, asking for a class syllabus would need to be an adverse action. Even affording the most liberal construction to the term "adverse action," asking for a syllabus does not suffice and Lugg makes no argument for it. But Lugg also states that the particular class was taken away within a week and cites to her deposition testimony for support. Doc. 35, at 86 (citing Lugg Dep., 227:22 – 228:10, 257:16 – 258:3, 413:5-10). If one ignores the fact that none of these citations actually specify that the class was taken away *within a week* and Lugg fails to provide the transcript pages 257-258 in her exhibit; ignores the fact that Fall 2017 is the first time Lugg alleges she should have taught EAF 512 but did not (*see* Doc. 35, at 32); and ignores any context surrounding the syllabus request, then the two events taken together, the request and class removal, could be an adverse action on the heels of a protected activity. However, Defendants rebutted Lugg's conclusory proposition with Exhibit 41, which demonstrates the discussion regarding the future of EAF 512 was still ongoing in December 2015. Doc. 36-2, at 2-3.

Even if the Court accepted Lugg's version that Sutton asked for a syllabus and took the class way within one week of the protected activity, despite her failure to cite evidence, the undisputed facts demonstrate the first syllabus request occurred well before April 17, 2015. Doc. 36, at 24. Sutton had asked multiple professors for their current EAF 512 syllabus, beginning at least as early as February 2015. Doc. 36-1, at 2. It would appear the April email was a follow-up

---

[54] Plaintiff fails to state which class she is referring to, the Court infers she means EAF 512 based on the undisputed facts.

to that request. Additionally, Sutton gave a legitimate business reason for changing EAF 512—
there   were multiple iterations because it was previously treated as a "catch-all general
methodology course" and he wanted to choose which iteration to move forward with. It is also
undisputed that multiple professors were teaching the course, including at least Lugg, Hatt, and
Otto. Doc. 35, at 26. Sutton ultimately chose Hunt/Hood to teach EAF 512. The consequence of
that decision means Lugg is not the only professor who was no longer teaching EAF 512. Doc.
36, at 24. Thus, her argument for proximity based on the syllabus request fails.

    Lugg's next proffered proximity of an adverse action on June 11, 2015, likewise fails.
She asserts that Sutton took an adverse action by taking away the budgeting for the law review
journal two hours after he received an email notification that the OEOEA received B.G.'s
complaint. Doc. 35, at 86-88. It is undisputed that within two hours of receiving that email,
Sutton informed Lugg there would be "no expenditures for the policy and law online journal for
next year. All full time faculty are returning to EAF next, therefore there will be little or no
variance money to support this effort." *Id.* at 68. However, as Defendants repeatedly emphasize,
details matter in proximity arguments. *See* Doc. 36, at 23 (citing *Bagwe v. Sedgwick Claims
Mgmt. Servs., Inc.*, 811 F.3d 866, 890 (7th Cir. 2016) (rejecting the plaintiff's temporal
proximity argument after viewing the events in chronological order)). Here, the undisputed facts
show the law journal reduction, like the syllabus-change, was already in the review process
before the June email. *Id*. It is undisputed that Sutton learned in 2014 that Lugg was the only
faculty member receiving compensation for editing the journal while all other faculty members
were given course releases in exchange for work on a publication. *See supra* fns. 14, 16. Lugg
has not provided evidence supporting her entitlement to this special benefit of an additional
$6,000 per year. *See supra* fn. 15.

The Parties agree that on February 24, 2015, Sutton told Lugg that he was reducing the budget for the journal because: "[b]udget decisions are based on the investment of resources that will have the greatest return for the academic unit. For that reason, a number of longstanding items in EAF will be adjusted away from antiquated rationale for spending." SOF ¶ 187. On that same page of emails, Lugg retorts to Sutton, "[s]ince in essence you are cutting my pay, my suggestion would be to drop it altogether." *Id*. It would appear based on his ultimate decision regarding the journal, Sutton took Lugg up on that suggestion. Yet, Plaintiff omits any discussion regarding the February email except to mark it as undisputed.

Ignoring all of the above context, Lugg attempts to divert attention by focusing on the June 2015 email. Even considering just the timing of the email, it is also undisputed that Sutton already believed Lugg was serving as a witness in B.G.'s complaint as early as April 2015,[55] two months before the email regarding the journal. Thus, the Court is hard-pressed to accept Lugg's couching of the facts to fit her argument for proximity where she has already admitted that Sutton knew much earlier about the protected activity. Lugg is correct in her assertion that the Court cannot make credibility determinations at summary judgment, however, no credibility determination is necessary for the Court's finding that the undisputed facts simply do not support Lugg's argument. Even if the chronological order of events supported her argument, Defendants offered two reasons for not paying Lugg $6000/year for work on the law journal for the 2015-2016 school year: she was the only one receiving this special benefit and there was no variance money available. Doc. 32, at 47. Lugg has not rebutted that reason with evidence of pretext.

---

[55] Lugg repeatedly reiterates that it is undisputed Sutton knew about her protected activity in April 2015 throughout her brief but overlooks that in her attempt to show suspicious timing here. *See* Doc. 35, at 4-5, 16-17, 66, 86, 90. She also uses that timeline of April 2015 to benefit her other arguments. *Id.* at 4 ("Specifically, within days of providing corroborating evidence [April 17, 2015], Dr. Sutton asked for the syllabus for one of Dr. Lugg's courses, and within approximately one week had taken away that class.").

Rather, Lugg does not dispute Sutton's testimony that EAF lacked funding for the journal because it would not have the variance money as faculty were returning from university leave and that the Dean of the College of Education told Sutton to spend all variance money exclusively on instruction. *See supra* fns. 20-21. She also does not dispute that Sutton informed her in 2014 that he was going to revisit compensation levels of the journal because she was the only faculty member receiving monetary compensation rather than a course release. *See supra* fn. 17. Thus, even when construing the facts in a light most favorable to Lugg, no reasonable juror could find causation based on temporal proximity.

### B. Corroborating Evidence

Alternatively, Lugg argues corroborating evidence supports an inference of a causal link. Doc. 35, at 88. Like the rest of Lugg's Response, Lugg offers six pieces of evidence in a series of block quotes and brief arguments, which the Court will discuss in turn.

**First**, Lugg points to a January 2016 faculty meeting where Sutton said, "if you mess with me you're going to get it back – you're going to feel it[.]" *Id.* at 89-90. According to Dean, Sutton looked at her and Lugg when he made this remark. *Id.* Lugg claims this remark from Sutton reveals his "personality trait" of lashing out in anger and retaliation against anyone that questions him. *Id.* at 90. In her additional material facts section, Lugg also cites Sutton's own words regarding this incident, "I told the faculty that they did not want to mess with me …". *Id.* at 69 (citing Ex. 14, Doc. 35-4, at 5). However, as Defendants point out, Lugg omits the entire sentence which reads, "I told the faculty that they did not want to mess with me because my faith is grounded in scripture and I am free." Doc. 35-4, at 5.

Even accepting Dean's version of Sutton's words and the direction of his eyes, contrary to Lugg's submission, a dispute of fact does not exist simply because a defendant made an

ambiguous remark to a crowd of colleagues. An employer's "unfulfilled threat of discipline for protected activity" generally does not qualify as an adverse action but it may qualify as "evidence of retaliatory intent behind a more concrete adverse action." *See Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). An inference of discrimination can be made regarding a remark "when they are '(1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action.'" *Bagwe*, 811 F.3d at 885 (quoting *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010)). In making this determination of whether a remark is discriminatory, the Court must also consider the context in which the remark was made. *Id.*; Doc. 36, at 24 (citing *Bagwe*, 811 F.3d at 885).

Beginning with the context of the statement, Sutton made this "threat" after it was discovered that someone printed numerous copies of a document regarding a disciplinary issue involving Sutton from nearly twenty years prior and left the copies on campus. The Parties agree Sutton's remark referred to the fliers. Doc. 36, at 24; Doc. 35, at 89. Even if Lugg was involved in the fliers, this was not a protected activity, nor does Lugg argue it as such.

In reviewing the actual remark, no disciplinary employment action was articulated, and it was an isolated remark rather than repeated ambiguous threats. As to timing, this remark occurred well after the law journal decisions were made so Lugg would need to connect the remark to her no longer receiving overloads. She does not pinpoint when those decisions were made or even attempt to connect the remark to those decisions. Likewise, Lugg has not connected this threat to a later materially adverse action in an effort to counter Defendants' non-discriminatory reason for disciplining Lugg or not assigning her overloads.[56] Thus, even when

---

[56] *See Poullard*, 829 F.3d at 857 (quoting *Dunn v. Washington County Hospital*, 429 F.3d 689, 692–93 (7th Cir. 2005); *Burlington N. and Santa Fe Ry. Co.*, 548 U.S. at 69).
  *Dunn*, 429 F.3d at 692 ("Talk is cheap; unless Dunn knew that Coy had sabotaged the career of other nurses, his statements would not have dissuaded reasonable persons from protecting their own rights

resolving ambiguities in favor of Lugg, an inference of retaliatory or discriminatory intent is not appropriate, and this statement does not support her causation theory.

**Second**, Lugg merely states that Sutton filed a claim against her on March 31, 2016, which refers to B.G., the student who filed a complaint against Sutton in April 2015, as Lugg's "surrogate" or "minion." However, Lugg does nothing to develop an argument on this piece of evidence. "[P]erfunctory and undeveloped arguments are deemed waived[.]" *See Perez v. Illinois*, 488 F.3d 773, 776–77 (7th Cir. 2007).

**Third**, Lugg asserts that Lugg and Dean were the only professors to "feel it," then meanders through various statements from Dean's deposition. Doc. 35, at 91. These statements are unhelpful for various reasons: most examples are vague, such as he "invented his own ways – his own use of policy . . . making it very difficult for students," "people get widely different amounts of resources," and "allowing faculty to treat me disrespectfully and hostilely." *Id*. "[C]onclusory statements not grounded in specific facts are not enough to stave off summary judgment." *King v. Ford Motor Company*, 872 F.3d 833, 840 (7th Cir. 2017). More importantly, the first block quote does not mention anything specific to the Plaintiff in this case, which is Lugg, not Dean. Where Dean does mention Lugg, her statements are a regurgitation of the same retaliatory acts Lugg alleges in her affidavit but in the form of "concerns" that Lugg shared with Dean. *Id*. Thus, they do not provide additional support to Lugg's claim of causal connection.

Neither Lugg nor Dean point to evidence that faculty with lesser qualifications were teaching "their courses" aside from their own conclusory opinions. It is unclear how other

---

under the statute and thus cannot violate Title VII."). We think this is simply a reflection of the Supreme Court's instruction that "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern*, 548 U.S. at 69, 126 S.Ct. 2405. Here, Poullard does not explain why the unfulfilled threats of discipline he received were significant enough in context to rise to the level of a materially adverse action, and we see no basis for that conclusion in the record.

faculty's qualifications would be within their knowledge, particularly where they do not offer specific facts describing those qualifications. *See also infra* section B (discussing comparator evidence). Even if they provided evidence of lesser qualifications, Dean's testimony supports the notion that other teachers had "their courses"[57] reassigned to adjunct faculty with lesser qualifications and Dean admitted that there is a nationwide trend of hiring adjuncts as well. *Id.* at 92. Regardless of a trend, Lugg fails to show more adjuncts were assigned to her classes than other classes of similarly situated individuals. Doc. 36, at 21. "The similarly-situated inquiry is a flexible one, but we frequently consider whether the employees in question had the same job description, were subject to the same standards, had the same supervisor, and had comparable experience, education, and other qualifications." *Poullard*, 829 F.3d at 855 (citing *Boumehdi v. Plastag Holdings*, LLC, 489 F.3d 781, 791 (7th Cir. 2007)). Yet, Plaintiff does not even offer a potential comparator. Another issue with Lugg's argument is that she simply supplies lengthy quotes without explanation, even where the significance is not obvious. It is not the Court's job to make Plaintiff's case or parse through lengthy quotes to unearth the significance of them.

**Fourth**, Lugg asserts causality is shown because Sutton took away classes from Dean and Lugg (the only professors to bring claims against Sutton), then gave them to adjuncts and took away summer sessions where Lugg was sometimes the only professor not offered summer courses. Doc. 35, at 92. Meanwhile, Lugg claims others were assigned full loads in the summer or overloads in the fall. However, "saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact." *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010). As discussed below, Lugg fails to offer specific facts to support her

---

[57] No evidence has been presented that any professor had an exclusive agreement to teach a particular course, thereby deeming it "their course," which could not be assigned to another professor.

assertions. *Ortiz* did not wash away the requirements of Rule 56 or allow a plaintiff to survive summary judgment by making conclusory statements without specific facts under the guise that the "holistic approach" support her theories. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) ('Mere conclusory allegations do not constitute evidence.') (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010)).

At the outset, Plaintiff has not identified admissible evidence to show that no other professors filed "claims," therefore, the Court disregards this conclusory statement. More importantly, as Defendants emphasize, Lugg repeatedly remarks that "others" receive these things, yet she fails to identify a single professor. Doc. 36, at 21. As to adjuncts, it is undisputed that Lugg knew as early as December 2014, well before she engaged in any protected activity, that Sutton intended to potentially hire adjuncts to teach EAF law courses. SOF ¶ 134. It appears Lugg simply had an issue with ISU hiring adjuncts, but tenured professors are not a protected class under Title VII. For example, Plaintiff was aggrieved that ISU had adjunct professors teach her courses while she was on sabbatical rather than re-arranging courses to better accommodate her. Doc. 35, at 37. Notably, in many of the disputes she raises in response to Sutton's decisions, she takes issue with Sutton choosing to hire adjuncts as a general matter. For example, Sutton stated he decided to assign adjuncts to teach courses in 2017 and 2018 "in accordance with EAF's agreement to assign more adjuncts to teach its P-12 principal preparation courses so that students had a chance to network and learn from instructors with practical experience." SOF ¶ 151. Lugg simply remarks, "[d]enies. There is not an agreement; Dr. Sutton unilaterally chose to hire an adjunct." Doc. 35, at 48. While he does not have discretion to discriminate or retaliate, it is disputed that Sutton, as Chair, has full discretion to assign courses. SOF ¶ 13. Lugg fails to connect Sutton's decisions to hire adjuncts to a plan to disproportionately assign adjuncts to

courses she taught. She also fails to offer specific facts to rebut Defendants' reason for hiring adjuncts to teach particular courses. *See e.g.,* Doc. 32 at 42-43; Doc. 32, at 92.

As to the overloads, Lugg does not allege that there were courses she was completely shut out from or assert that she asked for overloads each semester. In fact, she generally prefers not to discuss specific course names. The undisputed facts shows that sometimes she taught certain courses and sometimes she did not, but still had a full load. She does not allege that she had an agreement to be the only professor who taught certain courses.

For summer courses, Lugg does not cite evidence from her own affidavit or deposition, which specifically states that she taught summer courses before 2015 or that every time she requested summer teaching before 2015, she was granted it. Even if she did, that does not mean the administration was obligated to continue that practice. Summer 2017 is the only specific summer that she claims to have asked to teach and was denied. *Id.* at 73. That summer Sutton chose an adjunct instructor who was an associate superintendent of human resources to teach EAF 586, the Administration in Human Resources course. SOF ¶ 144. EAF 436 was also offered that summer but Sutton chose not to assign Lugg or Hatt to teach it due to the co-teaching experience of Summer 2015. SOF ¶ 141. Lugg offered no evidence of pretext for Sutton's decision regarding EAF 586 and she does not address his hiring reason for EAF 436 at all.

**Fifth**, Lugg reiterates that these "adverse actions" only happened to her and Dean, and Lugg testified that similarly situated individuals received different treatment. Doc. 35*,* at 93. But that was the extent of her testimony—regurgitating the term "similar situated"—without identifying a single professor who is similarly situated and received better treatment with overload scheduling. *Id*. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts

establishing the existence of the truth of the matter asserted." *King*, 872 F.3d at 840 (citing *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998)). Therefore, her proposed evidence is conclusory and disregarded.

**Sixth**, Lugg contends there is voluminous testimony from students that experienced an extended version of Sutton's harassment to Lugg. However, even viewing the statements as a whole, the statements do not provide corroborating evidence.

In this section, Lugg again supplies lengthy quotes where the significance is not obvious. It is not the Court's job to make Plaintiff's case or parse through lengthy quotes to unearth the significance of them. Lugg first points to a vague and conclusory statements from Dean for support: "I have observed that *things* have been made unusually difficult for Dr. Lugg's students and for some of mine, that Dr. Sutton has made *things* unusually difficult for them in the dissertation process." Doc. 35, at 93 (citing Dean Dep. 158:20-159:3) (emphasis added). Again, "conclusory statements not grounded in specific facts are not enough to stave off summary judgment." *King*, 872 F.3d at 840. Therefore, Dean's testimony about "things" is unavailing.

Next, Lugg offers testimony from a student that "thinks" Sutton "suggested" an unnamed professor to be on a committee to fail the student and take students away from Lugg. Doc. 35, at 94. To the extent the student testified regarding theories of Sutton's motivations, that testimony is vague and speculative, therefore it is disregarded. *See Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011) ("[R]eliance on speculation is not enough to get the case to a jury."). As to the committee action itself, it is simply too remote, and the argument is underdeveloped. Lugg did not name the professor or offer evidence to show the professor did something inappropriate in failing the student other the student's speculation. Similarly, the student's comments on what Lugg's thoughts were regarding Sutton's reasoning for taking courses away from her are hearsay

and speculative, therefore they are disregarded. *See* Doc. 35, at 94. Lugg also provides testimony from a student that shows Sutton "demeaned and disregarded" her qualifications to the student. *Id.* at 95. Yet, all of student's answers are, "I'm not sure" and "I don't recall specifically," then a disjointed rant that Lugg was the only advisor the student wanted, which fails to answer the posed question: "what did professor Sutton say during the meeting that you had with him that you consider demeaning and disregarding Dr. Lugg's qualifications?" *Id*.

To the extent Lugg continues to provide statements about Sutton affecting a student's graduation timeline, the Court emphasizes that the Plaintiff in this case is Elizabeth Lugg. *See id.* at 97. This case is about alleged discrimination and retaliation against Lugg, it is not a forum to air every grievance someone has had against Sutton, such as the swiftness or brevity of his emails. *Id.* at 97-98. While the experiences of students may be relevant to this lawsuit, repeated block quotes from individuals not party to this lawsuit regarding unrelated grievances do little to help Lugg survive summary judgment. Likewise, Lugg spends pages quoting a student's "gut feelings." The Court does not see how a student's "gut feeling [] that [Sutton] is not a good boss, that he should not be the chair of our program" shows evidence of causality. *Id.* at 98. Again, the student's testimony regarding the interworking of course scheduling is speculative and disregarded. *Id.* at 99. A regurgitation of Lugg's testimony in the form of student testimony regarding these topics to which the student has no first-hand knowledge does little to strengthen Lugg's case. Rather, it only reinforces the notion that Lugg has parroted her grievances to students, or at least one student.

On the next topic that Sutton urged a student to consider another professor for the student's dissertation chair, Lugg has not provided evidence that there was a nefarious reason for

Sutton's statement outside of the interest of the student. *See id.* at 95-96; Doc. 32, at 47. Even the

student admits as much,

> Q: Did Professor Sutton ever tell you that you would have an easier time
> graduating if you choose a different dissertation chair?
> A: He didn't come right out and say that, but it was very clear in our meeting that
> graduating with my current structure was not – was not in my best interest, it was
> not going to happen.
> . . .
> Q: Do you have any other basis for that belief, anything else to support it?
> A: I mean, no. I just got the pure sense that there was no justification for it . . . .

*Id.* at 96. Even so, Lugg does not allege that she was removed from sitting on dissertation

committees, or that she was no longer allowed to chair them.

As to Lugg's allegations that her performance reviews were retaliatory, Defendants

provided evidence in their Motion to show that Lugg was not meeting ISU's legitimate

performance expectations. *See* Docs. 32, at 43-46. The following are excerpts from six different

faculty members that expressed concerns about serving on a dissertation committee with Lugg

and Lugg's communication with them and others:

> As is often the case with this pair of faculty [Drs. Lugg and Dean], and those of us
> in EAF have long known, they raise these kinds of unwarranted complaints and
> grievances as a smokescreen in which to veil their own acts of racism and hate
> speech, falsehoods, pot-stirring, unauthorized promises made to students, and
> failures to follow through or serve students well, and as cover for their very own
> diploma-yielding "university of two."
>                                    * * *
> Our department, including students and faculty, have suffered from [Betsy Lugg's
> and Diane Dean's] relentless unethical, lying, and manipulative behavior. Their
> behavior has escalated as a result of you being chair because they cannot stand a
> Black person having authority over them. Numerous people in our department have
> shared with Shane McCreary and the outside consultant about their unethical,
> unprofessional, and racist behavior.
>                                    * * *
> 1. Issues of qualification for supervising PhD students. . .
> 2. Discriminate against minorities. She likes to "find problems" from minorities. It
> seems to her, minority needs to be supervised by her. She often use the title from
> law school to threaten people in EAF. She is the "Laws" of EAF.

3. Abuse power . . . Last year I was hijacked by her. She took every possibility-from Chair, dean to graduate director, to take away my right on academic freedom.

* * *

Betsy Lugg has consistently spoken ill about my coursework and curriculum for no apparent reason except to make my work life a living hell, because I am a Black woman committed to and hired to teach on social justice and equity in education . . . The most egregious of acts that leaves me sick to the pit of my stomach is when Lugg spent an entire semester galvanizing students who were currently enrolled in my course and convinced them to go to the Chair and Provost to speak against my course implementation, curriculum and teaching.

* * *

[Dr. Lugg] routinely rejects feedback on doctoral exams from colleagues. She has stated publicly that she will do what she wants to do and sees no need to attend to the concerns of colleagues . . . I am aware of a case where Lugg claims a student passed the exam despite the fact that there is no record of an exam going out for approval, being sent to the student, or having been returned. Carol has no record of it, and Dr. Lugg cannot produce a completed exam or even the original questions. Given the timing of this exam, only two committee members were required. The second reader was Dr. Dean who declined to confirm that there was an exam. I believe there was no exam. This is a clear breach of faculty ethics and demonstrates Lugg's lack of respect for colleagues.

* * *

Given the unworkable situation in our department and the Higher Education program with two faculty members, Betsy Lugg and Diane Dean, it is impossible to have any positive effect on the important work we need to do around curriculum development, or dissertation and doctoral exam work. Their continual lack of cooperation and disruption of meetings, disregard for established processes, talking negatively about other faculty in the department to students, bullying faculty, students, and administrators to get what they want, and making exceptions for some students to the detriment of the program has brought tension and stress within the department so much that I cannot be effective in this role, or even in my faculty role in general.

Doc. 32-6 (citing Ex. 27). It is undisputed that the DFSC sent three communications to Lugg identifying its concerns that colleagues refused to serve on dissertation committees with her and its belief that she was violating ISU's "Policy & Procedures, 1.17a: Professional Relationships" regarding communication about co-workers and to them, and further violations of this policy could result in disciplinary action. *See* Defendants' Exs. 26, 30, 32. In the argument section of her Response, Lugg does not attempt to show pretext behind these reviews and generally does not discuss them aside from citing vague testimony from Dean. Doc. 35, at 91.

Overall, the biggest deficiency in Lugg's Response is that "saying so doesn't make it so." *See 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d at 510. The Court agrees with Defendants' characterization that Lugg's Response largely relies on conclusory allegations, speculation, and opinions lacking foundation. Doc. 36, at 22. As to her substantive arguments, Lugg generally supplies a block quote of deposition testimony then a block quote of caselaw, which is sometimes unrelated, then tells the Court that a jury should decide this case. Lugg has not shown suspicious timing or provided corroborating evidence such that a reasonable jury could find an inference of causation here. Therefore, it is appropriate for the Court determine the inference as a matter of law. In doing so, the Court finds Lugg failed to meet her burden to establish a causal link and she failed to rebut Defendants' evidence to show a retaliatory intent can be inferred. Even when viewing the record in a light most favorable to Lugg and viewing the evidence as a whole, no material dispute of fact exists that requires a trial. Thus, the Court must grant summary judgment as no reasonable juror could find in her favor on her retaliation claims under the Ethics Act or Title VII. To the extent Lugg relies on the *McDonnell Douglas* framework, as similarly discussed below regarding her discrimination claim, she fails to present evidence of a similarly situated individual who did not engage in protected activity but was treated more favorably.

**B. Title VII Gender Discrimination Claim**

No reasonable juror could find that Lugg's sex caused any of the alleged adverse employment actions. "The singular question that matters in a discrimination case is: Whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (holding the plaintiff's discrimination and retaliation claims failed under the *Ortiz* holistic approach and

*McDonnell Douglas* framework) (quoting *Ortiz*, 834 F.3d at 765) (internal quotation marks). It is well-settled that a plaintiff may still utilize the *McDonnell Douglas* "burden-shifting" framework to meet the holistic standard described in *Ortiz*. Here, like in *McDaniel*, Lugg's claim fails under both *Ortiz* and *McDonnell Douglas*. Lugg seems to invoke the *McDonnell Douglas* framework, so the Court will discuss both in turn.

### 1. The *McDonnell Douglas* Framework

As Lugg partially quotes from *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687–88 (7th Cir. 2007), under *McDonnell Douglas*, a plaintiff must first make out a prima facie case by showing: "(1) she is a member of the protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated male employees more favorably." *Id*. (internal quotation marks and citations omitted). Once that has been shown, "the employer must offer a legitimate nondiscriminatory reason for the adverse employment action, which the employee may rebut by showing that the reason is a mere pretext for discrimination." *Id.* However, Lugg is mistaken that *Peirick* holds that prongs two and four merge together if the employee claims the employer is lying about the business expectations. Doc. 35, at 101. Rather, *Peirick* holds the "second prong and the *pretext question* seemingly merge because the issue is the same—whether the employer is lying." *Id*. In fact, the Seventh Circuit recently held in *McDaniel* that the court need not address the other elements of the *McDonnell Douglas* framework, including legitimate business expectations, where the plaintiff failed to satisfy the fourth element by not providing sufficient evidence regarding a similarly situated individual. *McDaniel*, 940 F.3d at 368. Thus, the Court begins with prong four.

Unfortunately for Plaintiff, saying the term "similarly situated" thirteen times does not make it so. In support of her discrimination claim, Lugg asserts that an unnamed male faculty member was not admonished for "failing to communicate." Doc. 35, at 100. While self-serving deposition testimony or affidavits are admissible evidence at summary judgment, if Lugg is attempting to provide a comparator then she needs to at least identify that person. *See Hill*, 724 F.3d at 967 (emphasizing the district court should have considered as evidence the plaintiff's deposition testimony that was based on *his personal knowledge* and *set forth specific facts*). Ample exhibits were included in the summary judgment briefing that spanned hundreds of pages, yet Lugg chose to cite her testimony vaguely discussing a male that was not criticized for "failing to communicate," but she, as a white female, was "criticized."

Lugg bears the burden of showing she is similarly situated to the individuals she identifies. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (holding a list of the names, ages, and positions of 37 employees was insufficient comparator evidence because it gave the court "no amplifying detail of the employees' qualifications or employment history that would allow this Court to comfortably conclude their hiring was the result of discriminatory motive rather than some other explanatory variable."). Though the test should not be rigidly applied, typically, a plaintiff must at least show a comparator "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (quoting *Snipes v. Illinois Dept. of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002) (internal quotation marks omitted)). Here, Lugg has failed to do that because she does not even provide the name for the male comparator, let alone the other relevant factors. This mirrors the plaintiff in *McDaniel*.

McDaniel provides even less detail than the plaintiff in *Skiba*. He argues that the eight other Material Handlers under Howard's supervision qualify as similarly situated employees. McDaniel, however, does not provide any information that would allow a finder of fact to determine that these individuals are indeed similarly situated: he did not submit the employees' names, work history, performance reviews, or—most importantly—their ages. In fact, he provided no information at all about the eight individual employees who he alleges are similarly situated . . . The district court correctly found that McDaniel's conclusory assertion that there is "evidence that he was treated less favorably than similarly situated employees who did not contest Howard's failure to comply with Progress Rail's policies" was insufficient to raise an issue of fact and survive summary judgment. As McDaniel has not identified any similarly situated employees to allow a factfinder to conduct a "meaningful comparison," his prima facie case for discrimination fails. *See Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007). Using the *Ortiz* holistic approach, McDaniel's claim fares no better.

*McDaniel*, 940 F.3d at 369. Likewise, Lugg only states the comparator is a male and a "faculty member." She does not state his name, whether he is a tenured professor, his work history and performance, whether it was Sutton that failed to admonish him, or whether Lugg is even the "white female" that she refers to in her testimony. She also does not assert that the unnamed male was not admonished for the same conduct she committed and then <u>given overloads</u>, which is her main example of an adverse action. Thus, because Lugg did not provide sufficient information about a similarly situated employee outside of her class that was treated more favorably, her discrimination claim fails under the *McDonnell Douglas* framework.

## 2. *Ortiz* and Other Evidence of Discrimination

In an effort to further adhere to the holistic *Ortiz* approach, the Court considers the other evidence Lugg offers in support of her gender discrimination claim. Lugg, without citation to any evidence, makes a blanket statement in footnote 2 of her Response that she "had universally stellar performance reviews prior to Dr. Sutton." Doc. 35, at 101. Assuming she had "stellar" reviews, it does not change the legitimate business objective Sutton gave for the DFSC issuing Lugg negative reviews in 2017, which is that the reviews were an attempt to correct long-

standing performance issues including her history of inappropriate communications, interpersonal conflict with faculty members, and violations of ISU's policy for professional relationships. Doc. 32, at 44-46. On January 31, 2017, the DFSC's letter informed Lugg that "making or sharing negative comments about one another with students or using students in an effort to promote personal and competitive agenda's [sic] regarding other faculty is a clear violation" of ISU Policy & Procedures, 1.17a: Professional Relationships and further violations of this policy could result in disciplinary action. SOF ¶¶ 176-178. On May 3, 2017, Sutton sent an email to Lugg with the subject line "Confidential DFSC Communication" stating:

> Multiple EAF faculty have reported to the Department Chair they do not wish to work on any dissertation committees you chair. The supervision, advising and mentoring of student research are criteria for the evaluation of teaching for university faculty (ASPT, p. 61, 2017). For that reason, the DFSC would like to invite you to a meeting to learn how we might assist you in creating a more welcoming environment for colleagues who serve on committees with you . . . This is an attempt to offer support for your teaching, something you have the right to refuse.

SOF ¶ 155. Notably, these negative reviews or communications occurred well after Lugg's protected activities in 2015 and before her next protected activity on May 22, 2017. Nor does Lugg make a proximity argument related to the negative reviews.

As to the DFSC's follow-up letter in June 2017, Defendants provided support that formed part of the basis for sending the letter, including statements from faculty members that were unwilling to serve on dissertation committees with Lugg and/or had issues with how Lugg communicated with them, which again speaks to ISU's cited policy regarding professional relationships. Defendants also offered evidence of similar letters sent to other faculty with the same title, "Performance Issues," that were likewise sent by Sutton as Chair and the Department Faculty Status Committee. Notably, according to the dates of the letters, those other letters were sent ten days prior to the letter sent to Lugg. Additionally, Lugg does not connect the

performance letters from DFSC to any adverse actions or allege anything inappropriate occurring within the make-up of the panel.

Next, Lugg highlights more vague assertions from her deposition such as, "Bottom line, if you are black and especially if you are a black male, you are above reproach from the Chair. If you are a female, and especially a white female who does not fit the female stereotype, you are always at fault even if the facts say otherwise." Doc. 35, at 100. Then, Lugg oddly cites her testimony regarding an excerpt of a story Sutton shared from his childhood in a staff meeting. Whether Sutton's brothers brought home dates that attempted to impress his mother by helping prepare meals has no bearing on whether Sutton discriminated against Lugg. "Even supposing this evidence were enough to establish that [Sutton or ISU] held biases against women, [Lugg] has failed to link those alleged biases to the decision to [not assign Lugg overloads]." *Harper v. Fulton Cty., Ill.*, 748 F.3d 761, 766 (7th Cir. 2014). As to a gender bias, Defendants also point out it is undisputed that Sutton selected at least two female faculty members, Hunt and Hood,[58] to teach courses that Lugg alleges she should have taught. Doc. 36, at 24. Finally, as to Lugg's allegation that ISU has failed to investigate continuing gender discrimination, Defendants have submitted a report detailing ISU's investigations and ultimate finding that Lugg's claims were unsubstantiated. Doc. 32, at 48; SOF ¶¶ 205-206 (citing Ex. 39). Lugg has not rebutted this evidence in her Response or even addressed it at all. For all of the reasons discussed above, Lugg has failed to show that her gender caused an adverse employment action, and her claim likewise fails when viewing the evidence as a whole under *Ortiz*.

In sum, "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder

---

[58] The Court disagrees with the Defendants that it is undisputed Sutton chose Hatt for a course that Plaintiff alleges she should have taught. The record only reflects that Hatt was chosen to co-teach with Plaintiff.

employee did not like would form the basis of a discrimination suit.'" *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (quoting W*illiams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). It is no secret that Lugg and Sutton strongly disagreed with one another on various issues. But that does not mean Sutton or ISU discriminated or retaliated against Lugg. In this case, a new chair within the education department arrived and started making changes to purportedly fit budgetary and student needs. Lugg did not like those changes, such as those which altered her "entitlement." While Plaintiff may have received special treatment in the past simply because she said so,[59] it does not mean Sutton was obliged to continue those at her whim, particularly where he implemented changes that applied to everyone, not just Lugg. Based on the undisputed facts, no reasonable juror could find a discriminatory or retaliatory intent behind these changes based on the *Ortiz* approach or *McDonnell Douglas* framework.

## CONCLUSION

For the reasons set forth above, Defendants' Motion (Doc. 32) for Summary Judgment is GRANTED. The Clerk is directed to terminate this case.


Signed on this 18th day of August, 2021.

<u>s/James E. Shadid</u>
James E. Shadid
United States District Judge

---

[59] *See e.g,* Doc. 35, at 61 (Another incentive Plaintiff received "to get her to leave the top ranked program at Penn State" was "that the $2000 normally allowed for moving expenses was increased to $6000 as Plaintiff said the lower amount was insufficient.").